Counsel of Record:
David Axelrod
Kelly Gibson
John Donnelly
Securities and Exchange Commission
Philadelphia Regional Office
One Penn Center
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
Telephone: (215) 597-3100
Facsimile: (215) 597-2740

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>EVGENII ZAVODCHIKOV, EXTRA TRADING COMPANY, ANDREY BOKAREV, RADION PANKO, GREEN ROAD CORP., NATALIA ANDREEVNA ALEPKO, SOLAR LINE INC., ANTON MASLOV, TAREK INVESTORS INC.,<br><br>Defendants. | Case No:<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission"), One Penn Center, 1617 JFK Boulevard, Suite 520, Philadelphia, Pennsylvania 19103, alleges as follows against the following defendants, whose names and last known addresses are set forth below:

a. Evgenii Zavodchikov
   Primorskiy Prospeckt House 167/1, Apt. 421
   Primorskiy District

Saint Petersburg 197374
Russia

b.  Extra Trading Company
    c/o Alpha Consulting Ltd., Suite 1, Second Floor
    Sound & Vision House, Francis Rachel Str.
    Victoria, Mahe
    Seychelles

c.  Andrey Bokarev
    Apt. 72, 45 Lanskoe Shosse
    Saint Petersburg 197343
    Russia

d.  Radion Panko
    Apt. 12, 18 Blohina Street
    Saint Petersburg
    Russia

e.  Green Road Corp.
    Apt. 2, 16 Lauren Berges Crescent
    Belama-3
    Belize City
    Belize

f.  Natalia Andreevna Alepko
    Apt. 46, Grazdanskiy Street 117/3
    Saint Petersburg, Russia

g.  Solar Line Inc.
    Nancy Whiticker House
    7 Old Street
    Roseau
    Commonwealth of Dominica

h.  Anton Maslov
    [Street address unknown]
    Russia

i.  Tarek Investors Inc.
    Global Bank Tower
    18th floor, Office 1801
    50th Street
    Panama City
    Republic of Panama

Case 2:16-cv-00845-MCA-LDW   Document 1   Filed 02/17/16   Page 3 of 43 PageID: 3

## SUMMARY

1.      This action is related to another action filed before this court, *SEC v. Dubovoy, et al.*, 15-cv -06076 (DNJ) (MCA) (the "Related Action"). As in the Related Action, the defendants herein (collectively referred to as the "Trader Defendants") perpetrated an international fraudulent scheme by working in concert with hackers who hacked the computer servers of at least two newswire services and stealing, through deception, confidential earnings information for numerous publicly-traded companies from press releases that had not yet been released to the public. The Trader Defendants then used that stolen material nonpublic information to trade securities and reap over $19.5 million in unlawful profits.

2.      As alleged in the Related Action, during an approximately five-year period, Ivan Turchynov and Oleksander Ieremenko—computer hackers residing in the Ukraine (the "Hackers") —hacked into certain U.S. newswire services and, through deception, stole more than 100,000 press releases for publicly-traded companies before they were issued to the public. Many of the stolen press releases contained information about quarterly and annual earnings data for these companies.

3.      The Hackers worked in concert with a network of traders, located in the United States and abroad, including the Trader Defendants herein, who, upon information and belief, paid the Hackers for the stolen information, either through a flat fee or a percentage of the illicit profits gained from the illegal trades that they executed based on the information.

4.      The Hackers' intrusions oscillated primarily between two newswire services, focusing on obtaining the press releases from one or the other depending on the hackers' access to the newswire services' computer networks.

3

5.     The Hackers stole the press releases and passed them, directly or indirectly, to the Trader Defendants and the trader defendants in the Related Action in the window of time between when the press releases were uploaded to the newswire service's system and when the press releases were publicly issued.  As a result, the Trader Defendants and the trader defendants in the Related Action had an unfair trading advantage over other market participants because they knew the content of the press releases before that information was publicly announced.

6.     Like the trader defendants in the Related Action, the Trader Defendants capitalized on this advantage by initiating trades before the press releases were issued to the public.  The Trader Defendants bought or sold securities depending on their anticipation of how the market would respond to the information in the stolen press releases.

7.     And like the trader defendants in the Related Action, upon information and belief, the Trader Defendants used deceptive means to conceal their trading activities and to make payments to the hackers.  The Trader Defendants concealed their trading activities through the use of undisclosed sub-accounts trading under the name of Exante Ltd. ("Exante") at Interactive Brokers and Lek Securities Corp. ("Lek") and the creation of off-shore entities.

8.     Then, after the press release was publicly issued, and the price of the securities changed as the market learned the previously undisclosed information, the Trader Defendants and the trader defendants in the Related Action reaped enormous profits.

9.     The Trader Defendants used this stolen information to realize over $19.5 million in illicit gains and collectively with the trader defendants in the Related Action generated over $100 million in ill-gotten profits.

10.     By knowingly or recklessly engaging in the conduct described in this related

Complaint, the Trader Defendants violated, and unless enjoined, will continue to violate the

securities laws.

## JURISDICTION AND VENUE

11.     The Commission brings this action pursuant to Section 20(b) of the Securities Act

[15 U.S.C. §§ 77t(b) and 15 U.S.C. § 77t(e)] and Sections 21(d) and 21A of the Exchange Act

[15 U.S.C. §§ 78u(d) and 78u-1] to enjoin such transactions, acts, practices, and courses of

business, and to obtain disgorgement, prejudgment interest, civil money penalties, and such other

and further relief as the Court may deem just and appropriate.

12.     This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a)

of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e), 21A and 27 of

the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1 and 78aa].

13.     Venue in this District is proper pursuant to Section 22(a) of the Securities Act [15

U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the

transactions, acts, practices, and courses of business constituting the violations alleged herein

occurred within the District of New Jersey and elsewhere, and were effected, directly or

indirectly, by making use of the means or instruments or instrumentalities of transportation or

communication in interstate commerce, or of the mails, or the facilities of a national securities

exchange.  For example, during the relevant time period, PR Newswire's computer servers,

which were hacked in connection with the scheme, were located in Jersey City, New Jersey and

Piscataway, New Jersey.  In addition, securities transactions related to this matter were executed

on NASDAQ servers in Carteret, New Jersey and by broker dealers in Jersey City, New Jersey.

## THE TRADER DEFENDANTS

14.     **Evgenii Zavodchikov ("Zavodchikov")**, age 28, is a Russian citizen, residing at Primorskiy Prospeckt  House 167/1, Apt. 421, Primorskiy District, Saint Petersburg 197374, Russia.  He is the owner of defendant Extra Trading Company.

15.     **Extra Trading Company ("Extra Trading")** is a Seychelles corporation owned by Zavodchikov, with its registered office c/o Alpha Consulting Ltd., Suite 1, Second Floor, Sound & Vision House, Francis Rachel Str., Victoria, Mahe, Seychelles.  It is the owner of a sub-account ending *1217 held at Exante.

16.     **Andrey Bokarev ("Bokarev")**, age 37, is a Russian citizen residing at Apt. 72, 45 Lanskoe Shosse, Saint Petersburg 197343, Russia.  He is the co-owner of defendant Green Road Corp.

17.     **Radion Panko ("Panko")**, age 38, is a Russian citizen residing at Apt. 12, 18 Blohina Street, Saint Petersburg, Russia.  He is the co-owner of defendant Green Road Corp.

18.     **Green Road Corp. ("Green Road")** is a Belizean corporation with its registered office at Apt. 2, 16 Lauren Berges Crescent, Belama-3, Belize City, Belize.  It is the owner of a sub-account ending *1213 held at Exante.  Green Road is owned by defendants Bokarev and Panko

19.     **Natalia Andreevna Alepko ("Alepko')**, age 34, is a Russian citizen, residing at Apt. 46, Grazdanskiy Street 117/3, Saint Petersburg, Russia.  She is the owner of defendant Solar Line Inc.

