## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

**SECURITIES AND EXCHANGE COMMISSION,**

               **Plaintiff,**

    v.

**EVEGENII ZAVODCHIKO, et al.,**

               **Defendants.**

CA No.

*Filed Ex Parte*

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER FREEZING ASSETS, GRANTING OTHER EQUITABLE RELIEF, AND FOR AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE ISSUED

David Axelrod, Esq.
Kelly Gibson, Esq.
John Donnelly, Esq.

U.S. Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
Telephone: (215) 597-3100
Facsimile: (215) 597-2740
DonnellyJ@sec.gov

**Of Counsel**
Joseph Sansone, Esq.

February 17, 2016

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES............ ............................................................ i

INTRODUCTION ............................................................................................ 2

STATEMENT OF FACTS ............................................................................. 5

ARGUMENT........ ........................................................................................... 8

    I.     The Court Should Enter A Temporary Restraining
            Order Freezing the Trader Defendants' Assets ............................... 9

           A. Legal Standard For An Asset Freeze ................................... 9

           B. The Commission Has Satisfied Each Of The
               Alternate Bases For The Freeze:  The
               Commission Is Likely To Succeed On The
               Merits And An Inference Can Be Drawn That
               The Trader Defendants Violated Federal
               Securities Laws ....... ........................................................... 11

                   1. The Violations Of Section 17(A) Of The
                       Securities Act, Section 10(b) Of The
                       Exchange Act And Rule 10b-5
                       Thereunder ...... ...................................................... 11

                      a. Defendants Used A Fraudulent Device ................. 12

                      b. Defendants Acted With Scienter............................. 14

                      c. The Scheme Was In Connection With
                         The Purchase And Sale Of Securities.................... 15

2.  The Trader Defendants Are Also Liable
    For Aiding And Abetting The Hackers'
    Violations Of Federal Securities Laws ..................... 16

3.  The Trader Defendants Are Also Liable
    Under Section 20(b) Of the Exchange Act ............... 18

C.  Freezing The Trader Defendants' Assets Is
    Necessary To Preserve The Status Quo ............................ 18

II.     This Court Should Enter An Order To Show Cause ......................... 20

III.    This Court Should Enter An Order Prohibiting The
        Destruction Of Documents ........ ......................................... 20

IV.     The Court Should Authorize Alternative Service Of The
        Pleadings And Documents Relating To This Motion ......................... 21

CONCLUSION ........ ................................................................... 23

# TABLE OF AUTHORITIES

**PAGE**

*Basic v. Levinson*, 485 U.S. 224 (1988)........................................................ 13

*CFTC v. Am. Metals Exchange Corp.*,
  991 F.2d 71 (3d Cir. 1993) .................................................................... 9

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)....................................... 14

*Fed. Trade Comm'n v. Pecon Software, Inc.*, 2013 WL 4016272
  (S.D.N.Y. Aug. 7, 2013) .................................................................... 22

*Hecht Co. v. Bowles*, 321 U.S. 321 (1944) .................................................... 13

*In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319
  (S.D.N.Y. 2004)............ .................................................................... 12

*Monsen v. Consol. Dressed Beef Co.*, 579 F.2d 793 (3d Cir. 1978)............. 17

*SEC v. Babikian*, 2014 WL 2069348 (S.D.N.Y. April 21, 2014)................. 21

*SEC v. Cavanagh,* 155 F.3d 129 (2d Cir. 1998) ........................................... 10

*SEC v. Chang,* No. 14 Civ. 4132  (S.D.N.Y. June 9, 2014) ......................... 21

*SEC v. Coates*, 1994 WL 455558 (S.D.N.Y. Aug. 23, 1994)....................... 10

*SEC v. Dorozhko*, 574 F.3d 42 (2d Cir. 2009)............................................. 13. 15

*SEC v. Dorozhko*, 606 F. Supp. 2d 321 (S.D.N.Y. 2008)............................. 15

*SEC v. Dubovoy,*  2015 WL 6122261
  (D.N.J. Oct. 16, 2015)…..................................................................... 11, 21