20.     **Solar Line Inc. ("Solar Line")** is a corporation formed in the Commonwealth of Dominica with its registered office at the Nancy Whiticker House, 7 Old Street, Roseau,

6

Commonwealth of Dominica.  It is the owner of a sub-account ending *1228 held at Exante.

Solar Line is owned by defendant Alepko.

21.    **Anton Maslov ("Maslov')**, age 33, is a Russian citizen.  He is the owner of

defendant Tarek Investors Inc.

22.    **Tarek Investors Inc. ("Tarek")** is a Panamanian corporation with its registered

office at Global Bank Tower, 18th floor, Office 1801, 50th Street, Panama City, Republic of

Panama.  It is the owner of a sub-account ending *1228 held at Exante.  Tarek is owned by

defendant Maslov.

## DEFENDANTS IN RELATED ACTION

### The Hackers

23.    **Oleksandr Ieremenko, a.k.a. Aleksander Eremenko, ("Ieremenko")** is 23

years old and resides in Kiev, Ukraine.

24.    **Ivan Turchynov ("Turchynov")** is 27 years old and resides in Kiev, Ukraine.

25.    The Hackers perpetrated the scheme from multiple IP addresses, including but not

limited to:  XXXXXX-18.42; XXXXX-9.101; XXXXXX-136.6; and XXXXXX-26.98.

26.    To conceal their true identities, the Hackers used multiple email accounts and

online "handles" in carrying out and communicating about the scheme.  To the extent referenced

in the complaint, other documents filed with the Court, or exhibits, these unique handles and

aliases will be redacted.  They will be replaced with the hacker defendant's name followed by

"Alias" (i.e., "Ieremenko Alias").

### The Traders

### The Dubovoy Group Defendants

27.     The Dubovoy Group defendants are a close-knit group of traders, consisting primarily of family, friends, and business associates of Arkadiy Dubovoy.  Collectively, the Dubovoy Group defendants realized over $31 million in illicit gains from the scheme.

28.     As part of this scheme, the Dubovoy Group defendants opened trading accounts in their names, names of companies they owned, and in the names of at least four of their associates ("Straw Owners").

    a.   Straw Owner 1 is the manager of Ukrainian ice cream company owned by Arkadiy Dubovoy.

    b.   Straw Owner 2 is the brother of defendant Leonid Momotok.

    c.   Straw Owner 3 is the manager of the Ukrainian branch of one of Arkadiy Dubovoy's companies, R.J. Construction.

    d.   Straw Owner 4 is another manager of the Ukranian branch of RJ Construction.

29.     **Arkadiy Dubovoy ("Arkadiy Dubovoy")** is 50 years old and resides in Alpharetta, Georgia.  He is the owner or partial owner of APD Developers LLC and Southeastern Holding and Investment Company LLC, defendants in the Related Action.  He is currently in prison and being held without bail in connection with a criminal case involving the same conduct that is the subject of the Related Action and this Complaint (*U.S. v. Turchnyov, et al.*, Crim. No. 15-CR. 390 (MCA), filed Aug. 5, 2015).

30.     **Igor Dubovoy ("Igor Dubovoy")** is 28 years old and is Arkadiy Dubovoy's son. He resides in Alpharetta, Georgia.  He owns Dawson & Dawson ("Dawson") and M&I Advising Inc. ("M&I Advising").  He was charged in a criminal case involving the same conduct that is

Case 2:16-cv-00845-MCA-LDW Document 1 Filed 02/17/16 Page 9 of 43 PageID: 9

the subject of the Related Action and this Complaint (*U.S. v. Turchnyov, et al.*, Crim. No. 15-CR.

390 (MCA), filed Aug. 5, 2015).

31.     **Pavel Dubovoy ("Pavel Dubovoy")** is 32 years old and resides in Kiev, Ukraine

and Alpharetta, Georgia. He was charged in a criminal case involving the same conduct that is

the subject of the Related Action and this Complaint (*U.S. v. Turchnyov, et al.*, Crim. No. 15-CR.

390 (MCA), filed Aug. 5, 2015).

32.     **Nelia Dubova ("Dubova")** is 38 years old and resides in Odessa, Ukraine. She

owned a brokerage account used in the scheme and she was the signatory officer for another

account involved in the scheme in the name of defendant Beratto Group.

33.     **Aleksandr Garkusha ("Garkusha")** is 47 years old and resides in Cumming,

Georgia. He was charged in a criminal case involving the same conduct that is the subject of the

Related Action and this Complaint (*U.S. v. Korchevsky, et al.*, Crim. No. 15-CR. 381, filed Aug.

5, 2015).

34.     **Vladislav Khalupsky ("Khalupsky")** is 44 years old and resides in Brooklyn,

New York, and Odessa, Ukraine. In connection with the scheme, he made or directed illicit

trades in certain accounts held in the name of Arkadiy Dubovoy. He was charged in a criminal

case involving the same conduct that is the subject of the Related Action and this Complaint

(*U.S. v. Korchevsky*, et al., Crim. No. 15-CR. 381, filed Aug. 5, 2015).

35.     **Vitaly Korchevsky ("Korchevsky")** is 49 years old and resides in Glen Mills,

Pennsylvania. Korchevsky coordinated his illegal trading with Arkadiy Dubovoy and other

members of the Dubovoy Group. Along with his wife, Korchevsky owns defendant NTS Capital

Fund L.P., which also traded in connection with this scheme. He was charged in a criminal case

brought involving the same conduct that is the subject of the Related Action and this Complaint (*U.S. v. Korchevsky, et al.*, Crim. No. 15-CR. 381, filed Aug. 5, 2015).

36.    **Leonid Momotok ("Momotok")** is 47 years old and resides in Cumming, Georgia. He advised Arkadiy Dubovoy how to trade using the stolen information, and he had formal trading authority for brokerage accounts used in the scheme but held in the name of other members of the Dubovoy Group. Momotok also used accounts held by Igor Dubovoy and Straw Owners 1, 2, 3, and 4 to trade in this scheme. He was charged in a criminal case involving the same conduct that is the subject of the Related Action and this Complaint (*U.S. v. Korchevsky, et al.*, Crim. No. 15-CR. 381, filed Aug. 5, 2015).

37.    **APD Developers, LLC ("APD")** purports to be a construction business based in Atlanta, Georgia. Arkadiy Dubovoy owns APD and opened brokerage accounts in the name of APD that were used in the fraudulent scheme.

38.    **Beratto Group LLC ("Beratto")** purports to be a real estate and investment company based in the British Virgin Islands. A Beratto owned account was used to make illicit trades in connection with the fraudulent scheme.

39.    **NTS Capital Fund L.P. ("NTS")** purports to be a hedge fund based in Glen Mills, Pennsylvania, owned by Korchevsky and his wife. Unlawful trades were made in NTS's brokerage account in connection with the scheme.

40.    **Southeastern Holding and Investment Company LLC ("Southeastern")** is a Georgia limited liability corporation with its principal place of business in Cumming, Georgia. Illicit trades were made in accounts in its name as part of the scheme.

### The Foreign Trader Defendants

41.     **David Amaryan ("Amaryan")** is 35 years old and resides in Moscow, Russia. He is the CEO of defendant Ocean Prime Inc. ("Ocean Prime") and the sole director of defendants Intertrade Pacific S.A., ("Intertrade") and Copperstone Capital ("Copperstone Capital"). Copperstone Capital manages Copperstone Alpha Fund ("Copperstone Fund"), a Cayman islands-based hedge fund. Ocean Prime and Intertrade purport to be proprietary trading funds. As described below, Amaryan and defendant Nikolai Slepenkov, who owns defendant Escada Logistics, often made illicit trades in the same securities, on the same days and around the same time and, frequently, via the same IP addresses.