*SEC v. Estate of Hirshberg*, 101 F.3d 109 (2d Cir. 1996) ............................ 11

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996)....................... 12

*SEC v. Forte*, 598 F. Supp. 2d 689 (E.D. Pa. 2009) ...................................... 10

*SEC v. Grossman*, 887 F. Supp. 649 (S.D.N.Y. 1995) ................................. 11

*SEC v. Infinity Grp., Co.*, 212 F.3d 180  (3d Cir. 2000)................................. 9, 19

*SEC v. Lucent Technologies, Inc.*, 610 F. Supp. 2d 342
   (D.N.J. 2009)…………..  ................................................................... 17

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980)............................................... 14

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990)............................ 10, 19, 20, 21

*Smith v. SEC*, 653 F.3d 121 (2d Cir. 2011).................................................... 10

*Stoneridge Investment Partners, LLC v.
   Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008) ...................................... 12

*United States v. Falcone*, 257 F.3d 226 (2d Cir. 2001) ................................ 16

*United States v. First Nat'l City Bank*, 379 U.S. 378 (1965)........................ 18

*United States v. O'Hagan*, 521 U.S. 642 (1997)........................................... 16

**Other Authorities**

Fed. R. Civ. P. 65(b)(2)  ………….................................................................. 20

Plaintiff Securities and Exchange Commission (the "Commission") requests that the Court grant its *Ex Parte* Application for a Temporary Restraining Order Freezing Assets, Granting Other Equitable Relief and for An Order To Show Cause, and freeze defendants' assets in the accounts identified in the accompanying proposed order.

This action relates to another action filed before this Court, *SEC v. Dubovoy, et al.*, No. 15-cv-06076 (MCA-MAH) (the "Related Action.")  On August 11, 2015, the Court entered an Amended Temporary Restraining Order in the Related Action (Dkt. No. 13),[1] freezing the assets of multiple defendants including Exante Ltd ("Exante").  Subsequently, Exante asserted that it operated as an executing broker and produced some evidence to show that certain of its clients conducted the unlawful trading activity in an account in Exante's name.  The Commission brings this action against the following nine defendants, all of whom are Exante customers or the principals of those customers, who used their Exante accounts to participate in and profit from the massive fraudulent scheme described in the Related Action:  Evegenii Zavodchiko, Extra Trading Company, Andrey Bokarev, Radion Panko, Green Road Corporation, Natalia Andreevna Alepko, Solar Line

---

[1]    The Court amended the Amended Temporary Restraining Order by Orders entered September 3, 2015 (Dkt. No. 57), November 5, 2015 (Dkt. No. 129), and November 18, 2015 (Dkt. Nos. 154 and 155).

Inc., Anton Maslov, and Tarek Investors Inc. (collectively, the "Trader Defendants").[2] Freezing the Trader Defendants' assets will preserve the status quo and the Commission's ability to recover disgorgement, prejudgment interest, and civil penalties for the fraud.

## INTRODUCTION

The fraudulent scheme worked as follows.  The Trader Defendants worked in concert with computer hackers residing in Ukraine, Oleksander Ieremenko and Ivan Turchynov (the "Hackers").  The Hackers hacked into the computer systems of at least two newswire services, through deceptive means, and illegally accessed press releases that had been uploaded to the newswire service by companies whose stock was traded on U.S. securities exchanges before those press releases were publicly disseminated by the newswire service.  In most cases, the stolen press releases contained critical quarterly earnings data.  The Hackers transmitted (directly or indirectly) the unpublished press releases to a network of traders, including the Trader Defendants and the defendants named in the Related Action, who paid the Hackers for stolen information.

---

[2]    The Commission intends to file a notice of voluntary dismissal of Exante, without prejudice, in the Related Action pursuant to Federal Rule of Civil Procedure 41(a).