42.     **Copperstone Alpha Fund ("Copperstone Fund")** purports to be a hedge fund established in the Cayman Islands with its principal place of business at Harbor Place, 2nd Floor, 103 South Church Street, P.O. Box 10364, Grand Cayman, Cayman Islands. Copperstone Fund is managed by Copperstone Capital, another Cayman entity, which is located at the same address as Copperstone Fund. The Copperstone Fund executed illicit trades in connection with the scheme.

43.     **Copperstone Capital ("Copperstone Capital")** is a, corporation registered in the British Virgin Islands, and has as its principal places of business at Harbor Place, 2nd Floor, 103 South Church Street, P.O. Box 10364, Grand Cayman, Cayman Islands, and16 Sadovnicheskaya Street, bld. 1, Moscow, 115035, Russia.

44.     **Ocean Prime Inc. ("Ocean Prime")** purports to be a proprietary trading fund established in the British Virgin Islands with its principal place of business in Moscow, Russia. Amaryan is the CEO of defendant Ocean Prime.

11

45.   **Intertrade Pacific S.A. ("Intertrade")** purports to be a proprietary trading fund established in the British Virgin Islands with its principal place of business in Moscow, Russia.

46.   **Nikolai Slepenkov ("Slepenkov")** is 46 years old and resides in Moscow, Russia. He is the CEO and owner of defendant Escada Logistics Ltd., which purports to be a proprietary trading fund.  He was employed by Copperstone Capital.  He executed illicit trades in connection with the scheme.

47.   **Escada Logistics Ltd. ("Escada")** purports to be a proprietary trading fund established in the British Virgin Islands with its principal place of business in Moscow, Russia. Slepenkov used Escada's account to execute unlawful trades connection with the scheme.

48.   **Alexander Fedoseev ("Fedoseev")** is 29 years old and resides in Voronezh, Russia, the same town as defendant Roman Lavlinskiy.  Fedoseev made unlawful trades in connection with the scheme.

49.   **Roman Lavlinskiy ("Lavlinskiy")** is 29 years old and resides in Voronezh, Russia.  Lavlinskiy made illicit trades in connection with the scheme.  Lavlinskiy's unlawful trades were often made in the same securities, on the same days, close to the same times and frequently via the same IP addresses as Fedoseev.

50.   **Oleksandr Makarov ("Makarov")** is 32 years old and resides in Kiev, Ukraine. In connection with the fraudulent scheme, Makarov executed illicit trades in his account.  His illicit trades were often made in the same securities, on the same days and close to the same times, and often through the same IP addresses as defendant Concorde Bermuda Ltd.

51.   **Concorde Bermuda Ltd. ("Concorde")** purports to be a Bermudian broker-dealer with its principal place of business in Kiev, Ukraine.  Concorde made illicit trades in connection with the scheme.  Those trades were often made in the same securities, on the same

12

days and close to the same times, and often through the same IP addresses as defendant

Makarov.

52.     **Global Hedge Capital Fund Ltd. ("Global Hedge")** purports to be a Cayman

Islands-based hedge fund with its principal place of business in Moscow, Russia.  Several of its

owners are directors of Exante and the two entities share employees.  Global Hedge executed

unlawful trades in connection with the scheme, often in the same securities, on the same days,

and close to the same times as the Trader Defendants.

53.     **Memelland Investments Ltd. ("Memelland")** purports to be a hedge fund

established in the British Virgin Islands with its principal place of business in Limassol, Cyprus.

In connection with the scheme, Memelland made illegal trades in its account at Interactive

Brokers and through an account it had with Exante, account ending *1204, through which he

realized additional ill-gotten gains.  Memelland often traded on the same day and in the same

securities as the Trader Defendants and/or Global Hedge.

54.     **Guibor S.A. ("Guibor")** purports to be a proprietary trading fund established in

France with its principal place of business in Paris, France.  It shares a business address and an

owner with defendant Omega 26 Investments Ltd.  Guibor engaged in illegal trading in

connection with the scheme.  Guibor and Omega 26 frequently traded in the same securities, on

the same days and close to the same times, and often through the same IP addresses.

55.     **Omega 26 Investments Ltd. ("Omega 26")** purports to be a proprietary trading

fund established in Samoa with its principal place of business in Paris, France.  Omega 26

engaged in illegal trading in connection with the scheme.  Omega 26 and Guibor frequently

traded in the same securities, on the same days and close to the same times, and often through the

same IP addresses

56. **Bering Explorer Fund Ltd. ("Bering")** purports to be a Bahamian company with its principal place of business in Moscow, Russia. Bering made trades in connection with the scheme.

57. **Maxim Zakharchenko ("Zakharchenko")** resides in Russia. He is one of two Bering directors, and had trading authority in certain Bering's brokerage accounts used in connection with the scheme. On information and belief, Zakharchenko directed Bering's illicit trades.

58. **Andriy Supranonok ("Supranonok")** is 33 years old and resides in Kiev, Ukraine. He is the CEO and owns 30% of defendant Jaspen Capital Partners' shares.

59. **Jaspen Capital Partners ("Jaspen")** purports to be a Bermudian company based in Kiev, Ukraine. In connection with the fraudulent scheme, illicit trades were placed in some of Jaspen's accounts and Supranonok's account resulting in nearly $25 million in ill-gotten gains.

## RELATED PARTIES

60. **Exante** purports to be a Malta-based broker-dealer. Exante held trading accounts at Interactive Brokers and at Lek. In connection with the fraudulent scheme the Trader Defendants placed trades through those accounts resulting in over $19.5 million in ill-gotten gains.

## HACKED NEWSWIRE SERVICES

61. **Marketwired L.P. ("Marketwired")** is a newswire service based in Toronto, Canada. It provides end-to-end content, news production, and distribution services to its clients, including many issuers in the United States. (The Amended Complaint in the Related Action referred to Marketwired as "Newswire Service 1.")

62.    **PR Newswire Association LLC** ("PRN") is a newswire service with headquarters in New York, New York.  It provides end-to-end content, news production, and distribution services to its clients, including many issuers in the United States.  Throughout the relevant time period, PRN's computer servers were located in Jersey City, New Jersey and Piscataway, New Jersey.  Collectively, Marketwired and PRN are referred to herein as the "Newswire Services."  (The Amended Complaint in the Related Action referred to PRN as "Newswire Service 2.")

63.    **Business Wire** is a newswire service with its headquarters in New York and California.  On information and belief, from at least January 2015 through May 2015, at least some of the defendants in this case and/or the Related Action perpetrated the same scheme against Business Wire, and may have targeted other newswire services as well.  (The Amended Complaint in the Related Action referred to Business Wire as "Newswire Service 3.")

## **TERMS USED IN THIS COMPLAINT**

### **Options**

64.    A stock option, commonly referred to as an "option," gives its purchaser-holder the option to buy or sell shares of an underlying stock at a specified price (the "strike" price) prior to the expiration date.  Options are generally sold in "contracts," which give the option holder the opportunity to buy or sell 100 shares of an underlying stock.

65.    A "call" option gives the purchaser-holder of the option the right, but not the obligation, to purchase a specified amount of an underlying security at a specified strike price within a specific time period.  Generally, the buyer of a call option anticipates that the price of the underlying security will increase during a specified amount of time.

66.    A "put" option gives the holder of the option the right, but not the obligation, to sell a specified amount of an underlying security at a specified strike price within a specific time

15

period.  Generally, the buyer of a put option anticipates that the price of the underlying security will decrease during a specified amount of time.

### Short-Selling

67.    Short-selling is the sale of a security not owned by the seller and is a technique used to take advantage of an anticipated decline in price.  An investor borrows stock for delivery at the time of the short sale.  If the seller can buy that stock later at a lower price, a profit results; if, however, the price rises, a loss results.