Armed with the unfair advantage that the inside information gave them over an unsuspecting market, the Trader Defendants and traders in the Related Action bought or sold (depending on whether they concluded that, when the information was publicly announced, the price of the company's stock would increase or decrease) securities in those companies whose press releases had been stolen. The Trader Defendants and traders in the Related Action made their initial trades in the window of time between when the press releases were uploaded to the newswire services' computer systems and when they were publicly disseminated—which, often, was only a few hours later. After the market reacted to the news, resulting in an increase or decrease in the price of the company's stock, the Trader Defendants and traders in the Related Action closed their positions. The Trader Defendants realized over $19.5 million in illicit gains from this fraud. Together with the traders in the Related Action, they collectively generated over $100 million in ill-gotten profits.

It is necessary to freeze the assets in the Trader Defendants' accounts, to preserve the status quo and the Commission's ability to recover disgorgement and civil penalties once the Commission prevails on its claims. Currently, the Commission has identified assets of the Trader Defendants that are held by Exante in accounts at Lek Securities UK Limited, Lek Securities Corp., and at Exante

3

These assets should be frozen.  Collectively, the assets have a current value of approximately $8.5 million—a fraction of the Trader Defendants' illicit profits from the scheme.  Absent an asset freeze, there is a substantial risk that the assets will be dissipated, particularly in light of the fact that the Trader Defendants are either residents of the Russian Federation or entities operated from the Russian Federation.

Accordingly, the Commission respectfully requests that the Court grant this motion and issue a temporary restraining order: (1) freezing the Trader Defendants' assets; (2) prohibiting the Trader Defendants from destroying, altering, or concealing records of any kind; (3) requiring the Trader Defendants to show cause why a preliminary injunction freezing such assets should not be entered; and (4) authorizing service of this motion and Order and any other pleadings or documents relating to this motion by personal delivery, facsimile, overnight courier, email, or first-class mail.

## STATEMENT OF FACTS[3]

Over approximately five years, Hackers—computer hackers residing in the

Ukraine—hacked into Marketwired L.P. ("Marketwired") and PRN Newswire

("PRN") and, through deception, stole more than 100,000 press releases for

publicly-traded companies before they were issued to the public.  (O'Connor Decl.,

¶¶ 17, 21, 24; and Zavos Decl.¶ 2, attached as Exhibit O to O'Connor Decl.)  The

Hackers used a variety of deceptive and sophisticated techniques to gain

unauthorized access to the unpublished press releases, including: (1) employing

stolen username/password information of authorized users to pose as authorized

users; (2) deploying malicious computer code designed to delete evidence of the

computer attacks; (3) concealing the identity and location of the computers used to

access the newswire services' computers; and (4) using back-door access-modules.

(Zavos Decl. ¶¶ 6, 10, 11, 14, attached as Exhibit O to O'Connor Decl.)  The

Hackers transmitted this information to a network of traders, including the Trader

Defendants, who paid the Hackers for the stolen information, either through a flat

---

[3]      In addition to this memorandum, filed herewith are the Commission's
Complaint; Motion for Temporary Restraining Order; the Declaration of Lynn
O'Connor ("O'Connor  Decl.") and Exhibits cited therein; and the Rule 65
Certification of John Donnelly.

fee or a percentage of the illicit profits gained from the illegal trading on the information.[4] (O'Connor Decl., ¶ 26.)

Many of the stolen press releases contained information about quarterly and annual earnings data for companies whose stock was traded on U.S. stock exchanges. (*Id.* ¶ 23.) It is common for financial analysis firms to estimate or predict a given issuer's quarterly or annual earnings. (*Id.*) The "market" reaches a consensus expectation based on these different predictions. When an issuer releases its earnings, the share price for that issuer generally increases if its earnings exceed the market consensus and generally decreases if its earnings fall short of the consensus prediction. (*Id.*)

The traders, including the Trader Defendants, used the stolen material nonpublic information to place trades in the window of time between when the press releases were uploaded to the newswire service's system and when the press releases were publicly issued ("window"). (*Id.* ¶¶ 23, 24, 28, 29.) They bought or sold securities, such as stocks, options, and contracts-for-differences (a derivative) depending on their anticipation of how the market would respond to the information in the stolen press releases. After the press releases were publicly

---

[4]     The Hackers ensured they were receiving the agreed-upon percentage by monitoring the trader's trading, either through reports from the traders or direct access to the accounts used to make unlawful trades. (O'Connor Decl ¶26.)

disseminated and the price of the securities changed as the market learned the previously undisclosed information, the traders closed their positions. Over the course of the scheme, the Trader Defendants and traders in the Related Action collectively reaped over $100 million in profits. (O'Connor Decl. ¶¶ 28, 29.)