### Contracts for Differences

68.    A contract for difference ("CFD") is a stock derivative that is an agreement between two parties to exchange the difference in value of an underlying stock between the time the contract is opened and the time at which it is closed.  If the share price increases for the underlying security, the seller pays this difference to the buyer.  If, however, the underlying share price declines, the buyer must pay the seller the difference.

69.    A CFD typically mirrors the movement and pricing of its underlying stock on a dollar-for-dollar basis, such that any fluctuation in the market price of the underlying security is reflected in the unrealized gain or loss of the CFD position.

70.    Generally, the investor in a CFD position benefits by acquiring the future price movement of the underlying common stock without having to pay for or take formal ownership of the underlying shares.

71.    Generally, the investor in a CFD is not required to pay for the underlying shares of the security.  Instead the CFD investor only pays the transaction fees charged by the CFD provider.  Thus, a CFD, like a stock option, allows an investor to recognize significant value from an underlying equity's price movement without having to pay for the underlying shares.

Case 2:16-cv-00845-MCA-LDW   Document 1   Filed 02/17/16   Page 17 of 43 PageID: 17

**IP Address**

72.     An "internet protocol address" ("IP address") is a unique number required for online activity conducted by a computer or other device connected to the internet. In simple terms, it is like a return address on a letter.

## FACTS

### The Newswire Services Are Repositories For Material Nonpublic Information

73.     The Newswire Services edited and released press releases for publicly-traded companies (also known as "issuers") in the United States. Often these press releases contained quarterly earnings data and other important financial information for a given issuer. Until the Newswire Services released the press release to the general public, the sensitive financial information in the press releases constituted material non-public information.

74.     To facilitate the process of disseminating quarterly earnings information to the public, issuers routinely provided draft press releases to the Newswire Services. The Newswire Services then edited, prepared, and stored electronically the press release for public dissemination.

75.     In providing these services, the Newswire Services become repositories for material non-public information from their issuer-clients. From 2010 through early 2014, the Newswire Services issued more than one million press releases on behalf of their clients. Many of these releases related to issuer earnings announcements. The publication of quarterly earnings information often has a significant positive or negative short-term effect on a given issuer's share price.

76.     For each press release, there is a window of time between when the issuer provides a draft press release to the Newswire Service and when the Newswire Service publishes

the release (the "window"). This window varied between a number of minutes and a number of

days.

### The Hackers Fraudulently Accessed
### Unpublished Press Releases From Marketwired and PRN

77.     The Hackers took advantage of the window by hacking into the Newswire

Services' computer systems, accessing the press releases prior to their publication, and then

sharing that information, either directly or indirectly, with the Trader Defendants and other

traders for a fee. The Trader Defendants and other defendants named in the Related Action

traded on the material, non-public information contained in the releases before the information

was published to the investing public. After the press release was publicly issued, these

defendants then closed the trading positions they had opened during the window of time between

the upload of the press release and its public dissemination.

78.     From 2010 until 2014, the Hackers electronically intruded ("hacked"), without

authorization, into the Newswire Services' computer systems and stole over 100,000 press

releases before they were publicly issued.

79.     The Hackers used deceptive means to gain unauthorized access to the Newswire

Services' computer systems, using tactics such as: (a) employing stolen username/password

information of authorized users to pose as authorized users; (b) deploying malicious computer

code designed to delete evidence of the computer attacks; (c) concealing the identity and location

of the computers used to access the Newswire Services' computers; and (d) using back-door

access-modules.

80.     During the period 2012-2014, the Hackers' theft of un-published press releases

oscillated between Marketwired and PRN depending on their ability to gain access to the

Newswire Services' servers. The following chart indicates the time periods during which the

Hackers were focusing on the different Newswire Services:

| Date Range | Marketwired | PRN |
|---|---|---|
| February 2010 to July 2010 | Hackers had access to network and press releases. | Limited access to the network. |
| July 2010 to January 2011 | Hackers had access to network and press releases. | Hackers had access to network and press releases |
| January 2011 to July 2011 | Hackers had access to network and press releases. | Change in PRN's computer system blocked access. |
| July 2011 to March 2012 | Hackers had access to network and press releases. | Hackers had access to network and press releases. |
| March 2012 to January 2013 | Hackers had access to network and press releases. | Change in PRN's computer system blocked access. |
| January 2013 to March 2013 | Hackers had access to network and press releases. | Hackers had access to network and press releases. |
| March 2013 to November 2013 | Hackers had access to network and press releases. | Change in PRN's computer system blocked access. |
| November 2013 to Present | Change in Marketwired's computer system blocked access. Continued attempts by hackers to access the network. | Continued attempts by hackers to access the network. |

81.     The Trader Defendants' trading activity, like the trading activities of the trading

defendants in the Related Action, mirrored the access and focus of the Hackers.  When the

Hackers stole press releases from Marketwired, the Trader Defendants traded in the securities of

the issuers whose press releases were stolen from Marketwired.  When the Hackers stole press

releases from PRN, the Trader Defendants traded in the securities of issuers whose press releases

were stolen from PRN.

## The Stolen Press Releases Gave The Trader Defendants
### An Illegal Trading Advantage

82.     Throughout this scheme, the Hackers stole more than 100,000 press releases before they were publicly issued. Many of the stolen press releases included corporate earnings results and, often, forecasted future earnings.

83.     It is common for financial analysis firms to estimate or predict a given issuer's quarterly or annual earnings. The "market" reaches a consensus expectation based on these different predictions. When an issuer releases its earnings, the share price for that issuer generally increases if its earnings exceed the market consensus and generally decreases if its earnings fall short of the consensus prediction. Accordingly, the stolen press releases contained material information that a trader could use to place securities trades and reap illicit profits.

### The Hackers Distributed The Stolen Information
### To Traders In Exchange For A Percentage Of Their Profits Or A Flat Fee

84.     The Hackers joined with the traders who participated in the scheme to profit on the material nonpublic information they stole through their deceptive hacks on the Newswire Services. The hackers distributed video evidence of their ability to steal information from the Newswire Services. On October 25, 2010, Turchynov attached a video file to an outgoing email message. This video shows a computer screen listing more than 300 files, many containing the term "release" in the file name. A text window then pops up with a message in Russian, explaining that what appears on the screen is an administrative panel for files and explaining how to download the files. The message concludes that access data will be sent to the email the viewer provides.

85.     As the video continues, it shows ten files being selected and downloaded to a zip file dated October 24, 2010.  The video further shows that the IP address used to download the files was XXXXXX-26.98.

86.     PRN's server logs confirm that its servers were unlawfully accessed on October 24, 2010—the date of the zip file in the Turchynov video.  PRN's logs also confirm that, on October 24, 2010, the ten files in the Turchynov video were downloaded via IP address XXXXXX-26.98.

87.     In October 2010 alone, Turchynov distributed via email more than 400 stolen press releases from PRN.

88.     Ieremenko also distributed stolen press releases electronically.  For example, on October 10, 2012, Iermenko electronically sent a link to a press release stolen from Marketwired to an unidentified person before the press release was publicly issued and described how he now had emails for employees at Marketwired that would allow him to hack into their host server.

89.     As part of the scheme, the trader defendants compensated the Hackers for stealing the press releases from the Newswire Services.  At times, the Hackers received a flat fee and, at other times, a percentage of the profits obtained from trading on the material nonpublic information stolen by the Hackers.  The Hackers ensured they were receiving the agreed-upon percentage by monitoring the trader defendants' trading, either through reports from the traders or direct access to the accounts used to make unlawful trades.

90.     For example, on July 20, 2011, the Dubovoy Group provided the Hackers account information and login credentials to one of the trading accounts in the name of Arkadiy Dubovoy.  This allowed the Hackers to monitor the trading in this account to determine the compensation owed for certain trades.