The Hackers oscillated primarily between two newswire services, Marketwired and PRN, focusing on obtaining the press releases from one or the other depending on the Hacker's access to the newswire services' computer networks. (*Id.* ¶ 24.) Like the traders in the Related Action, the Trader Defendants' trading activity mirrored the access and focus of the Hackers. (*Id.* ¶¶ 24, 29, 33.) When the Hackers stole press releases from Marketwired, the Trader Defendants traded in the securities of the issuers whose press releases were stolen from Marketwired. (*Id.*) When the Hackers stole press releases from PRN, the Trader Defendants traded in the securities of issuers whose press releases were stolen from PRN. (*Id.*)

### The Trader Defendants

The Trader Defendants include four entities, each of whom held an account at Exante through which they traded in connection with the fraudulent scheme, and their principals. Exante purports to be a Malta-based broker-dealer. It held trading accounts at Interactive Brokers and at Lek Securities Corp. During

the period from 2012 through 2014, the Trader Defendants placed trades through their Exante accounts resulting in over $19.5 million in ill-gotten gains. (O'Connor Decl. ¶ 30.)

Like the traders who are defendants in the Related Action, the Trader Defendants made these enormous profits by trading in the window between the upload and publication of issuers' press releases.  (*Id.* ¶ 30.)  Often, these trades occurred close in time to the issuers' upload of releases to the newswire service–an event that, but for the hacking, would only be known by the client and the newswire service.

### Examples of Fraudulent Trading

The O'Connor Declaration sets forth in detail six different examples of trading by the Trader Defendants and other traders named in the Related Action, in securities of companies whose press releases were stolen from the hacking. (O'Connor Decl. ¶¶ 42-77.)  Each of these examples shows defendants trading in these securities, in the window which was often only a few hours, and profiting. (*Id.*)

### ARGUMENT

The Trader Defendants participated in a massive fraudulent scheme through which they realized over $19.5 million in ill-gotten gains during an approximately

three-year period.  To preserve the status quo, and to prevent the Trader

Defendants from dissipating or transferring the assets currently held in accounts at

Lek Securities UK Limited, Lek Securities Corp., or Exante, the Court should

grant this motion and issue a temporary restraining order:  (1) freezing the Trader

Defendants' assets, including account number ending *MNI2 at Lek Securities UK

Limited, account number ending *ANTE at Lek Securities Corp., and the Trader

Defendants' accounts at Exante, including certain promissory notes and/or bond

certificates held by Exante that are assets of Tarek; (2) ordering the Trader

Defendants to show cause why a preliminary injunction freezing such assets should

not be entered; (3) prohibiting the Trader Defendants from destroying documents;

and (4) authorizing additional means of service of the pleadings and documents

relating to this motion.

## I.      The Court Should Enter A Temporary Restraining Order Freezing The Trader Defendants' Assets.

### A. Legal Standard For An Asset Freeze

"A freeze of assets is designed to preserve the status quo by preventing the

dissipation and diversion of assets." *SEC v. Infinity Grp., Co.*, 212 F.3d 180, 197

(3d Cir. 2000). *See also CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, 79 (3d

Cir. 1993).  An asset freeze can ensure "that any of the funds that may become

due," such as disgorgement, civil penalty, and prejudgment interest, "can be

collected." *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990) (holding that a freeze order on a brokerage account in an amount equal to the potential disgorgement and civil monetary penalty was appropriate relief). The district court's authority to temporarily freeze assets is "well settled," and "[i]n initiating securities litigation, the Government frequently obtains a court-ordered freeze of the defendant's assets." *SEC v. Forte*, 598 F. Supp. 2d 689, 692 (E.D. Pa. 2009) (quoting *SEC v. Coates*, No. 94–5361, 1994 WL 455558, at *1 (S.D.N.Y. Aug. 23, 1994)).