91.     The next day, that account was accessed from IP address XXXXXX-18.42—the IP address for a workstation Turchynov used to access webpages and one of the IP addresses the Hackers used to hack the Newswire Services.  Over the next six months, that same IP address accessed Dubovoy's trading account more than 300 times.

92.     At times, the Hackers used entities for the purpose of collecting their share of the ill-gotten gains from the illicit trading.

### The Dubovoy Group Communicated With The Hackers

93.     The Dubovoy Group had access to the press releases the Hackers stole.  On November 26, 2010, Pavel Dubovoy emailed Garkusha a link to the internet location of the server Turchynov used in the October 24, 2010 internet hacking video—a server located at the IP address XXXXXX-26.98—as well as login and password information to the server.  Pavel Dubovoy provided instructions, which informed the reader how to log in to the server and download files and advised users to conceal the identity of the computer they used to access the server.  Garkusha forwarded Pavel Dubovoy's email to an unidentified individual.

94.     In addition, as noted earlier, on July 20, 2011, the Dubovoy Group defendants provided the Hackers with access to at least one of the brokerage accounts held in the name of Arkadiy Dubovoy.  The next day, a Ukrainian IP address (XXXXXX-18.42) began accessing that brokerage account.  Turchynov used that same IP address to access webpages, and the Hackers used that IP address in multiple hacking attacks on the Newswire Services.  That IP address also accessed a second brokerage account belonging to Arkadiy Dubovoy.

Case 2:16-cv-00845-MCA-LDW   Document 1   Filed 02/17/16   Page 23 of 43 PageID: 23

95.     Turchynov used another IP address, XXXXX-9.101, to hack PRN from January 15, 2013 to March 2, 2013.  That same IP address was also used to access one of Arkadiy Dubovoy's brokerage accounts in May 2012.

96.     In addition, the Dubovoy Group defendants instructed the Hackers about which press releases to target.  For example, on October 12, 2011, via an intermediary, Pavel Dubovoy emailed Turchynov a list of fourteen U.S. issuers whose upcoming earnings releases were to be disseminated after the U.S. markets closed on October 12, 2011 and October 13, 2011, and the following week as well.

### Trading By The Dubovoy Group Defendants

97.     The Dubovoy Group defendants worked in concert to execute the fraudulent scheme, using the information stolen by the Hackers to make illicit trades in numerous accounts. They shared control of the accounts involved in the scheme, either through formal trading authorization or informally via shared logins and security information which allowed scheme members to pose as one another and trade online.

98.     The Dubovoy Group defendants tried to conceal their fraud by deceptively spreading their illicit trading across numerous accounts at more than 10 brokerage firms in the names of various individuals and entities.  Through this strategy, they hoped to avoid detection by brokers, regulators, and law enforcement.

99.     In addition, the Dubovoy Group defendants coordinated their illegal efforts.  They helped each other and the Straw Owners establish brokerage accounts that were used in the scheme, they shared trading access to the brokerage accounts, and they kept each other informed of their progress and developments.

100.   From January 2011 through February 2014, the Dubovoy Group defendants used the stolen press releases to collectively take more than 1,400 trading positions in the window between upload to the Newswire Service's computer system and public dissemination. Collectively, the Dubovoy Group defendants profited by more than $31 million from their involvement in the scheme.

**The Trader Defendants And The Foreign Trader Defendants In The Related Action Used
The Stolen Information To Profitably Trade In Advance
Of Public Issuance Of The Press Releases**

101.   Throughout the scheme, the Trader Defendants named in this case and the foreign trader Defendants in the Related Action used the material nonpublic information stolen by the Hackers to trade profitably.

102.   Like the Dubovoy Group defendants and the foreign trader defendants in the Related Action, the Trader Defendants made enormous profits trading in the window between issuers' upload of press releases to the Newswire Services and public dissemination of the press releases. Often, these trades occurred close in time to the issuers' upload of releases to the Newswire Service – an event that, but for the hacking, would only be known by the client and the Newswire Service. The chart below sets forth the volume and profitability of the Trader Defendants' unlawful window trades:

| Traders | No. of Events Traded | Window Profits |
|---|---|---|
| Tarek Investors | 101 | $9.97M |
| Solar Line | 74 | $4.63M |
| Green Road Corp. | 78 | $3.19M |
| Extra Trading Company | 55 | $2.07M |
| Total | | $19.86M |

103.    Like the Dubovoy Group and the Foreign Trader defendants in the Related Action, the Trader Defendants shifted their focus between the Newswire Services throughout the relevant period, in step with the hackers' shifting access.  When the Hackers accessed the unpublished press releases on the computer systems of Marketwired, the Trader Defendants traded based on information in those releases.  When the hackers changed their focus to PRN, the Trader Defendants traded in the securities of the issuers that were the subject of those releases.

104.    Like the Dubovoy Group and, upon information and belief, the Trader Defendants used middle-men and off-shore entities to facilitate the exchange of non-public press releases and payments for this information.

105.    Like the Dubovoy Group, upon information and belief, the Trader Defendants used a variety of electronic communication methods to obtain the non-public information.

106.    Upon information and belief, like the Dubovoy Group defendants, the Trader Defendants paid the hackers a flat fee or a percentage of their profits for the material, non-public information in a similar manner as members of the Dubovoy Group did.

107.    Upon information and belief, each of the Trader Defendants knowingly or recklessly engaged in a deceptive act, similar to those deceptive acts described above, in furtherance of the scheme to acquire and trade on the material, non-public information.

**The Trader Defendants Are Tied Together By Their Illegal Trading And the Fact That They Traded Through Exante**

108.    All of the Trader Defendants traded through Exante in connection with the scheme, thereby concealing their identities from the US market.  Each of the individual Trader Defendants is between 28 and 38 years old.  At least four of the five individual Trader Defendants reside in Saint Petersburg, Russia.  Collectively, the Trader Defendants realized over $19.5 million in gains through their illicit trading.

109.    Defendants Bokerav and Panko co-own defendant Green Road.

110.    In addition, Memelland (a defendant in the Related Action) also traded through Exante in connection with the scheme, realizing over $700,000 in ill-gotten gains from those trades.

111.    Two of the owners of Related Action defendant Global Hedge also own part of Exante.  Like the Trader Defendants and Memelland, Global Hedge also traded in connection with the scheme, often in the same securities and on the same days as the Trader Defendants and/or Memelland.

112.    As discussed above, the trading patterns in the accounts of the Trader Defendants and the defendants in the Related Action, including Global Hedge, and Memelland, illustrate the participation of the Trader Defendants in the scheme.  Their trading occurred in the window of time between when the press releases were uploaded to the Newswire Services' computer system and when they were publicly released, often close in time to the issuers' upload of releases to the Newswire Services.  And their trading oscillated between securities of issuers who disseminated their press release through Marketwired or PRN in lockstep with the hackers' shifting access.

### The Foreign Trader Defendants Are Inter-Connected And Connected To The Dubovoy Group

113.    As discussed above, the Trader Defendants, Global Hedge, and Memelland are connected.  Similarly, the remaining foreign trader defendants named in the Related Action can be separated into the following five groups based on similar trading patterns and inter-connections: (1) Amaryan, Copperstone Fund, Copperstone Capital, Ocean Prime, Intertrade, Slepenkov, and Escada; (2) Lavlinskiy and Fedoseev; (3) Omega 26 and Guibor; (4) Makarov and Concorde; and (5) Jaspen, Supranonok, Bering, and Zakharchenko.

114.    Like the Dubovoy Group and the Trader Defendants, these foreign trader defendants in the Related Action traded in the window of time between when the press releases were uploaded to the Newswire Service's computer system and when they were publicly released, often close in time to the issuers' upload of releases to the Newswire Services.  And their trading oscillated between securities of issuers who disseminated their press release through Marketwired or PRN in lockstep with the hackers' shifting access.