Because the Commission has an obligation to protect the public interest, the showing required for an injunction sought by the Commission is considerably lower than that for relief requested by a private party: "the standards of public interest, not the requirements of private litigation, measure the propriety and need for injunctive relief." *Unifund SAL*, 910 F.2d at 1035-36 (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 331 (1944)). The Commission must show either (1) a likelihood of success on the merits; or (2) that an inference can be drawn that the party has violated the federal securities laws. *Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011). Unlike private litigants, the Commission need not show a risk of irreparable injury. *See Unifund SAL*, 910 F.2d at 1036; *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998). "The Court may also factor the concern that

defendants will dissipate their assets or transfer them beyond the jurisdiction of the United States." *SEC v. Dubovoy*, No. 15-cv-6076, 2015 WL 6122261, at *3 (D.N.J. Oct. 16, 2015) (Arleo, J.).  Where a freeze order is appropriate, a court may freeze any available assets, including assets not traceable to the fraud.  *SEC v. Grossman*, 887 F. Supp.  649, 661 (S.D.N.Y. 1995), *aff'd*, *SEC v. Estate of Hirshberg*, 101 F.3d 109 (2d Cir. 1996) (summary order).

> **B.     The Commission Has Satisfied Each Of The Alternate Bases For The Freeze:  The Commission Is Likely To Succeed On The Merits And An Inference Can Be Drawn That The Trader Defendants Violated Federal Securities Laws**

As this Court determined when it issued a temporary restraining order in the Related Action (Dkt. No. 13), there is a likelihood that the individuals and entities who controlled the trading from Exante accounts violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Section 20(b) of the Exchange Act.  The Trading Defendants are culpable for the Exante-related activity described in the Related Action, deriving illicit profits from violations of federal securities laws.

> **1.     The Violations Of Section 17(a) Of The Securities Act, Section 10(b) Of The Exchange Act And Rule 10b-5 Thereunder**

The declarations and exhibits submitted in support of this motion show that the Commission is more than likely to succeed on its securities fraud claims.  To

establish a violation under either Section 17(a) of the Securities Act or Section

10(b) of the Exchange Act, the Commission ultimately must show that the Trader

Defendants (1) made a material misrepresentation (or a material omission if they

had a duty to speak) or used a fraudulent device; (2) acting with scienter; (3) in

connection with the purchase or sale of a security. *SEC v. First Jersey Sec., Inc.*,

101 F.3d 1450, 1467 (2d Cir. 1996).   The Trader Defendants' fraudulent scheme

to trade on the non-public information contained in stolen press releases satisfies

each of these elements.

### a. Defendants Used a Fraudulent Device

Defendants' conduct supplies the requisite deception for the scheme-based

securities fraud claims. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta,*

*Inc.,* 552 U.S. 148, 158 (2008); *In re Global Crossing, Ltd. Sec. Litig.,* 322 F.

Supp. 2d 319, 335 (S.D.N.Y. 2004) ("It is apparent from Rule 10b-5's language

and the case law interpreting it that a cause of action exists under subsections (a)

and (c) for behavior that constitutes participation in a fraudulent scheme, even

absent a fraudulent statement by the defendant.").   The Trader Defendants and the

traders and hackers who are defendants in the Related Action employed fraudulent

devices and engaged in a fraudulent scheme by deceptively hacking into the

computer systems of Marketwired and PRN, stealing material nonpublic

information regarding publicly-traded companies in not-yet-published press releases, and trading in securities based on that information.