### Examples Of The Trader Defendants' Illegal Trading Using The Stolen Press Releases

115.    Below are 6 examples of where the Trader Defendants used the material nonpublic information stolen by the Hackers.

**Example 1 – Edwards Life Sciences**

116.    During the relevant period, Edwards Lifesciences ("Edwards") was involved in the science of heart valves and hemodynamic monitoring.  It was incorporated in Delaware and headquartered in California.  Edwards' common stock was listed on the NYSE.

27

117.    Edwards uploaded an earnings release to Marketwired on April 23, 2013, at approximately 11:39 am.  The earnings release stated that Edwards' earnings per share had increased by 125 percent but that the Company was lowering its guidance for the next quarter.

118.    Between the time it was uploaded on April 23 and the public distribution of the earnings release by Marketwired at 4:01 pm that day, a number of Trader Defendants and defendants in the Related Action sold short Edwards stock and CFDs and profited, as set forth below:

| Date | Time (ET) | Event | Profits |
|---|---|---|---|
| 4/23/2013 | 11:39 pm | Edwards uploads 1Q earnings release to Marketwired | |
| 4/23/2013 | 12:33 pm | Concorde sells short Edwards stock in IB *1358 | $12,371 |
| 4/23/2013 | 12:33 pm | Makarov sells short Edwards stock in IB *4548 | $1,088 |
| 4/23/2013 | 12:42 pm | **Extra Trading Company sells short Edwards stock in Lek - Exante sub-account *1217** | **$341,500** |
| 4/23/2013 | 1:04 pm | Lavlinskiy sells short Edwards stock in IB *7182 | $63,359 |
| 4/23/2013 | 1:04 pm | Fedoseev sells short Edwards stock in IB *4148 | $128,947 |
| 4/23/2013 | 1:09 pm | Memelland sells short Edwards stock in Exante *1204 | $34,249 |
| 4/23/2013 | 1:09 pm | Global Hedge Capital Fund sells short Edwards stock in IB *4444 | $71,593 |
| 4/23/2013 | 1:13 pm | Jaspen sells Edwards CFDs in GFT *1765, Cantor Fitzgerald*0994, Cantor Fitzgerald *0011 | $670,573 |
| 4/23/2013 | 1:16 pm | **Tarek Investors Inc. sells short Edwards stock in Lek - Exante sub-account *1228** | **$598,864** |
| 4/23/2013 | 1:28 pm | Dubovoy Group sells short Edwards stock and sells Edwards put options in Korchevsky's E*Trade *6623 | $250,254 |
| 4/23/2013 | 1:30 pm | Dubovoy Group sells short Edwards stock in Korchevsky's JP Morgan *0336 | $47,487 |
| 4/23/2013 | 1:32 pm | Dubovoy Group sells short Edwards stock in Arkadiy Dubovoy's Merrill Lynch *9078 | $172,876 |
| 4/23/2013 | 1:41 pm | Dubovoy Group sells short Edwards stock in Straw Owner 1's TradeStation *7799 | $31,699 |
| 4/23/2013 | 1:42 pm | Copperstone Alpha sells short Edwards stock in Credit Suisse *0WM0 | $103,338 |
| 4/23/2013 | 1:43 pm | Intertrade sells short Edwards stock in IB *8284 | $154,482 |
| 4/23/2013 | 1:47 pm | **Solar Line Inc. sells short Edwards stock in Lek - Exante sub-account *1228** | **$457,763** |
| 4/23/2013 | 1:54 pm | Bering sells Edwards CFDs in Cantor Fitzgerald *969 | $280,240 |
| 4/23/2013 | 1:55 pm | Dubovoy Group sells short Edwards stock in Arkadiy Dubovoy's E*Trade *6987 | $117,849 |
| 4/23/2013 | 2:29 pm | Slepenkov sells short Edwards stock in IB *6218 | $107,000 |

| 4/23/2013 | 2:43 pm | Omega 26 sells short Edwards stock in IB *2898 | $166,434 |
|-----------|---------|-----------------------------------------------|----------|
| 4/23/2013 | 2:44 pm | Guibor sells short Edwards stock in IB *2450 | $113,092 |
| 4/23/2013 | 3:02 pm | Dubovoy Group sells short Edwards stock in Arkadiy Dubovoy's Scottrade *0584 | $9,841 |
| 4/23/2013 | 3:02 pm | Dubovoy Group sells short Edwards stock in Arkadiy NFS *6216 | $182,063 |
| 4/23/2013 | 3:10 pm | Dubovoy Group sells short Edwards stock in Straw Owner 4's IB *8944 | $31,353 |

119. With the benefit of the stolen material nonpublic information, the Trader Defendants and defendants in the Related Action who traded in Edwards stock and CFDs during the window between upload of the earnings release and its publication traded in a manner expecting the price of the stock to decrease when the news was published.

120. After the news was publicly released, the market responded the way the Trader Defendants and the defendants in the Related Action anticipated and the price of Edwards stock dropped from $82.81 per share to $64.60 per share.

121. With the unfair advantage of the stolen material nonpublic information, the Trader Defendants realized over $1,398,000.

**Example 2 – Las Vegas Sands**

122. During the relevant period, Las Vegas Sands Corp. ("LVS"), a U.S. company headquartered in Las Vegas, Nevada, was involved in the hotel resort business. LVS's common stock was listed on NYSE.

123. LVS uploaded an earnings release to Marketwired at 11:08 pm on July 24, 2012, announcing second quarter results, including a decline in quarterly profits from 45 cents per share to 29 cents per share.

124.   Between the time it was uploaded on July 24 and the public distribution of the earnings release by Marketwired at 4:01 pm on July 25, a number of Trader Defendants and defendants in the Related Action sold short LVS securities and profited, as set forth below:

| Date | Time (ET) | Event | Profits |
|------|-----------|-------|---------|
| 7/24/2012 | 11:08 pm | LVS uploads 1Q earnings release to Marketwired | |
| 7/25/2012 | 9:47 am | Jaspen sells LVS CFDs in GFT *1765, Saxo *1048, Cantor Fitzgerald*0994, Cantor Fitzgerald *0011 | $1,217,590 |
| 7/25/2012 | 2:52 pm | Dubova sells short LVS stock in APX 4ZL14899 | $28,320 |
| **7/25/2012** | **3:08 pm** | **Solar Line sells short LVS stock in Lek - Exante sub-account *1228** | **$143,070** |
| 7/25/2012 | 3:10 pm | Global Hedge sells short LVS stock in IB U824444 | $110,608 |
| **7/25/2012** | **3:11 pm** | **Tarek sells short LVS stock in Lek - Exante sub-account *1228** | **$239,857** |
| **7/25/2012** | **3:20 pm** | **Extra Trading sells short LVS stock in Lek - Exante sub-account *1217** | **$58,549** |
| **7/25/2012** | **3:29 pm** | **Green Road sells short LVS stock in Lek - Exante sub-account *1213** | **$96,591** |

125.   With the benefit of the stolen material nonpublic information, the Trader Defendants and defendants in the Related Action who traded in LVS securities during the window between upload of the earnings release and its publication traded in a manner expecting the price of the stock to decrease when the news was published.

126.   As the traders anticipated, after the earnings release was made public, the price of LVS stock decreased by $1.10 per share.

127.   The Trader Defendants profited and made over $538,000.

**Example 3 – Solar Winds.**

128.  During the relevant period, Solar Winds Inc. ("Solar Winds"), headquartered in Austin Texas, was involved in the IT management business. Solar Winds' common stock was listed on the NYSE.

129.  Solar Winds uploaded an earnings release to Marketwired on April 30, 2013, at approximately 1:03 pm. The earnings release stated that Solar Winds' first quarter earnings per share had increased to 30 cents per share as compared to 23 cents per share in the prior-year quarter. Solar Winds' earnings missed analysts' estimates of 39 cents per share and the company forecast current-quarter results below expectations as well.