The Hackers obtained the material nonpublic information used to trade by misrepresenting themselves and hacking into the newswire services' computer systems. *See SEC v. Dorozhko*, 574 F.3d 42, 49-50 (2d Cir. 2009) (holding that defendant could be liable for securities fraud for hacking into a company's computer system and trading based on stolen earnings reports). The Hackers used a plethora of sophisticated and deceptive techniques to trick, circumvent, or bypass computer security to gain illicit access to the newswire services' computer systems, including: (1) employing stolen username/password information of authorized users to pose as authorized users; (2) deploying malicious computer code designed to delete evidence of the computer attacks; (3) concealing the identity and location of the computers used to access the newswire services' computers; and (4) using back-door access-modules. (Zavos Decl. ¶¶ 6, 10, 11, 14, attached as Exhibit O to O'Connor Decl.) This conduct is "deceptive" under the securities laws. *Dorozhko*, 574 F.3d at 50-51. The Trader Defendants participated in and profited from this scheme.

The scheme specifically targeted material non-public information. *See Basic v. Levinson*, 485 U.S. 224, 231-32 (1988) (concluding that information is material

if there is a substantial likelihood that a reasonable investor would consider that the information significantly altered the "total mix" of available information). Between 2010 and 2014, the Hackers stole over 100,000 press releases before they were publicly released. Many of these press releases pertained to companies' earnings reports, which reasonable investors consider important when making an investment decision. Indeed, information regarding the financial condition of a company is presumptively material. *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980).

The materiality of the information is also evidenced by, among other things, the fact that the Trader Defendants devoted substantial amounts to their trading on the hacked information and reaped huge illicit profits from this conduct.

### b. Defendants Acted With Scienter

Without question, the Hackers and traders, including the Trader Defendants, intended to profit through deception, supplying the requisite scienter.[5] *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976) (scienter is "a mental state embracing intent to deceive, manipulate, or defraud"). The Hackers acted intentionally when they illegally accessed the Newswire Services' computer

---

[5]     Scienter under Section 17(a)(1) and Section 10(b) and Rules 10b-5(a) and (c) can also be established by recklessness. And only negligence is required for a claim under Section 17(a)(2) or (3).

systems and stole the material nonpublic information in the unpublished press releases. Likewise, the Trader Defendants and the traders in the Related Action acted intentionally when they obtained the stolen information, often from accessing a secure computer server established to enable the covert transmission of this information. And the Trader Defendants and traders in the Related Action knowingly traded based on the stolen information, frequently in a window of only a few hours between when the information was stolen and when the press release was publicly issued. The substantial assets they devoted to these trades further demonstrate that the Trader Defendants acted with scienter. *See SEC v. Dorozhko*, 606 F. Supp. 2d 321, 328 (S.D.N.Y. 2008) (holding "hacking and trading" activity evidenced the required scienter), *vacated on other grounds*, 574 F.3d 42 (2d Cir. 2009). This long-running, complex, and extremely lucrative fraud scheme was no accident.

Because the fraudulent scheme involved intentionally deceptive conduct by the Hackers and traders, including the Trader Defendants, the Commission will succeed at establishing scienter.

### c. The Scheme Was In Connection With The Purchase And Sale Of Securities

The scheme was in connection with the purchase and sale of securities because the very purpose of it was to profit from securities trades. The Trader

Defendants used the material non-public information that the Hackers obtained to reap enormous profits by trading in the United States securities markets. The vast majority of in-the-window trades conducted by the Trader Defendants involved securities that were listed on exchanges in the United States. *See United States v. Falcone*, 257 F.3d 226, 233 (2d Cir. 2001) (the "in connection with" requirement is satisfied where a defendant misappropriates information that "derives its value from its utility in securities trading") (quoting *United States v. O'Hagan*, 521 U.S. 642, 657 (1997)) (internal quotation marks and alterations omitted).