130.  Between the time it was uploaded and the public distribution of the earnings release by Marketwired at 4:10 pm on April 30, a number of Trader Defendants and defendants in the Related Action sold short Solar Winds securities, consistent with the expectation that the price would fall, and profited as set forth below:

| Date | Time (ET) | Event | Profits |
|------|-----------|-------|---------|
| 4/30/2013 | 1:03 pm | Solar Winds uploads 1Q earnings release to Marketwired | |
| **4/30/2013** | **2:09 pm** | **Tarek sells short Solar Winds stock in Lek - Exante sub-account *1228** | **$194,973** |
| 4/30/2013 | 2:15 pm | Lavlinskiy sells short Solar Winds stock in IB *7182 | $8,180 |
| **4/30/2013** | **2:16 pm** | **Green Road sells short Solar Winds stock in Lek - Exante sub-account *1213** | **$99,873** |
| **4/30/2013** | **2:16 pm** | **Extra Trading sells short Solar Winds stock in Lek - Exante sub-account *1217** | **$88,700** |
| 4/30/2013 | 2:17 pm | Fedoseev sells short Solar Winds stock in IB *4148 | $17,373 |
| 4/30/2013 | 2:24 pm | Dubovoy Group sells short Solar Winds stock in Dubovoy's Merrill Lynch *9078 | $16,449 |
| 4/30/2013 | 2:26 pm | Dubovoy sells short Solar Winds stock in ETR *6987 | $23,614 |
| 4/30/2013 | 2:33 pm | Dubovoy Group sells short Solar Winds stock in Straw Owner 4's IB *8944 | $22,243 |

| 4/30/2013 | 2:40 pm | Dubovoy Group sells short Solar Winds stock in NFS *6216 | $77,573 |
| 4/30/2013 | 2:55 pm | Dubovoy Group sells short Solar Winds stock and buys call options in TDA *6350 | $10,868 |
| **4/30/2013** | **3:24 pm** | **Solar Line sells short Solar Winds stock in Lek - Exante sub-account *1228** | **$203,072** |

131.    With the benefit of the stolen material nonpublic information, all of the Trader Defendants and defendants in the Related Action who traded in Solar Winds securities during the window between upload of the earnings release and its publication traded in a manner expecting the price of the stock to decrease when the news was published.

132.    As the traders anticipated, after the earnings release was made public, the price of Solar Winds stock decreased by over $7 per share.

133.    The Trader Defendants realized gains through their trading in Solar Winds of over $586,000.

**Example 4: BroadSoft Inc.**

134.    During the relevant period, BroadSoft Inc. ("BroadSoft"), headquartered in Gaithersburg, Maryland, provided software and services to mobile, fixed-line and cable service providers.  BroadSoft's common stock was listed on the NASDAQ.

135.    BroadSoft uploaded an earnings release to Marketwired on August 3, 2012, at approximately 11:38 am.  The earnings release stated that BroadSoft's second quarter earnings per share had increased to 33 cents per share as compared to 27 cents per share in the prior-year quarter.  BroadSoft also announced that it was acquiring the assets of Adaption Technologies which was expected to enhance the company's Software-as-a-Service business.

136.    Between the time it was uploaded and the public distribution of the earnings release by Marketwired, three days later, at 4:13 pm on August 6, a number of Trader

Defendants and defendants in the Related Action bought BroadSoft stock, consistent with the

expectation that the price would increase, and profited as set forth below:

| Date | Time (ET) | Event | Profits |
|------|-----------|-------|---------|
| 8/3/2012 | 11:38 am | BroadSoft uploads 2Q earnings release to Marketwired | |
| 8/3/2012 | 1:24 pm | Guibor buys BroadSoft stock in IB *2450 | $508,031 |
| 8/3/2012 | 2:25 pm | Makarov buys BroadSoft call options in IB *4548 | $4,360 |
| **8/3/2012** | **3:43 pm** | **Solar Line buys BroadSoft stock in Lek - Exante sub-account *1228** | **$698,175** |
| 8/3/2012 | 3:53 pm | Global Hedge buys BroadSoft stock in IB *4444 | $79,356 |
| 8/3/2012 | 5:00 pm | Omega 26 buys BroadSoft CFDs in Cantor CFD055 | $519,266 |
| 8/3/2012 | 5:04 pm | Bering buys BroadSoft CFDs in Cantor CFD966 | $563,221 |
| **8/6/2012** | **9:41 am** | **Green Road buys BroadSoft stock in Lek - Exante sub-account *1213** | **$416,666** |
| **8/6/2012** | **9:51 am** | **Tarek buys BroadSoft stock in Lek - Exante sub-account *1228** | **$182,374** |

137.    With the benefit of the stolen material nonpublic information, all of the above

Trader Defendants and defendants in the Related Action who traded in BroadSoft securities

during the window between upload of the earnings release and its publication traded in a manner

expecting the price of the stock to increase when the news was published.

138.    As the traders anticipated, after the earnings release was made public, the price of

BroadSoft stock increased by over $9 per share.

139.    The Trader Defendants realized gains of over $1.29 million by trading in advance

of the BroadSoft announcement.

### Example 5: NVIDIA Corporation

140.    During the relevant period, NVIDIA Inc. ("NVIDIA"), headquartered in Santa Clara, California, was in the computer graphics and processor business. NVIDIA's common stock was listed on the NASDAQ.

141.    NVIDIA uploaded an earnings release to Marketwired on August 8, 2012, at approximately 7:48 pm. The earnings release stated that NVIDIA's second quarter earnings per share increased to 19 cents as compared to 10 cents in the prior quarter.

142.    Between the time it was uploaded and the public distribution of the earnings release by Marketwired, at 4:20 pm on August 9, a number of Trader Defendants and defendants in the Related Action bought NVIDIA stock, consistent with the expectation that the price would increase, and profited as set forth below:

| Date | Time (ET) | Event | Profits |
|---|---|---|---|
| 8/8/2012 | 7:48 pm | NVIDIA uploads 2Q earnings release to Marketwired | |
| 8/9/2012 | 1:31 pm | Lavlinskiy sells NVIDIA puts and buys NVIDIA stock in TDA *9065 and IB *7182 | $8,929 |
| 8/9/2012 | 1:42 pm | Jaspen buys NVIDIA CFDs in GFT *1765, Cantor *11, Cantor *94 | $93,676 |
| 8/9/2012 | 2:07 pm | Makarov buys NVIDIA stock in IB *4548 | $ 1,240 |
| 8/9/2012 | 2:45 pm | Dubova buys NVIDIA stock in APX *4899 | $ 5,853 |
| **8/9/2012** | **2:46 pm** | **Solar Line buys NVIDIA stock in Lek - Exante sub-account *1228** | **$27,001** |
| 8/9/2102 | 2:53 pm | Global Hedge buys NVIDIA stock in IB *4444 | $82,540 |
| **8/9/2012** | **3:00 pm** | **Green Road buys NVIDIA stock in Lek - Exante sub-account *1213** | **$35,161** |
| **8/9/2012** | **3:03 pm** | **Tarek buys NVIDIA stock in Lek - Exante sub-account *1228** | **$29,732** |
| **8/9/2012** | **3:06 pm** | **Extra Trading buys NVIDIA stock in Lek - Exante sub-account *1217** | **$ 4,716** |

143.   With the benefit of the stolen material nonpublic information, all of the above Trader Defendants and defendants in the Related Action who traded in NVIDIA securities during the window between upload of the earnings release and its publication traded in a manner expecting the price of the stock to increase when the news was published.

144.   As the traders anticipated, after the earnings release was made public, the price of NVIDIA stock increased, and the Trader Defendants made over $96,000 in ill-gotten gains.