### 2. The Trader Defendants Are Also Liable For Aiding And Abetting The Hackers' Violations of Federal Securities Laws

Like the traders named in the Related Action, the Trader Defendants are also liable under Section 15(b) of the Securities Act and Section 20(e) of the Exchange Act for aiding and abetting the Hackers' violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder. Pursuant to Section 15(b) and Section 20(e), which Congress amended in 2010 in enacting the Dodd-Frank Act, a defendant is liable for aiding and abetting when: (1) there is an underlying primary securities law violation by another;

(2) defendant provided substantial assistance to the violator; and (3) defendant acted knowingly or recklessly in providing that assistance.[6]

Here, for the reasons discussed in the section relating to primary liability under Section 17(a), Section 10(b) and Rule 10b-5, the Trader Defendants knowingly or recklessly provided substantial assistance to the Hackers' primary violations. Indeed, the involvement of the traders who participated in the scheme, their trading, and their payments to the Hackers were essential for the Hackers to profit from the fraudulent scheme. By statute, any defendant liable for aiding and abetting a primary violation "shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided." Accordingly, the Trader Defendants are subject to the same disgorgement and potential penalties for aiding and abetting as they are for their primary violations.

---

[6]    The Court of Appeals for the Third Circuit has not yet addressed the standard. Prior to Congress enacting the Dodd-Frank Act, which became effective July 21, 2010, some district courts interpreted the statute to require that the aider and abettor have actual knowledge of the underlying violation. *See, e.g., SEC v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 361 (D.N.J. 2009) (citing *Monsen v. Consol. Dressed Beef Co.*, 579 F.2d 793, 799 (3d Cir. 1978). Although the enactment of Dodd-Frank renders the issue moot in this instance, the conduct at issue here also satisfies that higher standard.

3.  **The Trader Defendants Are Also Liable Under Section 20(b) of the Exchange Act**

The Trader Defendants are also liable for the conduct of the Hackers under

Section 20(b) of the Exchange Act, which prohibits unlawful activity through or by

means of any other person: "It shall be unlawful for any person, directly or

indirectly to do any act or thing which it would be unlawful for such persons to do

under the provisions of this title or any rule or regulation thereunder through or by

means of any other person." Thus, here, pursuant to Section 20(b), the Trader

Defendants are also liable for violations of 17(a) of the Securities Act, Section

10(b) of the Exchange Act, and Rule 10b-5 thereunder because the conduct of the

Hackers in deceptively stealing the material nonpublic information from

Marketwired and PRN is attributable to the Trader Defendants.

C.  **Freezing the Trader Defendants' Assets Is Necessary To Preserve The Status Quo**

Here, an asset freeze is necessary because there is significant risk that the

Trader Defendants will attempt to either transfer or dissipate assets. Because all of

the Trader Defendants are overseas, it is likely that when they learn of this case,

they will attempt to move those assets. An asset freeze will help preserve the

status quo and preserve these assets to satisfy a judgment in favor of the

Commission. *See United States v. First Nat'l City Bank*, 379 U.S. 378, 385 (1965)

18

(concluding that asset freeze was appropriate to prevent dissipation of assets or transfer of assets abroad); *Unifund SAL*, 910 F.2d at 1041.

Moreover, the Trader Defendants' account and the assets held by Exante should be frozen in their entirety to maintain the status quo and preserve the opportunity to collect on a judgment in this case, including civil penalties. *See Infinity Grp.*, 212 F. 3d at 197 ("A freeze of assets is designed to preserve the status quo by preventing the dissipation and diversion of assets."); *Unifund SAL*, 910 F.2d at 1041-42 (holding that a freeze order on a brokerage account in an amount equal to the potential disgorgement and civil monetary penalty was appropriate relief). Defendants are subject to a range of substantial penalties for their misconduct. Pursuant to Section 21A of the Exchange Act 15 U.S.C. § 78u-1], they could be penalized up to three times their ill-gotten gains. Alternatively, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], defendants are subject penalties of up to $775,000 per violation for entities and $160,000 per violation for individuals. Collectively, the total amount of the Trader Defendants' disgorgement, pre-judgment interest, and penalties, could exceed $75 million.

The total estimated amount of the Trader Defendants' assets at Exante and/or in the Lek Accounts is approximately $8.5 million—far less than their potential liability. Accordingly, the Court should freeze these assets.