**Example 6: Lexmark International Inc.**

145.   During the relevant period, Lexmark International Inc. ("Lexmark"), headquartered in Lexington, Kentucky, was in the printing and digital information business. Lexmark's common stock was listed on the NYSE.

146.   Lexmark uploaded an earnings release to PRN on January 28, 2013, at approximately 1:08 pm. The Lexmark release reported lower-than-expected fourth-quarter and annual earnings.

147.   Between the time it was uploaded and the public distribution of the earnings release by PRN, at 7 am on January 29, 2013, a number of Trader Defendants and defendants in the Related Action sold short Lexmark stock, consistent with the expectation that the price would decrease, and profited as set forth below:

| Date | Time (ET) | Event | Profits |
|------|-----------|-------|---------|
| 1/28/2013 | 1:08 pm | Lexmark International Inc. uploads 4Q earnings and 2012 year-end release to PRN | |
| 1/28/2013 | 2:48 pm | Fedoseev sells short Lexmark stock in IB *7182 | $37,832 |
| 1/28/2013 | 2:51 pm | Lavlinskiy sells short Lexmark stock in IB *7182 | $23,409 |
| **1/28/2013** | **3:27 pm** | **Green Road Corp. sells short Lexmark stock in Lek - Exante sub-account *1213** | **$178,562** |
| 1/28/2013 | 3:35 pm | Global Hedge Capital Fund sells short Lexmark stock in IB *4444 | $127,029 |
| **1/28/2013** | **3:38 pm** | **Extra Trading Company sells short Lexmark stock in Lek - Exante sub-account *1217** | **$181,682** |
| 1/28/2013 | 3:47 pm | Dubovoy Group sells short Lexmark stock in Arkadiy | $8,904 |

| | | Dubovoy's Merrill Lynch *9078 | |
|---|---|---|---|
| 1/28/2013 | 3:57 pm | Tarek sells short Lexmark stock in Lek - Exante sub-account *1228 | $391,575 |

148.    With the benefit of the stolen material nonpublic information, all of the above

Trader Defendants and defendants in the Related Action who traded in Lexmark securities

during the window between upload of the earnings release and its publication traded in a manner

expecting the price of the stock to decrease when the news was published.

149.    As the traders anticipated, after the earnings release was made public, the price of

Lexmark stock decreased by approximately $4.21 per share.

150.    The Trader Defendants collectively realized over $751,000 in ill-gotten gains.


**The Trader Defendants And The Defendants In The Related Action Realized Over $100
Million From The Fraudulent Scheme**

151.    The Trader Defendants along with the defendants in the Related Action engaged

in a long-running, deceptive scheme to steal material nonpublic information from the Newswire

Services and use that information to gain an illegal advantage in the markets.  Collectively, the

Trader Defendants and the defendants in the Related Action realized over $100 million from

their scheme.

152.    Both the hacking and the trading were essential to the scheme.  As a result, the

scheme oscillated between Newswire Services, as the Hackers' accessed ebbed and flowed.

153.    For each illicit trade, the Trader Defendants traded on the basis of material

nonpublic information.

154.    Upon information and belief, at all times relevant to this Complaint, the Trader

Defendants acted knowingly and/or recklessly.  Upon information and belief, the Hackers and/or

Trader Defendants also attempted to conceal their conduct from detection in a variety of ways, such as: using computer technology to hide their true identities, pose as others to access the Newswire Services' computer systems, and delete evidence of their illegal intrusions and their access to stolen releases; using aliases and "handles" to hide their true identity; using a secret, secure webserver to disseminate and retrieve the stolen press releases; conducting their trading through entities established in off-shore jurisdictions; and conducting their illicit trading through the Exante account, thereby concealing their identity.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act

155.   The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 154, inclusive, as if they were fully set forth herein.

156.   The Trader Defendants, by engaging in the conduct described above, knowingly or recklessly, in connection with the offer or sale of securities, by the use of the means or instruments of transportation, or communication in interstate commerce or by use of the mails, directly or indirectly:

(a)   employed devices, schemes or artifices to defraud;

(b)   obtained money or property by means of untrue statements of material facts, or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)   engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

157.     By engaging in the foregoing conduct, defendants violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

158.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 154, inclusive, as if they were fully set forth herein.

159.     By engaging in the conduct described above, the Trader Defendants knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

(a)     employed devices, schemes or artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)     engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

160.     By engaging in the foregoing conduct defendants violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder.

## THIRD CLAIM FOR RELIEF

### Violations of Section 20(e) of the Exchange Act

161.  The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 154, inclusive, as if they were fully set forth herein.

162.  As alleged above, the Hackers violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder, as alleged in this Complaint.

163.  Upon information and belief, through their illicit trading, payments to the Hackers, , and other means alleged in this Complaint, the Trader Defendants knowingly provided substantial assistance to, and thereby aided and abetted, the Hackers in connection with the Hackers' violations of the securities laws.

164.  By engaging in the foregoing conduct, pursuant to Section 15(b) of the Securities Act and Section 20(e) of the Exchange Act, the Trader Defendants violated, an unless enjoined will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder.

## FOURTH CLAIM FOR RELIEF

### Violations of Section 20(b) of the Exchange Act

165.  The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 154, inclusive, as if they were fully set forth herein.

166.  By engaging in the foregoing conduct, the Trader Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder through or by means of the Hackers.

167.   By engaging in the foregoing conduct, pursuant to Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)], the Trader Defendants violated, an unless enjoined will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder.

**PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court enter an emergency, temporary, and preliminary order freezing the assets of the Trader Defendants subject to the motion for a temporary restraining order and preliminary injunction, as alleged in this Complaint, prohibiting the destruction of documents, and ordering alternative means of services.

Further, the Commission respectfully requests that the Court enter a final judgment:

**I.**

Permanently restraining and enjoining defendants from, directly or indirectly, violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Ordering each defendant to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

**III.**

Ordering each defendant to pay a civil penalty up to three times the profits made pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1] or, alternatively, to pay a civil penalty under Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

Case 2:16-cv-00845-MCA-LDW  Document 1  Filed 02/17/16  Page 41 of 43 PageID: 41

## IV.

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

Respectfully submitted,

By: _____

David Axelrod, Esq.
Kelly Gibson, Esq.
John Donnelly, Esq.
Attorneys for Plaintiff

**SECURITIES AND EXCHANGE**
**COMMISSION**
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA  19103
Telephone: (215) 597-3100
Facsimile: (215) 597-2740
DonnellyJ@sec.gov

Of Counsel:

Joseph Sansone, Esq.

Date:  February 17, 2016

41

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | |
| v. | **DESIGNATION OF AGENT**<br>**FOR SERVICE** |
| EVGENII ZAVODCHIKOV, EXTRA TRADING COMPANY, ANDREY BOKAREV, RADION PANKO, GREEN ROAD CORP., NATALIA ANDREEVNA ALEPKO, SOLAR LINE INC., ANTON MASLOV, TAREK INVESTORS INC., | |
| Defendants. | |

Pursuant to Local Rule 101.1(f), because the Securities and Exchange Commission (the "Commission") does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as eligible as an alternative to the Commission to receive service of all notices or papers in the captioned action. Therefore, service upon the United States or its authorized designee, Leticia Vandehaar, Deputy Chief, Civil Division, United States Attorney's Office for the District of New Jersey, 970 Broad Street, 7th Floor, Newark, NJ 07102 shall constitute service upon the Commission for purposes of this action.

Respectfully submitted,

s/ John Donnelly
David Axelrod, Esq.
Kelly Gibson, Esq.
John Donnelly, Esq.

Attorneys for Plaintiff
U.S. Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103

42

Philadelphia, PA  19103
(215) 597-3100
DonnellyJ@sec.gov

February 17, 2015