## II.   This Court Should Enter An Order To Show Cause

The continuation of any relief obtained pursuant to this Motion, and the consequent preservation of the status quo, is dependent upon the Court's entry of a preliminary injunction within fourteen days. Fed. R. Civ. P. 65(b)(2). Accordingly, the Commission requests that the Court enter an order requiring defendants to show cause why a preliminary injunction imposing the same relief as set forth in the temporary restraining order should not be entered.

## III.  This Court Should Enter An Order Prohibiting The Destruction Of Documents

In order to protect all documents and tangible things necessary to establish a complete record in this matter, the Commission seeks an order prohibiting the destruction of documents or tangible things. Such "innocuous" orders are routinely granted to protect the integrity of the litigation. *See, e.g., Unifund SAL*, 910 F.2d at 1040, n.11. Good faith preservation of documents cannot be assumed in the context of such a fraudulent scheme.

**IV.    The Court  Should Authorize Alternative Service Of The Pleadings And Documents Relating To This Motion**

In addition to the means of service provided by the Federal Rules of Civil Procedure, the Commission asks this Court to authorize service of any Order issued by the Court in connection with this Application, as well as the papers on which the Order was granted, upon defendants by email and by overnight delivery to counsel for Exante, to be distributed to the Trader Defendants by Exante, and by sending through international third-party delivery (such as UPS) to the addresses that the Commission has identified for the Trader Defendants.  And, to the extent the Commission obtains any email addresses it believes are associated with the Trader Defendants, it will serve the relevant documents by email as well.  These alternative means are calculated to provide notice of the Court's Order and the underlying documents and have been approved by courts in similar circumstances in other cases.  *See SEC v. Dubovoy*, No. 15-cv-06076 (MCA-MAH) (Dkt. No. 13); *SEC v. Chang,* No. 14 Civ. 4132, Dkt. No. 3 (S.D.N.Y. June 9, 2014) (approving service through email and service on broker) (Ramos, J.) (unpublished). *See also Unifund SAL*, 910 F.2d at 1033 (service of process on foreign investor was proper where the papers were delivered to investor's broker, which forwarded the papers to foreign country where they were received by the investor); *SEC v. Babikian*, No. 14 Civ. 1740, 2014 WL 2069348, at *1 (S.D.N.Y. April 21, 2014)

(order noting that the Court had "permitted alternative service of process on [defendant] via email" for Canadian citizen whose whereabouts were unknown); *FTC v. Pecon Software, Inc.*, Nos. 12 Civ. 7186, 12 Civ. 7188, 12 Civ. 7191, 12 Civ. 7192, 12 Civ. 7195, 2013 WL 4016272, at *5 (S.D.N.Y. Aug. 7, 2013) ("Service by email alone comports with due process where a plaintiff demonstrates that the email is likely to reach the defendant.").

As of the date the Commission filed the Related Action, the Trader Defendants had active accounts at Exante with substantial assets. Transmission of the documents through Exante and in the manner requested is calculated to provide notice to the Trader Defendants. In light of the assets remaining in the accounts, the Trader Defendants likely continue to monitor the accounts and can be contacted by Exante.

The Commission respectfully requests that the Court authorize the following alternative means of service upon the Trader Defendants of the Commission's Application for a Temporary Restraining Order and supporting papers, including this Memorandum and any Order of the Court granting this application via the methods requested. These alternate methods of service are tailored to the circumstances of the case and designed to give the Trader Defendants actual notice

and a meaningful opportunity to respond to the Commission's application for a preliminary injunction.

## CONCLUSION

For the foregoing reasons, and those set forth in the accompanying declarations and exhibits, the Commission respectfully requests that the Court issue an Order to Show Cause, Temporary Restraining Order, and Order Freezing Assets and Granting Other Relief in the form of the order submitted with this motion.

Respectfully submitted,

By: s/ John Donnelly
David Axelrod, Esq.
Kelly Gibson, Esq.
John Donnelly, Esq.

Attorneys for Plaintiff
U.S. Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA  19103
Telephone: (215) 597-3100
Facsimile: (215) 597-2740
DonnellyJ@sec.gov

**Of Counsel**
Joseph Sansone, Esq.

Dated:  February 17, 2016