# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Civil Action No.: 15-cv-06076 (MCA-MAH) |
| Plaintiff, | |
| v. | |
| ARKADIY DUBOVOY, et al. | |
| Defendants. | |

## Second Declaration of Lynn O'Connor

I, Lynn O'Connor, hereby declare as follows:

1.      I am employed as Senior Counsel in the Enforcement Division in the Philadelphia

Regional Office of the United States Securities and Exchange Commission (the "Commission"),

the Plaintiff in this matter, located at 1617 JFK Boulevard, Suite 520, Philadelphia, Pennsylvania

19103.  My official duties include participating in fact-finding inquiries and investigations to

determine whether federal securities laws have been, are presently being, or are about to be

violated, and assisting in the Commission's litigation of enforcement actions.

2.      I hold a law degree from the University of Pennsylvania Law School, located in

Philadelphia, Pennsylvania.  I am licensed to practice law in Pennsylvania.

3.      I am assigned to the Commission's investigation relating to the conduct alleged in

the complaint.

4.      In connection with this assignment, I have, among other things, reviewed certain

of the defendants' emails; forensic reports relating to the hacking defendants' computers;

forensic reports regarding the hacking into certain newswire services; documents received from

the newswire services, including upload and submission times for press releases; and documents

received from various broker-dealers registered in the U.S., including account documentation for numerous brokerage accounts owned and/or controlled by the trading defendants, as well as trade blotters showing order entry and execution times.

5.      I make this declaration based on my personal knowledge, information and/or belief, and based upon my review and analysis of the records referenced above, in support of the Commission's Motion for a Temporary Restraining Order, Order Freezing Assets and Granting Other Relief, and for a Preliminary Injunction and incorporate by reference my Declaration dated August 9, 2015 and the Exhibits thereto.

6.      I make this second declaration based on my personal knowledge, information and/or belief, and based upon my review and analysis of the records referenced above, in support of the Commission's Motion for a Temporary Restraining Order, Order Freezing Assets and Granting Other Relief, and for a Preliminary Injunction as it relates specifically to Exante Ltd. for the purpose of adding additional relevant information and documents in support of the Commission's Motion. I incorporate by reference my Declaration dated August 9, 2015 and the Exhibits thereto. For ease of reference, exhibits attached to this second declaration are numbered consecutively following the last exhibit in my earlier declaration. Herein, reference to my earlier declaration shall be to "O'Connor Decl." and references to this declaration shall be to "Second O'Connor Decl.".

### Additional Information Regarding Defendant Exante Ltd.

7.      **Defendant Exante is owned and/or operated by four partners:** Alexey Kirienko ("Kirienko") the CEO and founder of Exante; Vladimir Masliakov ("Masliakov ") the an Executive Director and co-founder of Exante; Anatoli Knyazev ("Knyazev") an Executive Director and co-founder of Exante; and Gatis Eglitis ("Eglitis") an Executive Director and co-

founder of Exante. **Exhibit A to Eglitis Declaration, p. 128 of 137.** At the time it was formed and during much of the relevant five year time period, Ivan Naumov ("Naumov") was also a director of Exante. **Second O'Connor Decl. Exhibit 144** is a true and correct redacted copy of Lek account opening documents for Exante. Three of these individuals also own or operate Defendant Global Hedge: Kirienko, Masliakov, and Knyazev. **O'Connor Decl. ¶ 31; Exhibit 97.**

8. On December 15, 2010, Kirienko filed a Personal Questionnaire with the Malta Financial Services Authority ("MFSA") seeking approval to occupy a position of trust at Exante, a licensed entity regulated by the MFSA. In this questionnaire, Kirienko specifies that the position that he will occupy is that of "Portfolio Manager" and states that "[m]y duties within the Applicant shall be very similar to my duties within Global Hedge Capital Management."

9. On September 20, 2012, on behalf of defendant Exante, Eglitis and Naumov executed a Corporate Resolution which stated, in part:

> RESOLVED First: That Mr. Ivan Naumov the Director of EXANTE ltd. or Mr. Gatis Eglitis the Director of this corporation be, and each of them hereby is , authorized and empowered, for and on behalf of this corporation (hereinafter the "Corporation") **to establish and maintain one or more accounts**, which may be MARGIN accounts, **with Lek Securities Corporation** (hereinafter the "Brokers") **for the purpose of** i**nvesting in, or otherwise acquiring, selling (including SHORT SALES),** possessing, or turning to account of, or realizing upon and generally dealing in and with **any and all forms of securities** ... .

**Second O'Connor Decl. Exhibit 145** is a true and correct copy of the Exante Corporate Resolution dated Sept. 20, 2012 (emphasis added).

10.     On September 24, 2012, Eglitis, Kirienko, Masliakov, Knyazev and Naumov signed account opening documents in the name of Exante Limited at Lek Securities. The document identifies the account as a **"principal"** account at Lek. The account acronym for this account was "EXAN." **Second O'Connor Decl. Exhibit 144**.

11.     Exante has a Head of Global Trade Desk who gave a webinar in which he shared "his trading techniques and some strategic trading tips." **Exhibit A to the Eglitis Declaration, p. 34 of 137.**

12.     Exante also hosted regular meetings for a H2T's "Traders Club" and Kirienko, and Knyazev participated in one of the discussions and "shared their expertise on the topic of 'trading in global markets.'" **Exhibit A to the Eglitis Declaration, p. 55 of 137.**

13.     Exante also owns, manages and promotes a Hedge Fund Index, based on hedge funds that Exante vets and selects. An October 2012 Special Report edition of Hedgeweek, featured Exante and an interview of Eglitis. One of the main aspects of Exante highlighted in the article was how carefully Exante scrutinizes managers before allowing them on the platform and how it then does further due diligence before listing them in its Hedge Fund Index. The article states:

> For any manager wishing to join the platform, which already includes a number of billion-dollar funds, EXANTE's team works closely with them discussing the strategy in detail, and ultimately deciding whether the manager is good enough to list on the platform. EXANTE's fund platform is potentially a game-changer for the industry. … The one-point-click model gives investors the opportunity to invest directly in those funds. … [Exante Investors] can either build their own funds of funds, or choose to … invest [] in the index of managers which Exante is now building. …. All the funds listed

on the system have gone through due diligence. "There are a lot of funds that we have approached … that we cannot place on our system because we are reluctant to expose our customers to such managers. What we offer is quality content," states Eglitis.. … [An immediate focus] is building out the index. Eglitis explains how this is created: "We take the 20 top performers to currently construct the index. … The managers chosen will be based on a series of qualitative and quantitative criteria…. If you had invested in the EXANTE Hedge fund Index in March 2010, you'd currently be up 36.4 per cent" Notes Eglitis.

**Second O'Connor Decl. Exhibit 146** is a true and correct copy of an article of Hedgeweek Special Report dated October 2012 entitled: "Exante 2012" entitled: "A One-click Approach to Accessing Alpha."

14.     In addition, Exante owns, manages and promotes a hedge fund focusing on Bitcoin investments. In October 2012, Anatoli Knyazev announced that Exante was launching a hedge fund "to take advantage of using Bitcoins." **Second O'Connor Decl. Exhibit 147** is a true and correct copy of an article of Hedgeweek Special Report dated October 2012 entitled "Exante 2012" entitled: "The Emergence of Electronic Gold …?"

15.     In **Exhibit K to the Eglitis Declaration**, the Global Hedge Capital Fund account statement dated August 7, 2015, indicates holdings in BitcoinSub.Exante and BTC.Exante.

I, Lynn O'Connor, do hereby declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge. Executed on this 21st day of August, 2015.

Lynn O'Connor

5

# EXHIBIT 144

# LEK SECURITIES
MEMBER OF THE NEW YORK STOCK EXCHANGE

## Account Form                    ☑ New    ☐ Change

**Account Name**   EXANTE Limited

| Branch | Account Acronym | SS or Tax I.D. | Citizenship | Resident of | Initial Transaction | Date |
|---|---|---|---|---|---|---|
| EXT | EXAN | | | MALTA | | 09 17 2012 |

☐ Option ☐ Margin      **Discretionary Authority:** ☑ Full ☐ Limited ☐ Firm Employee     **Age/DOB**
☐ DVP ☐ Cash           **Name** GATIS EGLITIS                                              31

| Marital Status | Dependents | How was account acquired? Call In ☐ Walk In ☐ Advertising ☐ Cold Call ☐ Other ☐ |
|---|---|---|
| single | | If referral, name of person referring account _____ How long have you known customer ___ |

**Customer (s) Name and Address** ☑ Principal ☐ Investment Manager

EXANTE Limited

PORTOMASO BUSINESS TOWER ANNEX LEVEL 7

MALTA (EU)

City ST.JULIANS   State ___   Zip STJ4011

**First Interested Party's Name and Address** ☐ Principal ☐ Investment Manager

Gatis Eglitis

PORTOMASO BUSINESS TOWER ANNEX LEVEL 7

MALTA (EU)

City ST.JULIANS   State ___   Zip STJ4011

| Special Instructions (additional space on the back) | Delivery/Receive Instructions (If receive instructions are different from deliver instruction, check box and state instruction) ☐ |
|---|---|

**Bank Reference:** HSBC Malta plc     DTC# ___   Institution ID ___

**Other Reference:** FIDES Corporate Services Limited     Agent (BAS) # ___   Customer # ___

**Investment Objective (s):** ☐ Income ☐ Growth ☐ Speculation
☑ Trading ☐ Other (Specify)

**Institutional Accounts – person authorized to transact business**
Name: GATIS EGLITIS        Tel: ( )  +35620150777
Name: IVAN NAUMOV          Tel: ( )  +35620150111

## Financial Background

Annual Income _____   Net Worth _____

Net Liquid Assets _____   Fed Tax Bracket ___%

Home Address (if different from above)



Tel: ( )

**Individual Accounts**
Employer:                Type of Business:
                         Occupation:
Bus. Addr.:              Position:
                         Tel: ( )

Spouse's Name:           Type of Business:
Employer:                Occupation:
Address:                 Position:
                         Tel: ( )
                         SSN:

Is customer an officer, director or 10% shareholder of any publicly held company? ☐ YES ☐ NO. Is the customer (1) a broker-dealer, (2) an officer, director, general partner, employee or agent of a broker-dealer, (3) a senior officer of a banking organization (any kind), insurance company, registered investment company, registered advisory firm or other institutional type account, or a person in the securities department – or in a position to influence transactions – of any such institution, (4) an immediate family member of any person in 2 or 3, or (5) an account in which a broker-dealer or any person in 2, 3, or 4, has a beneficial interest? ☑ YES ☐ NO. If "YES", specify (indicate name, relationship and position): Mr. GATIS EGLITIS, Director of EXANTE Ltd

(NOTE: if the answer to above question is or becomes "YES", advise your manager before entering any new issue trades.)

Is the RR registered in the state where the customer ☐ ___ ☐ ___

Reg. Rep. ___

Sup. Approval ___

Rev. 4/9/2002

SEC-LEK-E-0001735

**CONSENT TO ELECTRONIC DELIVERY OF DOCUMENTS**

Lek Securities Corporation ("LSC") is an electronic-based broker-dealer providing self-directed brokerage services. By agreeing to electronic delivery the undersigned ("Customer") is giving its informed consent to electronic delivery of all Account Communications (as defined below), other than those Customer has specifically requested be delivered in paper form. Electronic instructions must be sent to such electronic addresses and/or using such system as LSC may specify. On receipt of electronic instructions, an acknowledgement of the instruction will be provided. LSC shall be deemed not to have received any order item by Customer electronically where LSC has not acknowledged the instruction. "Account Communications" mean all current and future Account statements, trade confirmations, notices, disclosures, regulatory communications (including prospectuses, proxy solicitations and proxy notices) and other information, documents, data and records regarding the LSC Account(s) and the Service (including amendments to the Customer Agreement and other agreements between Customer and LSC) delivered or provided to Customer by LSC, the issuers of the Securities and/or Other Property in which Customer invests and other parties.

**Revocation of Consent.** Customer may revoke or restrict consent to electronic delivery of Account Communications anytime, subject to the terms of this Agreement, by notifying LSC in writing or by phone of its intention to do so. Customer also has the right to request paper delivery of any Account Communication that the law requires LSC to provide in paper form. It is understood that if Customer revokes or restricts consent to electronic delivery of Account Communications or requests paper delivery, LSC, at its discretion, may charge a reasonable service fee for the delivery of Account Communications that would otherwise be delivered electronically. Neither the revocation or restriction of consent, or the request for paper delivery, nor LSC's delivery of paper copies of Account Communications will affect the legal effectiveness or validity of any electronic communication provided while the consent was in effect.

**Electronic Delivery System.** Customer agrees that the primary method of LSC communications will be by posting information or messages to this Account on the LSC Website. Customer agrees to check the LSC Website regularly for up-to-date information to avoid making time-sensitive information and to notify LSC immediately by telephone if unable to access the LSC Website. Furthermore, Customer consents to be considered informed and up-to-date concerning all postings on this LSC Website.

Customer can download and save or print the Account Communications received via electronic delivery for internal record keeping. Customer will have access through the LSC Web site to confirmations, account statements and information affecting positions and money balances for at least the current year.

Customer will have access to specific underlying trade data for at least two months. Customer may obtain copies of earlier documents on request. Customer acknowledges that the Internet is not a secure network and that communications transmitted over the Internet may be accessed by unauthorized or unintended third parties.

1 | Lek Securities Corporation One Liberty Plaza – 52nd Floor New York, NY 10006 212.509.2300
www.LekSecurities.com

SEC-LEK-E-0001736

E-mail notifications sent by LSC will not contain sensitive or confidential customer information, including account numbers and the identity of the security purchased. Due to security risks, Customer will not send any sensitive information, such as account numbers or Passwords, in an unencrypted e-mail.

Customer agrees to promptly and carefully review all Account Communications as and when delivered and to notify LSC by telephone prior to the opening of the New York Stock Exchange on the business day immediately following the receipt of account information if Customer disputes the accuracy of any trade related position or balance by LSC or finds such a trade related posting. Customer agrees to notify LSC by telephone within two (2) business days if customer objects, questions, or disputes the accuracy of any account information posted. Failure by LSC to make such a timely related posting. LSC information of all positions and accurate, complete, and conclusive unless Customer objects within the above specified time periods.

**Duration of Consent:** This consent will be effective immediately and will remain in effect unless and until either Customer or LSC revokes it. Customer understands that it may take up to three (3) days to process a revocation of consent to electronic delivery, and Customer may receive electronic notifications in the interim.

**Costs:** Potential costs associated with electronic delivery of Account Communications include charges from internet access providers and telephone companies, and such charges are borne by Customer. LSC does not charge additional online access fees for receiving electronic delivery of Account Communications.

**Consent and Representations.** Customer hereby agrees to have carefully read the above information regarding informed consent and fully understands the implications thereof. Customer hereby agrees to the conditions outlined above concerning electronic delivery of Account Communications. Customer also agrees to maintain a valid e-mail address and to continue to have access to the internet. If Customer's e-mail address changes, Customer agrees to immediately notify LSC of the new e-mail address.

No customer confirmations or customer statements will be mailed.
CUSTOMER MUST REQUEST A LOGON TO ACCESS ACCOUNT INFORMATION.

Customer request to logon to the website: _____
Website Password will be provided upon funding of the account.

EXANTE LIMITED
(Legal Entity Name)

(Signature)    MR. IVAN NAUMOV
DIRECTOR     (Print Name)
(Title)       09 , 20 , 2012
              Dated

2 | Lek Securities Corporation One Liberty Plaza – 52nd Floor New York, NY 10006 212.509.2300
www.LekSecurities.com

SEC-LEK-E-0001737

# Schedule A

## Prepared for EXANTE LTD
### Effective September 13, 2012

### A. Execution and Clearing Charges

**US Listed and OTC Equities:**
Retroactive to First share based on monthly volume:
(in millions of shares traded)

| | |
|---|---|
| 0 – 1 | $0.00300/share |
| 1 – 5 | $0.00250/share |
| 5 – 15 | $0.00200/share |
| 15 – 25 | $0.00150/share |
| 25 – 50 | $0.00100/share |
| 50 – 100 | $0.00095/share |
| 100 – 250 | $0.00090/share |
| 250+ | $0.00085/share |

| | |
|---|---|
| Orders called or routed to our Trade support desk | $0.01/share |
| Options: | $1.00 per contract |
| Bonds ($25 min. per ticket) | .25% of principal |
| US Treasuries ($15 min. per ticket) | .05% of principal |
| E-mini and other Futures products | $1.90/contract + Exchange Fees |
| FX transaction ($8 minimum trade) | $25 million and $50/delivery |
| Canadian Listed Equities | $0.010/share |
| Mexican Listed Equities | 10 basis points |
| Ticket charge for DVP/RVP | $15.00/Delivery and Receipt |

- ECN, NASDAQ, OASYS, OMGEO, NSCC, DTC, OCC and other third party routing fees and rebates passed on based on CUSTOMER's trade volume.
- Exchange and Regulatory fees passed on based on CUSTOMER's trades.

SEC-LEK-E-0001738

Print Name: MR ANATOLI KNYAZEV
Title: DIRECTOR
Signature:

Personal Residence: VOKZALNAYA STR 5-34
AK @ EXANTE.EU

RUSSIAN FEDERATION
0333

MOSCOW  119017
0887  RUS PASSPORT

Print Name: MR VLADIMIR MASLIAKOV
Title: DIRECTOR
Signature:

Personal Residence: VAVILOVA STR 58U/108
VM @ EXANTE.EU

RUSSIAN FEDERATION
0333

MOSCOW  119333
5600  RUS PASSPORT

Dated 20th September 2

IVAN NAUMOV
DIRECTOR

SEC-LEK-E-0001739

Print Name:
MR GATISEGLITIS

Title:
DIRECTOR

Signature:

Personal Residence:
TAHOE PLACE FL 2, TRIQ

GEO EXANTE ECI

Street Address

email address

IS-JORNIET MALTA

OTH

Town/Area(?)

Phone

Cell Phone

ST JULIANS

SLM 1850

LVA PASSPORT

City

State

Zip

Print Name:

Title:

Signature:

Personal Residence:

Street Address

email address

Town/Address(?)

Phone

Club Phone

City

State

Zip

Social Security Number

Dated: 20th September 2012

IVAN NIKOLOV     DIRECTOR

Print Name                    Title

SEC-LEK-E-0001740

LISTING OF OFFICERS AND DIRECTORS OF A CORPORATION
OR
GENERAL PARTNERS OF A PARTNERSHIP OR MANAGING MEMBERS OF A LIMITED LIABILITY COMPANY

TO:   LEK SECURITIES CORPORATION

The following persons are authorized to act on behalf of EXANTE  LIMITED

Print Name:
MR. IVAN NAUMOV          Title: DIRECTOR          Signature:

Personal Residence:
ADRIATICA COURT, TWO MOONS          IVN@EXANTE.EU

TA'XBIEX ROAD, MALTA          141

ST. JULIANS          STJ1610          |3|6|6|7| |   LTU PASSPORT

Print Name:
MR. ALEXEY KIRIENKO          Title: DIRECTOR          Signature:

Personal Residence:
MICHURINSKIY AV. 7/6/34          ALEX@EXANTE.EU

RUSSIAN FEDERATION          0093

MOSCOW          119192          |1|2|4|6|0|
          RUS PASSPORT

SEC-LEK-E-0001741

# EXHIBIT 145

## CORPORATE RESOLUTION

Date: 09.20.2012

Gentlemen:

The undersigned, Secretary of  EXANTE Limited                    (the "Corporation"), hereby
certifies:

that the attached hereto is a true and correct copy of resolutions adopted by the Board of Directors of the
Corporation in accordance with law and the by-laws of the Corporation at a meeting held on
which resolutions are still in full force and effect on the date hereof;

that each of the persons named below, who are the persons empowered by the attached resolutions to act on
behalf of the Corporation, is the duly elected and qualified incumbent in the office of the Corporation set
opposite his name and the signature set opposite his name and the signature set opposite his name is his true
and correct signature:

| EXANTE Ltd | IVAN NAUMOV | |
|---|---|---|
| Office | Name | Signature |
| EXANTE Ltd | GATIS EGLITIS | |
| Office | Name | Signature |

and that the Corporation is duly organized and is validly existing under the laws of the State and Country of
Malta                    empowers the Corporation to transact the business defined in the
resolutions a           which  attached hereto, and that no limitation has been imposed upon such
resolutions by          by-laws of the Corporation or otherwise.

(SEAL)

_____ (SECRETARY)

Countersigned by:

_____
(PRESIDENT / VICE PRESIDENT)

1

**RESOLUTIONS ADOPTED BY THE BOARD OF DIRECTORS OF**

**EXANTE LIMITED**

AT A MEETING HELD ON 20th September 2012

**RESOLVED**

**FIRST:**
That MR. IVAN NAUMOV the Director of EXANTE Ltd or MR. GATIS EGLITIS the DIRECTOR of this corporation be, and each of them hereby is, authorized and empowered, for and on behalf of this corporation (hereinafter the Corporation"), to establish and maintain one or more accounts, which may be MARGIN accounts, with Lek Securities Corporation, (hereinafter the "Brokers") for the purpose of purchasing, investing in, or otherwise acquiring, selling (INCLUDING SHORT SALES), possessing, or turning to account of, or realizing upon, and generally dealing in and with any and all forms of securities, including, but not by way of limitations, shares, stocks, bonds, debentures, notes, scrip, participation certificates, rights to subscribe, options, warrants, certificates of deposit, mortgages, chooses in action, evidences of indebtedness, commercial paper, certificates of indebtedness and certificates of interest, of any and every kind and nature whatsoever, secured or unsecured; likewise the authority and power hereby conferred extends to and includes all interests and rights, whether represented by trust, participation and/or certificates or otherwise.

The fullest authority at all times with respect to any such commitment or with respect to any transaction deemed by any of the said officers and or agents to be proper in connection therewith is hereby conferred, including (without limiting the generality of the foregoing) to give written or verbal instructions to the Brokers with respect to said securities; to borrow money and or securities, from or through the Brokers, and to secure repayment thereof with the property of the Corporation; to bind and obligate the Corporation to and for the carrying out of any contract, arrangement, or transaction which shall be entered into by any such officer and or agent for and on behalf of the Corporation with or through the Brokers; to pay in cash or by cheeks and or drafts drawn upon the funds of the Corporation such sums as may be necessary in connection with any of the said accounts; to deliver securities to the said Brokers; to order the transfer or delivery thereof to any other person whatsoever, and/or to order the transfer of record of any securities or titles, to any name selected by any of the said officers or agents; to affix the corporate seal to any documents or agreements, or otherwise; to endorse any securities or execute powers of attorney with respect thereto in order to pass title thereto; to direct the sales or exercise of any rights with respect to any securities; to sign for the corporation all releases, powers of attorney and/or other documents in connection with any such account, and to agree to any terms or conditions to control any such account; to direct the Brokers to surrender any securities to the proper agent or party for the purpose of deposit with any protective or similar committee, or otherwise; to accept delivery of any securities; to appoint any other person or persons to do any and all things which any of the said officers and/or agents is hereby empowered to do, and generally to do and take all action necessary in connection with the account, or considered desirable by such officer and / or agent with respect thereto.

**SECOND:**
That the Broker may deal with any and all of the persons directly or indirectly by the foregoing resolution empowered, as though they were dealing with the Corporation directly.

2

**THIRD:**

That the Secretary of the Corporation be and he/she hereby is authorized, empowered and directed to certify under the seal of the Corporation, (the certificate to be countersigned by the President or any Vice-President of the Corporation) to the Brokers

   (a)   a true copy of these resolutions
   (b)   specimen signatures of each and every person by these resolutions empowered
   (c)   a certificate (which, if required by the Brokers, shall be supported by an opinion of the general counsel of the Corporation, or other counsel of the Corporation, or other counsel satisfactory to the Brokers) that the Corporation is duly organized and is validly existing, that its charter empowers it to transact the business by these resolutions defined under the laws of Malta _____ and that no limitation has been imposed upon such powers by the by-laws or otherwise.

**FOURTH:**

That the foregoing resolutions and the certificates actually furnished to the Brokers by the Secretary of the Corporation pursuant thereto be, and they hereby are, made irrevocable until written notice of the revocation thereof shall have been received by the Brokers.

**FIFTH:**

That the Brokers may rely upon the certified copy of the resolutions, specimen signatures, and certificate, as continuing fully effective unless and until the Brokers shall receive due written notice of change or rescission, and the dispatch or receipt of any other form of notice shall not constitute a waiver of this provision, nor shall the failure to supply any specimen signature invalidate any transaction where the party authorizing the same has been actually empowered thereto by or in conformity with these resolutions

**SIXTH:**

That in the event of any change in the office or powers of persons hereby empowered, the Secretary shall certify such changes to the Brokers in writing in the manner hereinabove provided, which notification when received, shall be adequate both to terminate the powers of persons theretofore authorized, and to empower the persons thereby substituted or added.

3

EXHIBIT 146

BITCOIN

# The emergence of electronic gold...?



**Anatoliy Knyazev**

"I hope our fund will be the first hedge fund to take advantage of using Bitcoins," explains Anatoliy Knyazev in Moscow. One of Exante's managing partners, Knyazev confirms that the firm is currently in the process of structuring the fund, with a view to launch this autumn.

Bitcoin is a decentralised, digital currency that could revolutionise the world of payments. It refers to both the open source software used to trade the electronic currency, as well as the currency itself. An anonymous group developed the concept in 2009, publishing a white paper that detailed the crypto-currency algorithms and proof of how Bitcoin worked.

As Knyazev explains: "Bitcoin is basically an electronic version of cash, or gold. Each user has a file on the computer representing their wallet. It has a unique public key which you use to send and receive money." In order to use received Bitcoins, the user needs to have the private key that matches the public key the Bitcoin was received with.

Bitcoins function the same way as cash: every transaction made is irreversible, and if, for whatever reason, the Bitcoin wallet is lost, there is no way of retrieving it: "What's lost is lost, what's transferred is transferred," says Knyazev.

The Bitcoin system is peer-to-peer. All transactions are visible, and by using cryptographic algorithms Bitcoin is able to verify every successful transaction. What this does is build an ever-growing chain of transactions, allowing users to see where Bitcoins have been traded.

It's still early days for Bitcoin, which remains a highbrow concept. However, one of the features that could prove critical to its success is in-built deflation. This is because the rate at which Bitcoins arrive into the system is pre-determined. That rate follows a pre-determined curve, which will drop at a future point causing the inflow of new Bitcoins to reduce.

"With Bitcoin you have a process called 'mining', which involves the accrual of Bitcoins. To mine at a significant rate one needs custom designed hardware with GPUs or FPGAs," says Knyazev. This lies at the heart of Exante's investment strategy in the Bitcoin fund: to raise assets in US dollars and euros and purchase



Bitcoins, whose value should increase over time as more users mine them.

"We will hold the Bitcoins securely in a Swiss vault over a period of three, five, 10 years. The fund will be a regulated entity through which institutional investors will be able to access the Bitcoin market," says Knyazev.

As the rate at which Bitcoins are added to the system is controlled, it means that the more people mine, the less each of them is likely to get: currently the number of bitcoins mined averages 7,200 per day but in the near future this will drop to 3,600 bitcoins per day, and will continue to decline. Therefore, the acquisition of bitcoins will become more and more competitive.

"The system will peak at 21 million Bitcoins in 2020. Right now, in terms of where we are on the curve, around one half of the Bitcoins have been mined globally. The rate of circulation is higher in the early stages and slows down with time. So even though it's only taken three years to mine half of the Bitcoins, it will take another 10 years to mine the remaining half," explains Knyazev.

The niche fund strategy plans to launch with around EUR1million and Knyazev is excited about its prospects:

"As soon as Exante's clients hear about a smart new idea they tend to want to get involved. We are confident this will be the case with the Bitcoin fund." ◾

# Spirit of entrepreneurism delivers cumulative returns of 480%



Mark Nordlicht & Uri Landesman

"I like to describe ourselves at Platinum Partners as entrepreneurial traders. We select and promote entrepreneurs who have an understanding of how to structure transactions in a way that caps the limit to the downside while giving us all kinds of upside opportunities," says Uri Landesman, president and managing general partner of the New York-based firm.

Platinum Partners was started by Mark Nordlicht in 2003. Nordlicht's background was in trading natural gas volatility. He also specialised in making senior secured loans to private companies. These two strategies are still used by Platinum today in its flagship multi-strategy fund: Platinum Partners Value Arbitrage fund.

Since 2003, the fund has built an enviable track record, generating average annualised returns of 20.13 per cent – outpacing the firm's target of 15 per cent annualised. Its best performance to date came in 2007 when it returned 53 per cent, which Landesman attributes to a number of factors: "Three of our underlying strategies had their best ever years, no single strategy underperformed, and also we started that year with a relatively low asset base, which meant the gains we made had a big impact. The best strategy was volatility trading in natural gas. Uncertainty in the markets allowed us to set up some trades that created a tail-risk for free and made impressive gains," confirms Landesman.

The PPVA fund accounts for USD700million of the firm's USD1.125billion in AUM, and as Landesman says, one of the hallmarks of the firm's success is the ability to swing back and forth across different strategies. "We are completely focused on risk-adjusted returns. That has enabled us to deliver returns of over 20 per cent net of fees to investors, along with a high Sharpe Ratio (3.31). We try to avoid correlation between strategies at all times."

Those strategies range from long/short equity, event-driven, energy arbitrage, asset-based convertible debt (direct lending), volatility arbitrage to physical commodity arbitrage. "Portfolio Managers who get turned away from box-ticking institutions find a home with us. Over the last decade we've built a reputation as the place to go, particularly for idiosyncratic strategies," says Landesman.

Within the PPVA fund, long/short equity accounts for up to 20 per cent of the risk allocation, with three quant strategies, three energy-focused portfolios and two Asian trading strategies accounting for another 40 per cent; the direct lending strategy is between 10 and 12 per cent.

Although mindful of the challenges of increased correlation within global equity markets, Landesman says that the current team of four managers is about to become five, with a clear emphasis on telecoms, media and technology (TMT): "The new hire will be a media expert," says Landesman.

Last year's performance – up 21.03 per cent – was largely thanks to the special situations side of the book, says Landesman: "One strategy, which we call physical commodity arbitrage, is with a 71 per cent stake we own in Black Elk Energy, a private oil and natural gas producer in the Gulf of Mexico; this enjoyed a fairly significant write-up last year. The other big contributor was our event-driven healthcare basket, specifically an investment in biopharmaceutical firm Navidea."

Landesman confirms that the PPVA fund's two event-driven baskets are set to become three: event-driven healthcare, event-driven energy, and 'event-driven other': which covers all other strategies, particularly those focused on China. "The main theme we're playing over the long-term in China is the transition of the lower classes to middle class and taking advantage of their increased purchasing power." YTD the PPVA fund is up 8.20%. ∎



Platinum Partners Value Arbitrage Fund

2012

2003

| Sharpe Ratio | 3.31 |
|---|---|
| Assets Under Management | USD 1.1bn |
| Return since inception | 480.33% |
| Percentage of positive months | 88.7% |
| Years in operation | 9.5 |
| Strategy | Multi-strategy |
| Included in EXANTE Hedge Fund Index | Yes |

# E X A N T E



# The fastest growing alternative investments' community



EXANTE's Online Multiproduct Platform provides the best possible environment for Quantum Brains Capital Fund business as a part of Fishman Group. We highly appreciate the current progress and look forward to enhance our cooperation with EXANTE.

**Gregory Fishman**
Managing Partner of Quantum Brains Capital,
First prize winner of the MICEX & RTS award
"Best Private Investor 2011" in Russia

2010

2012

EXANTE
Hedge Fund Index

Equally weighted audited performance of 20 top performing Hedge Funds listed with EXANTE's Online Multiproduct Platform.

Join us at
# www.exante.eu


Portomaso Business Tower, Level 7, PTM01, St. Julians, Malta
Phone: +356 2015 0000 | info@exante.eu | www.exante.eu

EXHIBIT 147



OVERVIEW

# A one-click approach to accessing alpha

## By James Williams

EXANTE is a unique integrated trading and fund platform offering whose genesis grew out of a challenge faced by its five managing partners. All of them came from a trading background and shared a similar evolutionary path when working with different brokers and banks globally, developing algorithms and trading strategies.

As Gatis Eglitis, one of the managing partners, tells Hedgeweek, once they started to launch their own hedge funds, they encountered a challenge: each time a new entity was set up for proprietary trading it involved having to set up new relationships with counterparties. Actually getting everything set up and structured was a timely, inefficient process; something that EXANTE's managing partners observed was also proving to be a problem for fellow friends running asset management businesses.

To meet this challenge, EXANTE was established in March 2011. It received its licence from the Malta Financial Services Authority end-June 2011. Unlike other fund platforms, EXANTE is an organic institution, blending multi-asset fund support with first-class trade execution services using a sophisticated technology infrastructure.

Says Eglitis: "We know exactly what are the needs of fund managers. We talk the same language, when they ask for a service we immediately understand their requirements because we've been in their shoes. Similarly to grandma's cookies which taste much better than those from a store, we initially designed the infrastructure for self-use only. Our platform is therefore more intuitive and easy to use in comparison to others.

"We've made it our mission to design a first-class infrastructure and view ourselves as a benchmark of transparency in the financial services industry. The fact that our customers are running successful cross exchange and asset class arbitrage proves that we are fulfilling our mission statement because the business of arbitrage requires superior infrastructure and transparent execution."

Although not exclusive, there exists a quantitative/ high frequency trading slant to EXANTE. This is understandable given the managing partners' backgrounds. Picking up on the trading challenges referred to earlier, Eglitis explains: "Every asset manager faces an exhausting relationship establishing processes with counterparties. They find themselves having to deal with multiple brokers and departments to negotiate commercial conditions, credit lines, risks and connectivity issues. In some cases this process is so slow that either market opportunities or customer assets start flooding away.

"This story is common to all managers that deal with multiple asset classes like currencies, fixed income, commodities, stocks and futures. They end up juggling numerous platform providers, connectivity gateways, data vendors, and are forced to deploy a sophisticated buy-side back office tool to calculate the portfolio NAV at the end of each day.


Gatis Eglitis

"So the niche to us was obvious: we couldn't find any broker giving quality DMA access to all markets and instruments with competitive conditions, advanced STP capability and real-time risk monitoring from one account. We created the business for ourselves to overcome these problems and complexities, using the best technology ingredients. Today we share this solution with our friends and asset managers facing similar challenges."

Trading and hedge fund listing are two separate core offerings with EXANTE. The latter is a similar concept to fund listing on an exchange with the sole difference being that it is done on a trading platform. On the platform, hedge funds are treated similarly to cash equities. For any manager wishing to join the platform, which already includes a number of billion-dollar funds, EXANTE's team works closely with them discussing the strategy in detail, and ultimately deciding whether the manager is good enough to list on the platform.

EXANTE's fund platform is potentially a game-changer for the industry. Currently, it has 35 investment management companies, managing around 100 funds. The one-point-click model gives investors the opportunity to invest directly in those funds. More importantly, for hedge fund managers they can trade fast and efficiently, across asset classes, in addition to benefiting from the marketing opportunities that arise from listing and potentially attracting new investors.

Anyone can view the funds. Potential new clients can simply download a demo for free, familiarise themselves with the interface and the funds composing EXANTE's index, and decide whether to open an account or not. Minimum investment, confirms Eglitis, is USD1million.

**Key platform features**
The first point to emphasise is that no one else is giving qualified investors the opportunity to directly invest into hedge funds on such a platform. The fact that all the funds are listed means investors can rotate into and out of different managers as they wish, and actively manage their portfolios directly. They can either build their own fund of funds, or choose to diversify their risk and take broad exposure by investing in the index of managers which EXANTE is now building.

"This allows investors to ultimately have full control of their investment, instead of depositing with a bank where risk is not transparent and the premium is close to zero," says Eglitis.

Secondly, all the funds listed on the system have gone through due diligence. That sets it apart from other fund databases which list funds, but cannot claim to have done due diligence on every one. "There are lots of funds that we have approached from various databases that we cannot place on our system because we are reluctant to expose our customers to such managers. What we offer is quality content," states Eglitis.

Third is the level of transparency it offers clients. People can see the performance and price of each fund just like any other financial instrument. Going forward, Eglitis says the platform will provide full fund profiles and allow users to filter their searches: either by geography, strategy, size of fund or other criteria.

On manager selection, Eglitis stresses that the critical factor is the ability to generate meaningful alpha. In that sense, EXANTE is not too concerned about the types of strategies on the platform, but rather their quality. "What counts when assessing a manager is the audited historical performance chart as this shows past volatility. If performance is exceptional we make sure that there is nothing lying underneath the tip of the iceberg. If not, we are happy to work with them and list their fund."

One interesting future development will be the creation of a ratings system for those managers listed on the platform. This, though, is not an immediate focus: rather it's on building out the index. Eglitis explains how this is created: "We take the 20 top performers to currently construct the index. Going forward, that figure will climb to 50, 100, as we look to develop a benchmark of top performers across all asset classes. The managers chosen will be based on a series of quantitative and qualitative criteria such as year-on-year returns, Sharpe Ratio, Sortino Ratio, managers' edge in the field, etc."

Such has been the success of the underlying managers over the last two years that "If you had invested in the EXANTE Hedge Fund Index in March 2010, you'd currently be up 36.4 per cent," notes Eglitis.

Actual AUM on the platform is USD1.5billion. Looking ahead to the remainder of the year, Eglitis comments: "We already have a pipeline of 100 managers. We hope to have 100 managers listed on the platform – including the 35 existing managers – by the end of the year." ◼

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Civil Action No.: 15-cv-06076 (MCA-MAH) |
| v. | |
| ARKADIY DUBOVOY, et al. | |
| Defendants. | |

**Third Declaration of Lynn O'Connor**

I, Lynn O'Connor, hereby declare as follows:

1. I am employed as Senior Counsel in the Enforcement Division in the Philadelphia Regional Office of the United States Securities and Exchange Commission (the "Commission"), the Plaintiff in this matter, located at 1617 JFK Boulevard, Suite 520, Philadelphia, Pennsylvania 19103. My official duties include participating in fact-finding inquiries and investigations to determine whether federal securities laws have been, are presently being, or are about to be violated, and assisting in the Commission's litigation of enforcement actions.

2. I hold a law degree from the University of Pennsylvania Law School, located in Philadelphia, Pennsylvania. I am licensed to practice law in Pennsylvania.

3. I am assigned to the Commission's investigation relating to the conduct alleged in the complaint.

4. In connection with this assignment, I have, among other things, reviewed certain of the defendants' emails; forensic reports relating to the hacking defendants' computers; forensic reports regarding the hacking into certain newswire services; documents received from the newswire services, including upload and submission times for press releases; and documents

received from various broker-dealers registered in the U.S., including account documentation for numerous brokerage accounts owned and/or controlled by the trading defendants, as well as trade blotters showing order entry and execution times.

5.     I make this declaration based on my personal knowledge, information and/or belief, and based upon my review and analysis of the records referenced above, in support of the Commission's Amended Complaint, Motion for a Temporary Restraining Order, Order Freezing Assets and Granting Other Relief, and for a Preliminary Injunction and incorporate by reference my Declarations dated August 9, 2015 and August 21, 2015 and the Exhibits thereto.

6.     I make this third declaration for the purpose of adding additional relevant information and documents in support of the Commission's Amended Complaint and Motion. For ease of reference, exhibits attached to this second declaration are numbered consecutively following the last exhibit in my earlier declarations.  Herein, reference to my earlier declarations shall be to "O'Connor Decl." and "Second O'Connor Decl." and references to this declaration shall be to "Third O'Connor Decl.".

**Additional Defendants:  Copperstone Alpha Fund and Copperstone Capital**

7.     **Copperstone Alpha Fund (the "Copperstone Fund")** purports to be a hedge fund established in the Cayman Islands with its principal place of business at Harbor Place, 2nd Floor, 103 South Church Street, P.O. Box 10364, Grand Cayman, Cayman Islands.  **Third O'Connor Decl. Exhibit 148** is a true and correct copy of the Copperstone Fund's Financial Statements for the period from February 6, 2012 (commencement of operations) to December 31, 2012.  The Copperstone Fund was launched by Copperstone Capital ("Copperstone"), another Cayman entity, which is located at the same address as the Copperstone Fund.  **Id. at p. 1; Third O'Connor Decl. Exhibit 149** is a true and correct copy of a July 7, 2015 Web article

2

entitled: "Copperstone Capital: Russian market insight." David Amaryan is the Director of the Copperstone Fund. **Third O'Connor Decl. Exhibit 148 at p.17.** He is also the fund's Managing Partner and Chief Investment Officer and, as such, is responsible for the investment management process of the Copperstone Fund and its day-to-day operations. **Third O'Connor Decl. Exhibit 149; Third O'Connor Decl. Exhibit 150** is a true and correct copy of a 2015 article in Acquisition International entitled "Copperstone Capital."

8. **Copperstone Capital** is a company owned by defendant Intertrade Pacific S.A. ("Intertrade"), a corporation registered in the British Virgin Islands, and has as its principal places of business Harbor Place, 2nd Floor, 103 South Church Street, P.O. Box 10364, Grand Cayman, Cayman Islands, and 16 Sadovnicheskaya Street, bld. 1, Moscow, 115035 Russia. **Third O'Connor Decl. Exhibit 151** is a true and correct redacted copy of an email chain between Interactive Brokers staff and Copperstone Capital staff dated December 23, 2011 with an attachment entitled "Register of Members and Directors and Officers CC.pdf"; **Third O'Connor Decl. Exhibit 152** is a true and correct copy of Incorporation documents for Intertrade; **Third O'Connor Decl. Exhibit 153** is a true and correct copy of an organization chart showing the relationships between David Amaryan, Intertrade and Copperstone. David Amaryan founded Copperstone Capital in 2010. He is the Chairman of the Investment Committee of Copperstone Capital, its sole Director and is responsible for its day to day operations. *Id.*; **Third O'Connor Decl. Exhibits 148 and 149.** Intertrade owns Copperstone Capital. *Id.*; **Third O'Connor Decl. Exhibit 154** is a true and correct copy of documents provided by Amaryan to Merrill Lynch on September 20, 2013, concerning Intertrade and Copperstone Capital. David Amaryan owns all shares of Intertrade. *Id.*

9.      The Copperstone Fund has an account at Merrill Lynch ending *2X05.  **Third O'Connor Decl. Exhibit 155** is a true and correct redacted copy of a Merrill Lynch account statement for the Copperstone Fund account ending *2X05.  The Copperstone Fund also has a prime brokerage account at Credit Suisse Securities (USA) account ending *0WM0.  **Third O'Connor Decl. Exhibit 156** is a true and correct redacted copy of a Credit Suisse account statement for the Copperstone Fund account ending *0WM0.  Upon information and belief, the Copperstone Fund also has prime brokerage accounts at Credit Suisse Securities (Europe) ("CS Europe") ending *0WM0, *KMG0, *KZS0, *6DY0, and *6GL0.  **Third O'Connor Decl. Exhibit 157** is a true and correct copy of the prime brokerage agreement between the Copperstone Fund and CS Europe.

10.      Between January 2012 and July 2015, as described in the Amended Complaint, the Copperstone Fund executed trades in these accounts resulting in at least $4 million in gains.  **Third O'Connor Decl. Exhibit 158** is a summary exhibit compiling data from the account statements for Copperstone Fund account ending *0WM0 for the time period January 2012 through July 2015.

11.      The trading at issue in the accounts controlled by Amaryan, including the Copperstone Fund accounts, often occurred in the window of time between when the press releases were uploaded to the Newswire Services' computer systems and when they were publicly released, often close in time to the issuers' upload of releases to the Newswire Services.  And, their trading oscillated between securities of issuers who disseminated their press release through Newswire Service 1 or Newswire Service 2 in lock-step with the hackers shifting access.  **Third O'Connor Decl. Exhibit 159** is a summary exhibit compiling information concerning Copperstone Fund's trading cited in the Amended Complaint**.**

4

I, Lynn O'Connor, do hereby declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.  Executed on this XX day of August, 2015.

Lynn O'Connor

EXHIBIT 148

# Copperstone Alpha Fund

Financial Statements

For the period from February 6, 2012 (commencement of operations) to
December 31, 2012

# Copperstone Alpha Fund

Financial Statements

| **Table of Contents** | **Page(s)** |
| --- | --- |
| General Information | 1 - 2 |
| Independent Auditors' Report to the Shareholders | 3 |
| Statement of Financial Position | 4 |
| Statement of Comprehensive Income | 5 |
| Statement of Changes in Equity | 6 |
| Statement of Cash Flows | 7 |
| Notes to the Financial Statements | 8 - 28 |

# Copperstone Alpha Fund

**General information**

| | |
|---|---|
| **Directors** | David Amaryan |
| | Vardan Amaryan |
| **Registered Office** | Copperstone Alpha Fund |
| | Harbour Place, 2nd Floor |
| | 103 South Church Street |
| | P.O. Box 10364 |
| | Grand Cayman KY1-1004 |
| | Cayman Islands |
| **Investment Manager** | Copperstone Capital |
| | Harbour Place, 2nd Floor |
| | 103 South Church Street |
| | P.O. Box 10364 |
| | Grand Cayman KY1-1004 |
| | Cayman Islands |
| **Administrator** | Trinity Fund Administration (Cayman) Ltd. |
| | Harbour Place, 2nd Floor |
| | 103 South Church Street |
| | P.O. Box 10364 |
| | Grand Cayman KY1-1004 |
| | Cayman Islands |
| **Prime Broker** | Credit Suisse Securities (Europe) Limited |
| | One Cabot Square |
| | London E14 4QJ |
| | United Kingdom |
| **Banker** | JP Morgan Chase Bank N.A. |
| | 25 Bank Street |
| | Canary Wharf |
| | London E14 5JP |
| | United Kingdom |
| **Auditors** | KPMG |
| | P.O. Box 493 |
| | Century Yard |
| | George Town, |
| | Grand Cayman KY1-1106 |
| | Cayman Islands |

# Copperstone Alpha Fund

**General information (continued)**

| | |
|---|---|
| **Legal Counsel**<br>(as to Cayman Law) | FINAB Legal Ltd.<br>Genesis Building, 3rd Floor<br>P.O. Box 32338 SMB<br>KY1-1209<br>Grand Cayman<br>Cayman Islands |
| **Share Registrar** | Trinity Fund Administration (Cayman) Ltd.<br>Harbour Place, 2nd Floor<br>103 South Church Street<br>P.O. Box 10364<br>KY1-1004<br>Grand Cayman<br>Cayman Islands |



**KPMG**
PO Box 493
Century Yard
Grand Cayman KY1-1106
CAYMAN ISLANDS

Telephone: +1 345 949-4800
Fax: +1 345 949-7164
Internet: www.kpmg.ky

# Independent Auditors' Report to the Shareholders

We have audited the accompanying financial statements of Copperstone Alpha Fund ("the Fund"), which comprise the statement of financial position as at December 31, 2012, the statements of comprehensive income, changes in equity and cash flows for the period from February 6, 2012 (commencement of operations) to December 31, 2012, and notes, comprising a summary of significant accounting policies and other explanatory information.

### Management's Responsibility for the Financial Statements

Management is responsible for the preparation and fair presentation of these financial statements in accordance with International Financial Reporting Standards, and for such internal control as management determine is necessary to enable the preparation of financial statements that are free from material misstatements, whether due to fraud or error.

### Auditors' Responsibility

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with International Standards on Auditing. Those standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on our judgement, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, we consider internal control relevant to the Fund's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Fund's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by the directors, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### Opinion

In our opinion, the financial statements present fairly, in all material respects, the financial position of the Fund as at December 31, 2012, and its financial performance, changes in equity and its cash flows for the period from February 6, 2012 (commencement of operations) to December 31, 2012 in accordance with International Financial Reporting Standards.

KPMG

June 27, 2013

KPMG, a Cayman Islands partnership and a member firm of the
KPMG network of independent member firms affiliated with KPMG
International Cooperative ("KPMG International"), a Swiss entity.

# Copperstone Alpha Fund

**Statement of Financial Position**

December 31, 2012
*(stated in United States dollars)*

| | Note | 2012 |
|---|---|---|
| **Assets** | | |
| ***Financial assets at fair value through profit or loss*** | | |
| ***Held for trading*** | | |
| Equity securities | 3,9 | 12,385,705 |
| Derivative assets | 3,9,10 | 59,107 |
| ***Loans and receivables*** | | |
| Cash and cash equivalents | 6,9 | 84,735 |
| Amounts due from broker | 7,9 | 4,032,472 |
| Dividend receivable | | 1,577 |
| ***Other assets*** | | 25,510 |
| **Total Assets** | | **16,589,106** |
| | | |
| **Liabilities** | | |
| ***Financial liabilities at fair value through profit or loss*** | | |
| ***Held for trading*** | | |
| Equity securities sold short | 3,9 | 432,700 |
| ***Financial liabilities measured at amortised cost*** | | |
| Amounts due to broker | 7,9 | 4,635,471 |
| Accounts payable and accrued expenses | | 175,132 |
| **Total Liabilities** | | **5,243,303** |
| | | |
| **Equity** | | |
| Management shares | 8 | 100 |
| Net assets attributable to holders of redeemable participating shares | | 11,345,703 |
| **Total Equity** | | **11,345,803** |
| | | |
| **Total Liabilities and Equity** | US$ | **16,589,106** |
| | | |
| Participating shares in issue | | 108,362.68 |
| Net asset value per participating share | US$ | 104.70 |

Approved on behalf of the Board of Directors and authorised for issue on June 27, 2013

DAVID AMARYAN
_____ Authorised signatory

VARDAN AMARYAN
_____ Authorised signatory

*See accompanying notes to the financial statements.*

4

# Copperstone Alpha Fund

**Statement of Comprehensive Income**
For the period from February 6, 2012 (commencement of operations) to December 31, 2012
*(stated in United States dollars)*

|  | Note | 2012 |
|---|---|---|
| **Investment income** | | |
| *Financial instruments at fair value through profit or loss* | | |
| *Held for trading* | | |
| Net realised gain on investments in securities | | 822,583 |
| Net unrealised gain on investments in securities | | 439,915 |
| Net realised loss on derivative contracts | | (403,834) |
| Net unrealised gain on derivative contracts | | 59,107 |
| Dividend income | | 53,097 |
| *Loans and receivables* | | |
| Interest income | | 10,686 |
| Other foreign currency losses | | (30,188) |
| **Total investment income** | | **951,366** |
| | | |
| **Operating expenses** | | |
| Management fees | 4 | 178,226 |
| Performance fees | 4 | 127,359 |
| Brokerage fee and commissions | | 94,992 |
| Custodian fees | | 64,392 |
| Legal and professional fees | | 24,176 |
| Administration fees | 5 | 20,395 |
| Withholding tax | | 13,900 |
| Interest expense | | 13,554 |
| Formation costs | | 8,205 |
| Dividend expense on short sales | | 860 |
| Other operating expenses | | 24,887 |
| **Total operating expenses** | | **570,946** |
| | | |
| **Net increase in net assets resulting from operations** | | US$ **380,420** |

*See accompanying notes to the financial statements.*

# Copperstone Alpha Fund

**Statement of Changes in Equity**
For the period from February 6, 2012 (commencement of operations) to December 31, 2012
*(stated in United States dollars)*

|  |  | 2012 |
|---|---|---|
| **Total equity at beginning of period** |  | - |
| **Net increase in net assets resulting from operations** |  | 380,420 |
| **Capital transactions** |  |  |
| Issue of management shares |  | 100 |
| Issue of redeemable participating shares |  | 12,467,283 |
| Redemption of redeemable participating shares |  | (1,502,000) |
|  |  | 10,965,383 |
| **Total equity at end of period** | US$ | 11,345,803 |
| **Represented by:** |  |  |
| Net assets attributable to holder of management shares |  | 100 |
| Net assets attributable to holder of redeemable preference shares | US$ | 11,345,703 |

*See accompanying notes to the financial statements.*

# Copperstone Alpha Fund

**Statement of Cash Flows**
For the period from February 6, 2012 (commencement of operations) to December 31, 2012
*(stated in United States dollars)*

|  | 2012 |
|---|---|
| **Cash provided by/(applied in):** | |
| **Operating activities** | |
| Net increase in net assets resulting from operations | 380,420 |
| **Add/(deduct):** | |
| Purchase of investments in securities | (69,543,025) |
| Proceeds from the sale of investments in securities | 62,367,112 |
| Net realised gain on investments in securities | (822,583) |
| Net unrealised gain on investments in securities | (439,915) |
| Net unrealised gain on derivatives | (59,107) |
| **Adjustments to reconcile net increase in net assets from operations to net cash used in operating activities:** | |
| Amounts due from broker | (4,032,472) |
| Dividend receivable | (1,577) |
| Other assets | (25,510) |
| Amounts due to broker | 4,635,471 |
| Accounts payable and accrued expenses | 175,132 |
| **Net cash used in operating activities** | **(7,366,054)** |
| **Cash flows from financing activities** | |
| Issue of management shares | 100 |
| Issue of redeemable participating shares | 8,952,689 |
| Redemption of redeemable participating shares | (1,502,000) |
| **Net cash inflow provided by financing activities** | **7,450,789** |
| **Net increase in cash and cash equivalents for the period, held as cash and cash equivalents at the end of the period** | US$  84,735 |
| **Supplementary information on cash flow from operating activities:** | |
| Interest received | 10,686 |
| Interest paid | (14,501) |
| **Supplementary disclosure on non-cash operating activities:** | |
| Purchase of investments[1] | 3,514,594 |

[1] During the period ended December 31, 2012, the Fund received equity shares in exchange for US$3,514,594 Redeemable Participating Shares of the Fund.

*See accompanying notes to the financial statements.*

# Copperstone Alpha Fund

**Notes to the Financial Statements**
December 31, 2012
*(stated in United States dollars)*

1. **Incorporation and background information**

   Copperstone Alpha Fund ("the Fund") is an open-ended investment fund designed to permit investors to participate in professionally managed portfolios. The Fund is a Cayman Islands exempted company incorporated on March 24, 2010 as a limited liability company under the provisions of the Cayman Islands Companies Law and commenced operations on February 6, 2012. The Fund changed its name from BCD Partners Limited to Copperstone Alpha Fund on April 15, 2011. The Fund was registered under the Mutual Funds Law of the Cayman Islands on July 7, 2011.

   The Fund aims to achieve capital appreciation by investing in a diversified portfolio of securities that reflects the Investment Manager's outlook on global emerging markets, with a particular emphasis on the markets of the Former Soviet Union ("FSU"). Whilst typically dealing in securities in or tied to the FSU markets, the Fund may also deal in financial instruments in other markets globally. The Fund will also engage in hedging opportunistically to limit downside risks, and will manage its cash position with a similar view.

   The Fund's investment activities are managed by Copperstone Capital (the "Investment Manager"). The administration of the Fund is performed by Trinity Fund Administration Limited (the "Administrator").

2. **Summary of significant accounting policies**

   The financial statements have been prepared in accordance with International Financial Reporting Standards ("IFRS") and interpretations adopted by the International Accounting Standards Board ("IASB").

   The financial statements were authorised for issue by the Board of Directors on June 27, 2013.

   The accounting policies have been consistently applied by the Fund. The principle accounting policies adopted by the Fund are as follows:

   *(a) Basis of preparation*

   The functional and presentation currency of the financial statements is the United States dollar and not the local currency of the Cayman Islands, which reflects the fact that the participating shares are issued and redeemed in United States dollars.

   The financial statements are prepared on a fair value basis for financial assets and financial liabilities at fair value through profit or loss. Other financial assets and liabilities and non financial assets and liabilities are stated at amortised cost which approximates their fair values. Purchases and sales are accounted for on a trade date basis.

8

# Copperstone Alpha Fund

**Notes to the Financial Statements (continued)**
December 31, 2012
*(stated in United States dollars)*

---

2.  **Summary of significant accounting policies (continued)**

    *(b) Use of estimates and judgement*

    The preparation of financial statements in accordance with IFRS requires management to make judgements, estimates and assumptions that affect the application of policies and the reported amounts of assets and liabilities, income and expense.

    The estimates and associated assumptions are based on historical experience and various other factors that are believed to be reasonable. The estimates underlying assumptions are reviewed on an ongoing basis. Revisions to accounting estimates are recognised in the period in which the estimate is revised if the revision affects only that period or in the periods of revision and future periods if the revision affects both current and future periods. Actual results could differ from estimates.

    *(c) Foreign currency translation*

    Transactions in foreign currencies are translated at the foreign currency exchange rate ruling at the date of the transaction. Monetary assets and liabilities denominated in foreign currencies are translated to US dollars at the foreign currency exchange rate ruling at the reporting date. Foreign currency exchange differences arising on translation and realised gains and losses on disposals or settlements of monetary assets and liabilities are recognised in the statement of comprehensive income. Non-monetary assets and liabilities denominated in foreign currency that are measured at fair value are translated to US dollars at the foreign currency exchange rates at the date that the values were determined. Foreign currency exchange differences relating to investments at fair value through profit or loss are included in gains and losses on investments. Foreign exchange differences on other monetary items, including cash are presented separately in the statement of comprehensive income.

    *(d) Financial instruments*

    (i)  Classification

    The Fund has designated the investments in equity securities, equity securities sold short and derivative financial instruments into the financial assets as well as financial liabilities at fair value through profit or loss as held for trading.

    Financial assets that are classified as loans and receivables include cash and cash equivalents, amounts due from broker, dividend receivable, and other assets.

    Financial liabilities carried at amortised cost include amounts due to broker and accounts payable and accrued expenses.

# Copperstone Alpha Fund

**Notes to the Financial Statements (continued)**
December 31, 2012
*(stated in United States dollars)*

2. **Summary of significant accounting policies (continued)**

   *(d) Financial instruments (continued)*

    (ii) Recognition and measurement

      The Fund recognises financial assets or liabilities on the date it becomes party to the contractual provisions of the instruments. From this date, any gains and losses arising from changes in fair value of the instruments are recognised in the statement of comprehensive income. A regular way purchase of financial assets is recognised using trade date accounting.

      Financial instruments are measured initially at cost. For financial assets acquired, cost is the fair value of the consideration given, while for financial liabilities cost is the fair value of consideration received. Subsequent to initial recognition, all instruments classified at fair value through profit or loss are measured at fair value with changes in their fair value recognised in the statement of comprehensive income.

      Financial assets classified as loans and receivables are carried at amortised cost using the effective interest rate method less impairment losses, if any.

      Financial liabilities, other than those at fair value through profit or loss, are measured at amortised cost using the effective interest rate method.

    (iii) Fair value measurement principles

      The fair value of financial instruments is based on their quoted market prices in active markets at the reporting date without any deduction for estimated future selling costs. Financial assets are priced at current bid prices, while financial liabilities are priced at current asking prices.

      The fair value of derivatives that are not exchange-traded is estimated at the amount the Fund would receive or pay to terminate the contract at the reporting date, taking into account current market conditions and the current creditworthiness of the counterparties.

10

# Copperstone Alpha Fund

**Notes to the Financial Statements (continued)**
December 31, 2012
*(stated in United States dollars)*

2. **Summary of significant accounting policies (continued)**

   *(d) Financial instruments (continued)*

   (iv) Impairment

   Financial assets that are stated at cost or amortised cost are reviewed at each reporting date to determine whether there is objective evidence of impairment. If any such indication exists, an impairment loss is recognised in the statement of comprehensive income as the difference between the asset's carrying amount and the present value of estimated future cash flows discounted at the financial asset's original effective interest rate.

   If in a subsequent period the amount of an impairment loss recognised on a financial asset carried at amortised cost decreases and the decrease can be linked objectively to an event occurring after the write-down, the write-down is reversed through the statement of comprehensive income.

   (v) Offsetting financial instruments

   Financial assets and liabilities are offset and the net amount reported in the statement of financial position where there is a legally enforceable right to offset the recognised amounts and there is an intention to settle on a net basis, or realise the assets and settle the liability simultaneously. The Fund has elected not to offset fair value amounts recognised in the statement of financial position.

   (vii) Derecognition

   The Fund derecognises a financial asset when the contractual rights to the cash flows from the financial asset expire or it transfers the financial asset and the transfer qualifies for derecognition in accordance with IAS 39.

   The Fund derecognises a financial liability when the obligation specified in the contract is discharged, cancelled or expired.

   (viii) Specific instruments

   *Investment in equity securities*

   Investments in equity securities are classified as held for trading and are carried at fair value with changes in fair value recognised in the statement of comprehensive income.

# Copperstone Alpha Fund

**Notes to the Financial Statements (continued)**
December 31, 2012
*(stated in United States dollars)*

2. **Summary of significant accounting policies (continued)**

   *(d) Financial instruments (continued)*

   (viii) Specific instruments (continued)

   *Equity investments sold short*

   The Fund may sell a security that it does not own in anticipation of a decline in the market value of the security (short sale). A gain, limited to the price at which the Fund sold the security short, or a loss, unlimited in magnitude, will be recognised in the statement of comprehensive income upon the termination of a sale if the market price at termination is less than or greater than, respectively, the proceeds originally received. Securities sold short represent obligations of the Fund to purchase the security in the market at prevailing prices to the extent that the Fund does not already have the securities in its possession. Accordingly, these transactions result in off-balance sheet risk as the Fund's satisfaction of the obligation may exceed the amount recognised in the statement of financial position.

   *Futures*

   Futures are contracts for delayed delivery commodities, securities or money market instruments in which the seller agrees to make delivery at a specific future date of a specified commodity or instrument, at a specified price or yield. Gains and losses on futures are recognised by the Fund based upon market fluctuations and are included in the statement of comprehensive income. The Fund did not hold any futures contracts at reporting date.

   *Equity Swaps*

   The fair value of equity swaps is calculated as the difference between the contract price and the reported market price of the underlying contract variables. Any gain or loss in fair value is recorded as unrealised gain or loss in the statement of comprehensive income. Upon settlement, the Fund recognises a realised gain or loss in the statement of comprehensive income.

12

# Copperstone Alpha Fund

**Notes to the Financial Statements (continued)**
December 31, 2012
*(stated in United States dollars)*

2. **Summary of significant accounting policies (continued)**

(e) *Fair value disclosures*

IFRS 7 outlines disclosures to be made with respect to fair value measurements within the financial statements. All financial instruments designated at fair value are categorised within a three-level hierarchy that reflects the significance of inputs used in measuring the fair values. The fair value hierarchy is as follows:

- Level 1: quoted prices (unadjusted) in active markets for identical assets or liabilities;
- Level 2: inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly (i.e., as prices) or indirectly (i.e., derived from prices); and
- Level 3: inputs for the asset or liability that are not based on observable market data (unobservable inputs).

Specific disclosures are required when fair value measurements are categorised as Level 3 in the fair value hierarchy. Furthermore, changes in valuation techniques from one year to another, including the reasons therefore, are required to be disclosed for each class of financial instruments.

(f) *Cash and cash equivalents*

The Fund considers all cash and short-term deposits with a maturity of three months or less, which are subject to insignificant risk of changes in their fair value, other than cash collateral provided in respect of derivatives, to be cash and cash equivalents. Such amounts are valued at historic cost which is considered to approximate their fair value.

(g) *Amounts due from/to brokers*

Amounts due from brokers comprise of cash collateral held with brokers, cash balances in excess of collateral requirements. Amounts due to brokers comprise of margin and short accounts at brokers.

(h) *Expenses*

All expenses are recognised in the statement of comprehensive income on an accrual basis.

# Copperstone Alpha Fund

**Notes to the Financial Statements (continued)**
December 31, 2012
*(stated in United States dollars)*

2.  **Summary of significant accounting policies (continued)**

*(i) Redeemable participating shares*

The Fund classifies financial instruments issued as equity instruments in accordance with the substance of the contractual terms of the instruments.

The Fund has one class of redeemable participating shares on issue. On liquidation, the holders of the redeemable participating shares shall rank first in the repayment of the nominal value paid up thereon and, will have the right to share, pro rata to their respective holdings and their respective participating class net asset value, in the Fund's surplus assets available for distribution, after the repayment of the nominal value paid up on the management shares. The redeemable preference shares provide the investors with the right to require redemption for cash at a value proportionate to the investor's share in the Fund's net assets at each redemption date and also in the event of the Fund's liquidation.

A puttable financial instrument that includes a contractual obligation for the Fund that instrument for cash or another financial asset is classified as equity if it meets the following conditions:

- it entitles the holder a pro rata share of the Fund's net assets in the event of the Fund's liquidation;
- it is in the class of instruments that is subordinate to all other classes of instruments;
- all financial instruments in the class of instruments that is subordinate to all other classes of instruments have identical features;
- apart from the contractual obligation for the Fund to redeem the instrument for cash or another financial asset, the instrument does not include any other features that would require classification as a liability; and
- the total expected cash flows attributable to the instrument over its life are based substantially on the profit or loss, the change in the recognised net assets or the change in the fair value of the recognised and unrecognised net assets of the Fund over the life of the instrument.

The Fund's redeemable participating shares meet these conditions and are classified as equity.

14

# Copperstone Alpha Fund

Notes to the Financial Statements (continued)
December 31, 2012
*(stated in United States dollars)*

2. **Summary of significant accounting policies (continued)**

(j) *Taxation*

Under the current laws of the Cayman Islands, there are no income, estate, transfer, sales or other Cayman Islands taxes payable by the Fund. The Fund has received an undertaking from the Governor in Cabinet of the Cayman Islands, exempting it from all local income, profit and capital taxes for a period of 20 years from the date of issue of the undertaking. The Fund intends to generally conduct its affairs such that it will not be subject to income tax in any jurisdiction. Certain dividends and interest income realised by the Fund may be subject to withholding taxes. The Fund seeks to minimise withholding taxes, if any, applicable to its investments.

(k) *New standards, amendments and interpretations to existing standards that are not yet effective*

On November 12, 2009, the IASB issued IFRS 9 *Financial Instruments* as the first step in its project to replace IAS 39 Financial Instruments: Recognition and Measurement. IFRS 9 introduces new requirements for classifying and measuring financial assets. On October 28, 2010, the IASB reissued IFRS 9, incorporating new requirements on accounting for financial liabilities, and carrying over from IAS 39 the requirements for derecognition of financial assets and financial liabilities. The IASB intends to further expand IFRS 9 to add new requirements for impairment of financial assets measured at amortised cost, and hedge accounting. IFRS 9 is effective for annual periods beginning on or after January 1, 2013 with earlier application permitted. On August 4, 2011, the IASB has also published an exposure draft proposing to push back the mandatory effective date from January 1, 2013 to January 1, 2015. IFRS 9 has not been early adopted in these financial statements.

On May 12, 2011, the IASB issued IFRS 13 Fair Value Measurement. IFRS 13 replaces the guidance on fair value measurement in existing IFRS accounting literature with a single standard. Though IFRS 13 does not change the requirements regarding which items should be measured or disclosed at fair value, it defines and provides guidance on how to determine fair value and requires certain disclosures about fair value measurements. IFRS 13 is effective for annual periods beginning on or after January 1, 2013 with earlier application permitted. IFRS 13 has not been early adopted in these financial statements.

The Directors anticipate that the adoption of IFRSs that were in issue at the date of authorisation of the financial statements, but not yet effective, will have no material impact on the financial statements of the Fund in the period of application.

# Copperstone Alpha Fund

**Notes to the Financial Statements (continued)**
December 31, 2012
*(stated in United States dollars)*

3. **Fair value information**

    (a) *Fair value hierarchy analysis*

    The tables below provide an analysis of the basis of measurement used by the Fund to fair value its financial instruments carried at fair value, categorised by the fair value hierarchy:

| December 31, 2012 | | Level 1 US$ | Level 2 US$ | Level 3 US$ | Total US$ |
|---|---|---|---|---|---|
| **Financial assets at fair value through profit or loss** | | | | | |
| *Held for trading* | | | | | |
| Equities investments | | 12,385,705 | - | - | 12,385,705 |
| Derivative assets | | - | 59,107 | - | 59,107 |
| | US$ | 12,385,705 | 59,107 | - | 12,444,812 |

| December 31, 2012 | | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|
| **Financial liabilities at fair value through profit or loss** | | | | | |
| *Held for trading* | | | | | |
| Equities investments sold short | | (432,700) | - | - | (432,700) |
| **Total investment** | US$ | (432,700) | - | - | (432,700) |

There were no transfers between the levels during the period.

    (b) *Valuation methods*

    All of the Fund's equity investments and derivative financial instruments are carried at fair value on the statement of financial position. Equity investments are classified as in Level 1 of the fair value hierarchy. Derivative financial instruments can be exchange traded or privately negotiated over-the-counter ("OTC"). OTC derivatives consist of equity swaps and are classified within level 2 of the fair value hierarchy.

    For other financial instruments, including amounts due from brokers, dividends receivable, other assets, amounts due to brokers and accounts payable and accrued expenses, the carrying amount approximates fair value due to the immediate or short-term nature of these financial instruments.

16

# Copperstone Alpha Fund

**Notes to the Financial Statements (continued)**
December 31, 2012
*(stated in United States dollars)*

---

**4. Related party transactions and balances**

*Management fee*

Under the terms of the investment management agreement entered into by the Fund and Copperstone Capital ("the Investment Manager"), the Investment Manager is entitled to receive the following remuneration from the assets of the Fund:

    (i)    a management fee of 2%, calculated and payable monthly in arrears. The management fee is calculated at the rate of 1/12 of 2% of the net asset value at every valuation date and paid monthly in arrears;

    (ii)    a performance fee, charged at 20% of any increase in the net asset value per share on each participating share during each calendar quarter (each a "Performance Period"), or such shorter period that the respective participating shares are outstanding. Performance fees are accrued monthly and payable quarterly in arrears, subject to a high watermark.

When there is a new subscription of participating shares and the net asset value per share has increased above the Peak Net Asset Value per share, the shareholder is required to pay an amount in excess of the net asset value per share equal to the accrued incentive fee.

The subscription price is the gross asset value per share (equal to net asset value per share before incentive fees accrued) and the difference between the gross asset value per share and the net investment asset per share is referred to as an "equalization credit". The equalization credit ensures that every holder of preference shares has the same amount of risk in the Fund. If the Fund maintains its performance to the end of the calculation period, the equalization credit will be refunded by issuing new shares to the investor.

When there is a new subscription of preference shares and the net asset value per share is less than the Peak Net Asset Value, the investor will be required to pay a subscription performance fee in relation to any subsequent increase in the net asset value per share up until the Peak Net Asset Value is reached. The payment of the subscription performance fee by the investor is achieved by means of a partial redemption of that investor's shareholding; this is known as "contingent redemption".

During the period from February 6, 2012 (commencement of operations) to December 31, 2012, management fees of US$178,226 were incurred, and at December 31, 2012, US$19,154 remained payable. Performance fees of US$127,359 were also incurred by the Fund during the period with US$127,359 remaining payable at December 31, 2012.

As stated in Note 6, all management shares are held by the Investment Manager.

Mr. David Amaryan, a director of the Fund, is also a director of the Investment Manager. Mr. Amaryan waived all fees as director to the Fund.

# Copperstone Alpha Fund

**Notes to the Financial Statements (continued)**
December 31, 2012
*(stated in United States dollars)*

5. **Administration fees**

In consideration for the provision of administration services by the Administrator to the Fund, the Administrator is entitled to receive fees, calculated as follows:-

- A basis points charge of 0.12% per annum of the NAV of the Fund of assets up to US$100,000,000;
- A basis points charge of 0.10% per annum of the NAV of the Fund of assets in the band between US$100,000,000.00 and US$250,000,000;
- A basis points charge of 0.08% per annum of the NAV of the Fund of assets in the band between US$250,000,000.00 and US$500,000,000; and
- A basis points charge of 0.05% per annum of the NAV of the Fund of assets in excess of US$500,000,000;

with all fees subject to a minimum of US$24,000 per annum to incorporate one active class of participating shares and on the basis of monthly net asset valuation calculations. In relation to the calculation of an interim Net Asset Value ("NAV") at any such Business Day as the Directors may determine, the Administrator will be entitled to an additional fee in the amount of US$2,000 for each such NAV payable by the subscribing or redeeming shareholder.

Any additional class offerings of the same trading portfolio in operation as at a valuation day will be charged to an additional minimum fee per Class in the amount of US$6,000 per annum. Additional trading portfolios within the same structure will be subject to additional fees.

The Administrator will also be entitled to transfer agency fees in the amount of US$25 per shareholder transaction and US$6.00 per equalisation transaction, which will be waived for the first twelve months of operations, and until otherwise agreed between the parties in writing.

In relation to the provision of audit assistance services, the Administrator will be entitled to a fee in the amount of US$4,000 per annum.

The Administrator will also be entitled to the reimbursement of all properly incurred and vouched out-of-pocket expenses incurred on behalf of the Fund in carrying out its duties for the Fund.

The fees of the Administrator will be calculated monthly and payable on the valuation day of each month and on the termination date.

During the period from February 6, 2012 (commencement of operations) to December 31, 2012, administration fees of US$20,395 were incurred, and at December 31, 2012, US$2,000 remained payable.

# Copperstone Alpha Fund

**Notes to the Financial Statements (continued)**
December 31, 2012
*(stated in United States dollars)*

---

6. **Cash and cash equivalents**

   Cash and cash equivalents at December 31, 2012 comprise of a cash balance of US$84,735 held with JP Morgan Chase Bank, N.A.

7. **Amounts due from/to broker**

   The Fund is required to maintain collateral with brokers to secure the open positions in derivative contracts and equity securities sold short. All trades are settled through the Prime Broker. The Prime Broker charges the Fund fees and other charges in the provision of services as agreed in a commercial manner between the parties from time to time. At December 31, 2012, US$4,032,472 was due from and US$4,635,471 was due to the Prime Broker and represented balances on deposit within the Prime Broker for collateral and other account transactions. At December 31, 2012 the cash balances held with the Prime Broker include cash pledged as collateral of US$330,257.

8. **Share capital**

   The Fund's capital is represented by the redeemable participating shares outstanding and the management shares outstanding.

   The Fund has the power to issue and redeem participating shares. The Fund may issue additional classes of participating shares at the discretion of the Directors. A separate Offering Memorandum, or an addendum to the Offering Memorandum, will be published in respect of each Class or Classes of participating shares issued by the Fund.

   The Fund does not have any externally imposed capital requirements.

   The authorised share capital of the Fund is US$50,000 divided into 4,990,000 participating shares of par value US$0.01 each and 100 management shares of par value US$1.00 each.

   The authorised share capital of the Fund as at December 31, 2012 are as follows:

   |                                                        | US$    |
   | ------------------------------------------------------ | ------ |
   | **Authorised**                                         |        |
   | 100 Management shares of US$1.00 each                  | 100    |
   | 4,990,000 Redeemable participating shares of US$0.01 each | 49,900 |
   |                                                        | 50,000 |

   The Fund was authorised to issue shares in fractional amounts. The Investment Manager is the sole holder of the management shares.

19

# Copperstone Alpha Fund

**Notes to the Financial Statements (continued)**
December 31, 2012
*(stated in United States dollars)*

---

8. **Share capital (continued)**

The table below outlines the share activity of the Fund for the period from February 6, 2012 (commencement of operations) to December 31, 2012:

|  | Shares |
|---|---|
| **Opening balance at February 6, 2012** (commencement of operations) | - |
| Issue of redeemable participating shares in the period | 123,868.81 |
| Redemption of redeemable participating shares in the period | (15,506.13) |
| **Closing balance at December 31, 2012** | 108,362.68 |

The rights attached to participating and management shares pursuant to the articles are summarised below.

The Fund does not anticipate paying or declaring dividends. However, participating shares carry a right to a dividend at the discretion of the directors.

The Directors have power to issue participating shares in different classes from time to time up to the limit of the authorised capital. Notwithstanding any provision to the contrary in the Offering Memorandum, the Directors will not create new classes of shares which will have a material adverse effect on the rights of shareholders who hold participating shares in the classes described within the Offering Memorandum.

Redeemable participating shareholders are not entitled to receive notice of, attend or vote at general meetings of the Fund; they have no voting rights except in connection with the variation of class rights. The redeemable participating shares carry the right to participate equally in any dividends declared by the Fund and are redeemable at the option of the holder.

The minimum initial investment in the participating shares is US$100,000. Subscriptions for additional participating shares are subject to a minimum of US$100,000, or such other amount as may be prescribed from time to time by the Directors either generally or in particular, provided that the minimum initial subscription is not below US$100,000.

Participating shares of the Fund will be offered during the Initial Offering Period at the Initial Offering Price of US$100 per participating share. After the close of the Initial Offering Period, participating shares may be available for subscription at the discretion of the Directors on each Subscription Day at the Subscription Price calculated at the close of business on each Valuation Day. The Subscription Price will equal the Net Asset Value per participating share on the relevant Subscription Day on which the application is effective. The net asset value per participating share is determined as of the close of business on each Valuation Day in accordance with the provisions set out in the Offering Memorandum.

Participating shares may be redeemed at the option of the Shareholder on each Redemption Day. Redemption requests are subject to a two day notice period.

# Copperstone Alpha Fund

**Notes to the Financial Statements (continued)**
December 31, 2012
*(stated in United States dollars)*

8.  **Share capital (continued)**

The Directors may, in their absolute discretion, defer payment of the redemption proceeds if the Fund is unable to make such payments due to circumstances beyond the Fund's control. Payment of redemptions will be made in which case the Fund will pay such redemption proceeds as soon as possible. The Directors may pro-rate all redemption requests on any Redemption Day to limit total redemptions to 10% of the participating shares in issue on the relevant Redemption Day. Any outstanding redemption requests will be carried forward to the next following Redemption Day (subject to further deferral if the deferred requests themselves exceed 10% of the number of participating shares then in issue) where they will be dealt with prior to any subsequent requests. All Participating Shares will be redeemed at the Redemption Price prevailing on the Redemption Day on which they are redeemed.

Valuation Day occurs on the last Business day of each calendar month.

On a winding up of the Fund the assets available for distribution to the shareholders will first be applied in repayment pari passu to such shareholders of the nominal amount of their shares in the Fund.

Any surplus of assets of the Fund then remaining will be distributed pari passu among the holders of participating shares.

9.  **Financial instruments and associated risks**

The Fund's investment activities expose it to a variety of financial risks, which can be classified as market risk (including price risk, interest rate risk and currency risk), credit risk (including counterparty risk) and liquidity risk.

   **(a)  Market risk**

Market risk represents the potential loss that can be caused by a change in the market value of the financial instrument. The Fund's exposure to market risk is determined by a number of factors, including market volatility, interest rates and foreign currency.

The Fund's strategy on the management of investment risk is driven by its investment objectives. The Fund's market risk is managed on a monthly basis by the Investment Manager in accordance with policies and procedures in place.

   *(i)  Currency risk*

The Fund may invest in financial instruments and enter into transactions denominated in currencies other than its functional currency. Consequently, the Fund is exposed to risks that the exchange rate of its currency relative to other foreign currencies may change in a manner that has an adverse effect on the value of that portion of the Fund's assets or liabilities denominated in currencies other than the US Dollar.

The Fund's currency risk is monitored and managed by the Investment Manager on a daily basis through active and passive currency hedging programs at overall portfolio level. The Investment Manager also assesses potential currency risk on a stock-by stock basis as part of a bottom-up security selection process. In general, the Investment Manager seeks to avoid currency risk by selecting securities traded in US Dollar.

The Fund's overall currency positions and exposures are monitored on a monthly basis by the Investment Manager.

21

# Copperstone Alpha Fund
(A Cayman Island Exempted Company)

**Notes to the Financial Statements (continued)**
December 31, 2012
*(stated in United States dollars)*

9. **Financial instruments and associated risks (continued)**

   (a) **Market risk (continued)**

   (i) *Currency risk (continued)*

   The Fund had the following exposure to foreign currencies as shown below:

| December 31, 2012 | Monetary Assets US$ | Monetary Liabilities US$ | Net Exposure US$ |
|---|---|---|---|
| Canadian dollar | 5,092,733 | (4,635,471) | 457,262 |

At December 31, 2012, had the US$ strengthened by 5% in relation to the Canadian dollar, with all other variables held constant, net assets attributable to holders of redeemable participating shares and the change in net assets attributable to holders of redeemable participating shares per the statement of comprehensive income would have decreased by US$22,863.

A 5% weakening of the US dollar against the Canadian dollar would have resulted in an equal, but opposite effect, on the basis that all the other variables, remain constant.

**(ii) *Interest rate risk***

The Fund is exposed to the risk that the fair value of future cash flows of its financial instruments will fluctuate as a result of changes in market interest rates. A significant amount of the Fund's assets and liabilities are held by way of amounts due from/to brokers. Amounts due from/to brokers are interest bearing based on the agreed upon rates between the Fund and the Prime Broker.

The Fund's interest rate risk is mitigated by limiting assets that are exposed to interest. In general, the Fund does not hold bonds, money market instruments or interest earning bank accounts.

# Copperstone Alpha Fund

**Notes to the Financial Statements (continued)**
December 31, 2012
*(stated in United States dollars)*

9. **Financial instruments and associated risks (continued)**

   (a)   **Market risk (continued)**

   *(ii) Interest rate risk (continued)*

   The following table details the Fund's exposure to interest rate risks. It includes the Fund's assets and liabilities at fair values, categorised by the earlier of contractual re-pricing or maturity date measured by the carrying value of the assets and liabilities.

| December 31, 2012 | Less than 1 month US$ | 1-3 months US$ | 3 months to 1 year US$ | More than 1 year US$ | Non-interest bearing US$ | Total US$ |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| *Financial assets at fair value through profit or loss – held for trading* | | | | | | |
| Equity securities | - | - | - | - | 12,385,705 | 12,385,705 |
| Derivative assets | - | - | - | - | 59,107 | 59,107 |
| | | | | | | |
| *Loans and receivables* | | | | | | |
| Cash and cash equivalents | 84,735 | - | - | - | - | 84,735 |
| Amounts due from broker | 4,032,472 | - | - | - | - | 4,032,472 |
| Dividend receivable | - | - | - | - | 1,577 | 1,577 |
| *Other assets* | - | - | - | - | 25,410 | 25,410 |
| **Total assets** | **4,117,207** | **-** | **-** | **-** | **12,471,799** | **16,589,006** |

| December 31, 2012 | Less than 1 month US$ | 1-3 months US$ | 3 months to 1 year US$ | More than 1 year US$ | Non-interest bearing US$ | Total US$ |
|---|---|---|---|---|---|---|
| *Financial liabilities at fair value through profit or loss – held for trading* | | | | | | |
| Equity securities sold short | - | - | - | - | (432,700) | (432,700) |
| | | | | | | |
| *Financial liabilities at amortised cost* | | | | | | |
| Amounts due to broker | (4,635,471) | - | - | - | - | (4,635,471) |
| Accounts payable and accrued expenses | - | - | - | - | (175,132) | (175,132) |
| **Total liabilities (excluding net assets attributable to redeemable shares)** | **(4,635,471)** | **-** | **-** | **-** | **(607,832)** | **(5,243,303)** |
| **Total interest rate sensitivity gap** | **(518,264)** | | | | | |

23

# Copperstone Alpha Fund

**Notes to the Financial Statements (continued)**
December 31, 2012
*(stated in United States dollars)*

---

9. **Financial instruments and associated risks (continued)**

    (a)    **Market risk (continued)**

    *(ii) Interest rate risk (continued)*

The Fund's financial instruments that are significantly exposed to interest rate risk are cash and cash equivalents and amounts due from/due to broker. The net impact of a 100 basis points rise on interest rates on an annual basis will increase the net asset value by US$5,183. A decrease of 100 basis points on interest rates will have an equal but opposite effect.

    *(iii) Price risk*

Price risk is the risk that the fair value or future cash flows of a financial instrument will fluctuate because of changes in market prices (other than those arising from interest rate risk or currency risk), whether those changes are caused by factors specific to the individual financial instrument or its issuer, or factors affecting similar financial instruments traded in the market.

As the majority of the Fund's financial instruments are carried at fair value with fair value changes recognised in the statement of comprehensive income, all changes in market conditions will directly affect net increase in net assets.

The following table details the breakdown of the financial assets and financial liabilities held by the Fund:

|  | December 31, 2012 US$ |
|---|---|
| *Financial assets at fair value – held for trading* |  |
| Equities held long | 12,385,705 |
| Derivative financial instruments | 59,107 |
|  |  |
| *Financial liabilities at fair value – held for trading* |  |
| Equities held short | (432,700) |
|  |  |
| **Total financial assets at fair value through profit or loss** | **12,012,112** |

At December 31, 2012, had the market prices increased by 3% with all other variables held constant, net assets attributable to holders of redeemable participating shares and the changes in net assets attributable to holders of participating shares per statement of comprehensive income would have increased by approximately US$360,364. An equal but opposite decrease would result if the market prices decreased by 3%.

24

# Copperstone Alpha Fund

**Notes to the Financial Statements (continued)**
December 31, 2012
*(stated in United States dollars)*

---

9. **Financial instruments and associated risks (continued)**

   (b) **Credit risk**

   Credit risk represents the potential loss that the Fund would incur if financial instrument counterparties failed to perform pursuant to the terms of their obligations to the Fund.

   The Fund's liquid assets, such as cash are subject to credit risk should the institutions with which they are placed default on any payments. Off-balance sheet credit risk exists among other situations when the collateral received by the Fund from the counterparty to an agreement with the Fund proves to be insufficient to cover the Fund's losses resulting from a default by the counterparty of its obligations to perform under the terms of the agreement. The Fund seeks to minimise credit risk by trading with reputable parties.

   The carrying amounts of financial assets best represent the maximum credit risk exposure at the reporting date. This relates also to the financial assets carried at amortised cost, as they have a short-term to maturity.

   At the reporting date, the Fund's financial assets exposed to credit risk amounted to the following:

   |                            | December 31, 2012 US$ |
   |----------------------------|----------------------:|
   | Amounts due from broker    | 4,032,472             |
   | Dividend receivable        | 1,577                 |
   | Cash and cash equivalents  | 84,735                |
   | **Total**                  | **4,118,784**         |

   The extent of the Fund's exposure to credit risks in respect of these financial assets approximates the carrying value of the assets.

   Cash and cash equivalents of the Fund are held with JP Morgan Chase Bank N.A. (the "Banker") and the amounts due from broker of the Fund is held with Credit Suisse (the "Prime Broker") both with S & P credit ratings of A- thereby exposing the Fund to concentration of credit risk towards the Banker and Prime Broker. Bankruptcy or insolvency of the Banker or Prime Broker may cause the Fund's rights with respect to securities held by the Banker and/or Prime Broker to be delayed or limited. However, the Directors are of the view that there is no material risk in relation to this as the cash balances are not held for prolonged periods. Management also monitors the risk exposure by monitoring the credit quality and financial position of the Banker and Prime Broker on a monthly basis.

# Copperstone Alpha Fund

**Notes to the Financial Statements (continued)**
December 31, 2012
*(stated in United States dollars)*

9. **Financial instruments and associated risks (continued)**

   (c) **Liquidity risk**

   Liquidity risk is the risk that the Fund will be unable to meet its obligations as they fall due.

   The Fund's constitution provides for monthly creation and cancellation of shares and it is therefore exposed to the liquidity risk of meeting shareholders redemptions at any time.

   The Fund's liquidity risk is managed on a daily basis by the Investment Manager and is mitigated by holding more than 75% of all investments with a liquidity of less than 1 day. No investments with a liquidity or more than 10 days are held by the Fund.

   The table below details the Fund's remaining contractual maturity for its financial liabilities.

| December 31, 2012 | Less than 1 month | 1-3 months | 3 months to 1 year | No stated maturity | Total |
|---|---|---|---|---|---|
| | US$ | US$ | US$ | US$ | US$ |
| *Financial liabilities at fair value through profit or loss held for trading* | | | | | |
| Equity securities sold short | (432,700) | - | - | - | (432,700) |
| | | | | | |
| *Financial liabilities at amortised cost* | | | | | |
| Amount due to broker | (4,635,471) | - | - | - | (4,635,471) |
| Accounts payable and accrued expenses | (47,773) | (127,359) | - | - | (175,132) |
| **Total** | **(5,115,944)** | **(127,359)** | **-** | **-** | **(5,243,303)** |

   (d) **Specific instruments**

   *Swap agreements*

   The Fund enters into various swap agreements including equity swaps, with broker-dealers or other financial institutions for investment purposes. A swap involves the exchange by the Fund with another party of their respective commitments to pay or receive cash flows, e.g., an exchange of floating rate payments for fixed-rate payments. Swap agreements and similar transactions can be individually negotiated and structured to include exposure to a variety of different types of investments or market factors. Depending on their structures, swap agreements may increase or decrease the Fund's exposure to long-or short-term interest rates (in the United States or abroad), foreign currency values, mortgage securities, corporate borrowing rates, or other factors such as security prices, inflation rates or the volatility of an index of one or more securities.

# Copperstone Alpha Fund

**Notes to the Financial Statements (continued)**
December 31, 2012
*(stated in United States dollars)*

9. **Financial instruments and associated risks (continued)**

   (d) **Specific instruments (continued)**

   *Swap agreements (continued)*

   The Fund's ability to realise a profit from such transactions will also depend on the ability of the financial institutions with which it enters into the transactions to meet their obligations to the Fund. If a counterparty's creditworthiness declines, the value of the agreement would be likely to decline, potentially resulting in losses. If a default occurs by the other party to such transaction, the Fund will have contractual remedies pursuant to the agreements related to the transaction, which may be limited by applicable law in the case of a counterparty's insolvency. Under certain circumstances, suitable transactions may not be available to the Fund, or the Fund may be unable to close out its position under such transactions at the same time, or at the same price, as if it had purchased comparable publicly traded securities.

   The Fund is subject to equity price risk in the normal course of business. The Fund may enter into an equity swap either to manage its exposure to the market or certain sectors of the market, or to create exposure to certain equities to which it is otherwise not exposed.

   Equity swap contracts involve the receipt of income on a referenced asset, plus any capital gains or losses over the payment period, while the other party receives a specified fixed or floating cash flow unrelated to the credit worthiness of the referenced asset. The Fund's equity swap contracts are scheduled to terminate from August 2013 through October 2013.

   (e) **Equity securities sold short**

   The Fund sells securities that it does not own, and it will therefore be obligated to purchase such securities at a future date. The value of the open short position is recorded as a liability, and the Fund records an unrealised gain or loss to the extent of the difference between the proceeds received and the value of the open short position. The Fund records unrealised gain or loss when a short position is closed out. By entering into short sales, the Fund bears the price risk of increases in the value of the security sold short in excess of the proceeds received. Possible losses from short sales differ from losses that could be incurred from purchases of securities because losses from short sales may be unlimited whereas losses from purchases cannot exceed the total amount invested.

10. **Derivative financial instruments**

   At December 31, 2012 derivative financial assets comprised of the following:

| Derivative asset | Underlying | Expiration | Number of contracts | Notional | Fair value |
|---|---|---|---|---|---|
| Equity Swaps | Equity | 21-Oct-13 | 70,000 | 303,751 | 19,140 |
| Equity Swaps | Equity | 26-Aug-13 | 1,000,000,000 | 190,033 | 39,967 |
| | | | | US$ | 59,107 |

# Copperstone Alpha Fund

**Notes to the Financial Statements (continued)**
December 31, 2012
*(stated in United States dollars)*

---

11. **Directors' interest**

   As stated in Note 4, Mr. David Amaryan, a director of the Fund, is also a director of the Investment Manager.

   Apart from the above, none of the directors, or any of their connected parties, held any interest in the equity of the Fund, whether beneficial or non-beneficial, at any point during the period. No director holds a material interest in any contract of significance with the Fund.

10. **Subsequent events**

   The Directors of the Fund have revised the Offering Memorandum subsequent to year end to revise the current investment strategy and introduce interim valuations and interim dealing days in respect of the participating shares of the Fund. The revised Offering Memorandum became effective on May 31, 2013.

   In preparing these financial statements, management has evaluated and disclosed all material subsequent events up to June 27, 2013, which is the date that the financial statements were available to be issued.



TF-238692

*Certificate of Incorporation on Change of Name*

*I DO HEREBY CERTIFY that*

**BCD WEALTH MANAGEMENT LIMITED**

*having by Special resolution dated 15th day of April Two Thousand Eleven changed its name, is now incorporated under name of*

**Copperstone Capital**

REGISTRAR OF COMPANIES
CAYMAN ISLANDS
EXEMPTED



*Given under my hand and Seal at George Town in the Island of Grand Cayman this 16th day of April Two Thousand Eleven*

An Authorised Officer,
Registry of Companies,
Cayman Islands.

REGISTER OF MEMBERS OF:

SHARE CLASS: Copperstone Capital
Ordinary Shares

DATE: May 12, 2011

| Name & Address | Cert # | Date of Entry | Shares Acquired | Shares Disposed | Date of Cessation | Amount paid or agreed to be paid | Nature of Acquisition | Transfer Details |
|---|---|---|---|---|---|---|---|---|
| Tamil Limited<br>Harbour Centre, Ground Floor<br>42 North Church Street<br>PO Box 1569<br>Grand Cayman KY1-1110<br>Cayman Islands<br>*Total shares held: 0.00 shares* | - | 24-Mar-2010 | 100.00 | 100.00 | 24-Mar-2010 | USD 100.00 | Original Issue | 100 shares tfr'd to Intertrade Pacific S.A. |
| Intertrade Pacific S.A.<br>Geneva Place, Waterfront Drive<br>PO Box 3469, Roar Town<br>Tortola, BVI<br>*Total shares held: 100.00 shares* | 1 | 24-Mar-2010 | 100.00 | | | | USD 100.00 | 100 shares tfr'd from Tamil Limited | |

REGISTER OF DIRECTORS & OFFICERS OF:     Copperstone Capital

DATE: May 12, 2011

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| G.P. Limited<br>Harbour Centre, Ground Floor<br>42 North Church Street<br>PO Box 1569<br>Grand Cayman KY1-1110<br>Cayman Islands | Director | 24-Mar-2010 | 24-Mar-2010 |
| Cayman Directors Limited<br>Harbour Centre, Ground Floor<br>42 North Church Street<br>PO Box 1569<br>Grand Cayman KY1-1110<br>Cayman Islands | Director | 24-Mar-2010 | 24-Mar-2010 |
| David Amaryan<br>Bolshaya Akademicheskaya Street 15<br>Building 1, Apartment 255<br>Moscow 125130<br>Russia | Director | 24-Mar-2010 | |
| Cayman Management Services Ltd.<br>Harbour Centre, Ground Floor<br>42 North Church Street<br>PO Box 1569<br>Grand Cayman KY1-1110<br>Cayman Islands | Secretary | 24-Mar-2010 | |

# COPPERSTONE CAPITAL

To: Bank of America Merrill Lynch

I, David Amaryan, being a sole Director of the company "Copperstone Capital", hereby declare that the following documentation provided to BoAML earlier by Maria Lopatina is correct as of today's date:

Certificate of Incumbency for Copperstone Capital

Certificate of Incumbency for Intertrade Pacific S.A.

CC's Register of Directors and Members

ID of David Amaryan

Dated this: 20th day of September, 2013

Director

David Amaryan



## *NOTARIZATION*

I, **Lewis S. Hunte**, **Notary Public** in Road Town, Tortola, British Virgin Islands do hereby certify that the signature which appears on the foregoing document is the true and correct signature of **Nicola Jane Metcalf**, acting in the capacity of **Authorized Signatory** of Jordans (Caribbean) Limited.

Dated: 21ˢᵗ March 2012



**British Virgin Islands** **25ᶜ**

_____
Lewis S. Hunte
Notary Public

## *APOSTILLE*

### (Convention de la Haye du 5 Octobre 1961)

1.  Country:  **Tortola, British Virgin Islands**

    This public document

2.  has been signed by:      Lewis S. Hunte

3.  acting in the capacity of: Notary Public

4.  bears the seal/stamp of:   Lewis S. Hunte

### *CERTIFIED*

5.  at Road Town, Tortola

6.  the 21ˢᵗ day of March, 2012

7.  by:   "REGISTRAR-GENERAL"

8.  No ........R.G....0.4356

9.  Seal/stamp:



10. Signature .............................



J O R D A N S
INTERNATIONAL

## CERTIFICATE OF INCUMBENCY

| NAME OF COMPANY: | INTERTRADE PACIFIC S.A. |
| --- | --- |
| INCORPORATION DATE: | 8 October 2009 |
| COMPANY REGISTRATION NUMBER: | 1550899 |
| AUTHORIZED NUMBER OF SHARES: | A maximum of 50,000 shares of no par value |
| REGISTERED ADDRESS: | PO Box 3469, Geneva Place, Waterfront Drive, Road Town, Tortola, British Virgin Islands |

| Names | Addresses | Titles | No. of Shares | Certificate Number | Dates of Appointment |
| --- | --- | --- | --- | --- | --- |
| Mr. David Amaryan | Flat 49, bld. 1, Moscow, Andreevskaya nab. | Director | | | 8 October 2009 |
| Mr. David Amaryan | Flat 49, bld. 1, Moscow, Andreevskaya nab. | Shareholder | 50000 | 1 | 8 October 2009 |

We, **JORDANS (CARIBBEAN) LIMITED** of Geneva Place, Waterfront Drive, P.O. Box 3469, Road Town, Tortola, in the British Virgin Islands as Registered Agent of **INTERTRADE PACIFIC S.A.**, a BVI Business Company organized and existing under the laws of the British Virgin Islands (the "Company"), **DO HEREBY CERTIFY** that, to the best of our knowledge and belief, the above information is correct and the Company is in good legal standing until 7 October 2012.

Dated: 20 March 2012



Nicola Jane Metcalf
Authorized Signatory
**JORDANS (CARIBBEAN) LIMITED**
Registered Agent

www.jordans-international.com

Jordans (Caribbean) Limited   Geneva Place   Waterfront Drive   PO Box 3469   Road Town   Tortola   British Virgin Islands
T +1 284 494 6543   F +1 284 494 6515   E info@jordans-bvi.com
Registered in British Virgin Islands No. 1448724   Registered Office: Craigmuir Chambers   Road Town   Tortola   British Virgin Islands

[B.CER03(06)]

# COPPERSTONE CAPITAL

To: Bank of America Merrill Lynch

I, David Amaryan, being a sole Director of the company "Copperstone Capital", hereby declare that the following documentation provided to BoAML earlier by Maria Lopatina is correct as of today's date:

Certificate of Incumbency for Copperstone Capital

Certificate of Incumbency for Intertrade Pacific S.A.

CC's Register of Directors and Members

ID of David Amaryan

Dated this: 20th day of September, 2013

Director

David Amaryan

EXHIBIT 149

My App



2:31 AM - Wednesday 23 March 47611

Skip to content

# Copperstone Capital: Russian market insight

?7th July 2015   ? Finance

Copperstone Alpha Fund is a world-class hedge fund that combines headquarters in Moscow with international asset management expertise



*David Amaryan, Director, Copperstone Capital*

Copperstone Capital was founded by David Amaryan in 2010. Mr Amaryan had spent 10 years in the industry prior to establishing Copperstone Capital, working for both the buy-side and the sell-side, in Russia and across the Atlantic in New York.

The initial focus of Copperstone Capital was private account management. In 2012 the company launched the flagship Copperstone Alpha Fund. The fund has established an impeccable reputation of high integrity, trustworthiness and transparency with an

Search …   Go!

## Follow Us

About Us

Terms and Conditions

Privacy Policy

Contact Us

Subscribe To The Digital Edition Of The European Magazine Free Of Charge

Subscribe To The Hard Copy Edition Of The European Magazine

**Annual Magazine Subscription (6 Issues) Shipping Options**

UK Shipping £49.95



Buy Now

My App

attractive performance track record that has been recognised by a variety of awards. The fund is up 68 per cent since its inception against 46.94 per cent for MSCI ACWI Index (includes both emerging and developed markets), -25.51 per cent for RTS Index (composite index based on prices of the 50 most liquid Russian stocks), 65.83 per cent for S&P 500 Index (capitalisation-weighted index of 500 stocks) respectively. Mr Amaryan is still responsible for the investment management process of the fund and is involved in the day to day operations, despite the fact that Copperstone Capital's list of services has expanded. Today, Copperstone offers its clients comprehensive investment management, personal net-worth management and advisory services.

The firm brings together a unique combination of international asset management expertise, a highly professional team with extensive investment experience and first-hand knowledge of the Russian stock market and business environment.

Mr Amaryan is the Chairman of the Investment Committee, which includes five key members of the team and meets on a weekly basis to get an update on company-specific events and discusses all current portfolio positions in relation to the current business, economic and political environments. The fund has no restrictions to particular regions or asset classes. The investment philosophy combines a number of strategies to provide a natural diversification hedge.

Generally, 50-60 per cent is invested with a value strategy, 20-30 per cent with emerging and global macro strategy and the remaining funds are invested with event-driven special situations strategy. Copperstone Capital's value strategy takes advantage of market mispricing and invests in stocks trading at an attractive relative valuation or at a discount to their own NAV (net asset value) or SOTP (sum of the parts) valuation. Emerging and global macro-strategy aims to profit from general global market trends while event-driven strategy aims to profit from stock specific events, such as M&A, IPO/SPO, bankruptcy procedures.

**Copperstone Capital's achievements: A statement from the Director**
Despite the fact that our main focus is on equity investments in Russia and the CIS, we aren't restricted to a particular region or asset class in our investment activities. This allows us to be much more flexible, looking for value in various markets around the world. This advantage becomes critical during periods of distressed economic conditions and political turbulence, something we witnessed in Russia last year. Our focus on absolute investor returns rather than on a particular region allowed us to switch to global markets and reshuffle our portfolio to have a minimal exposure to Russia in this period of instability and volatile returns.

We strive to provide the best possible risk-adjusted return by exploiting our proprietary asset valuation models together with a pro-active portfolio management approach. As we are not part of any large financial group, we are much better suited to making quick decisions, which is essential when you are dealing with the stock market.

Despite the current situation in Russia, we believe the trough is behind us: the most recent economic data is coming out stronger than expected, the ruble has found equilibrium and we see positive developments in Russia's relationship with the West. The market is up +35 per cent YTD but is still heavily under invested despite being part of the major EM indices. We have absolutely no doubt that investors will increase

## Popular Stories

### Sleep deep flying high



### Is eating out back in?



### Group Jamai: Building on success



### Othman Benjelloun: A portrait of a visionary



### Rioja's Cune Imperial is named wine of the year



My App

their exposure to Russia in the near future and our local knowledge and expertise will prove to be invaluable once again. Before you think we are just another fund trying to draw a picture perfect image, we want to highlight that we understand Russia from within and are able to recognise and use its "flaws" to our advantage. We do not ignore such disadvantages as excessive policy volatility and instability of the legal regime – we try to find ways to create returns around them.

We have big plans for the immediate future. We are constantly seeing more and more international investors ready to share our investment philosophy and are excited to get better acquainted with our business approach. We have decided to open offices in London, Vienna and New York to be closer to our investors. Our London office will be operational by year-end. We are also planning to launch a fixed income, distressed Russian debt and real estate in the near future.

*David Amaryan, Director, Copperstone Capital*

**Further information**

http://www.copperstonecapital.com/

mailto:info@copperstonecapital.com

Share this story

## Post navigation

Previous Story
Fitting the past into a future

Next Story →
Managing culture shock

## Leave a Reply

Your email address will not be published. Required fields are marked *

Name *

Email *

### Nestlé: Shareholder dialogue in a diversified ownership…



### The Chinese Economy is Having Some Tremors



### High potential realised



### 48 hours in Marrakech



### Interview with Gerardo Garcia, CEO, Barents Re



My App

Website

LT8F

CAPTCHA Code*

Comment

Post Comment

About Us   Terms and Conditions   Privacy Policy   Contact Us

©2014 The European, all rights reserved. The European is a registered trademark of Chase Publishing Ltd

EXHIBIT 150

Copperstone Capital



ACQUISITION INTERNATIONAL
The Voice of Corporate Finance

Find out why we're the winner of the
Acquisition International 'Leader in Lead Generation 2014'
Enquire Today ➤                                    so leads

HOME   ABOUT US   ISSUES   SUBSCRIBE   CONTACT   ADVERTISE   PAY ONLINE   LUX

FIND AN EXPERT   DEAL DIARY   GUIDES   AWARDS   ROUND TABLES   MICROSITES          Search Articles





MERRILL
DATASITE

There is
an art
to due
diligence

Get the
white
paper

# Copperstone Capital

**Copperstone Capital is an investment management firm founded in 2010 in Moscow, Russia by David Amaryan.**

The firm was founded by David Amaryan and Vardan Amaryan and for several years the company has been managing private and pooled foreign accounts of its clients and in 2012 has successfully launched its flagship Copperstone Alpha Fund. Since its launch, the Fund has had a solid performance track record and established an impeccable reputation of highest integrity, trustworthiness and transparency. As a recognition of this Copperstone Alpha Fund received "The Best Russian Hedge Fund Award (since inception)" in 2015.

David Amaryan, Managing Partner & Chief Investment Officer is responsible for the investments management process of the Fund and day to day operations of the Investment Manager. He has over 15 years of investment experience.

Copperstone Capital manages wealth for high net worth individuals and institutions and provides advisory services. Copperstone brings together a unique combination of international asset management expertise, highly professional team with proven investment capabilities and extensive knowledge of Russian business environment.

**We assist our clients in following areas:**

- Investment management
- Personal Net-Worth Management
- Advisory Services

Here is how David Amaryan comments on Copperstone Capital achievements:

Copperstone Capital

In our investment activities we generally seek a broader mandate with little restriction to a particular region or asset class. And though our main focus is equity investments in Russia and the CIS, it allows us to be much more flexible, looking for value in various markets around the world. This advantage becomes critical during prolonged periods of distressed economic conditions, similar to what we've managed to observe last year in our country. In this particular case, it allowed us not only to timely switch our investment focus to Global markets and avoid major losses, but also to considerably outperform our Russian peers. This helps the Fund to become one of the best performing funds in Russia in 2014.

The fund's performance is a result of thorough analysis with careful and consistent risk controls. We strive to provide the best possible risk-adjusted return by exploiting our proprietary asset valuation models in line with a pro-active portfolio management approach. As we are not part of any large financial group, we are much better suited to make precise and objective investment decisions.

Despite the extremely turbulent conditions last year Russian financial market is constantly evolving and we hope that in the nearest future it will start to occupy an increasingly prominent place in the portfolios of most global and international investors.

However, in order to successfully operate in the Russian market, its peculiar features and weaknesses should always be taken into consideration, while making most of the business and investment decisions.

Additionally, Russian capital markets still face a number of artificial obstacles – largely the consequence of government interventions.

**Other well-known factors include:**

- Excessive policy volatility and instability of the legal regime
- Swollen bureaucracy and inefficient legal framework
- Barriers to foreign entry
- In many fields counter-productive tax laws, including excessive taxation of foreign residents
- Weak tax incentives for individuals to save for retirement

We have big plans for the nearest future. As we are constantly seeing more and more international investors ready to share our investment philosophy and excited to get better acquainted with our business approach, we are currently actively working on opening our offices in London and New York. That will also be a major step to becoming a truly global hedge fund.

We are planning to launch a fixed income fund and a distressed Russian debt fund specially tailored for investors with low –to-moderate risk appetites.

Hedge funds have been formally authorised for qualified investors in Russia since 2008. However, Russian legislation has very slow developments in this field and therefore most of the Russian hedge funds tend to operate as a more active alternative to mutual funds. That is the main reason why the financial performance of majority of Russian hedge funds tends to strongly correlate with the market developments.

The ability to de-correlate the fund performance from the broad market recessions, while continuing to find investment opportunities in most of the economic sectors and always stay 100% transparent for all partners and investors we consider as our biggest challenge and, at the end, an advantage from the very first day of the company.

Share this page:

**QUICK LINKS**

Home
About Us
Issues
Subscribe
Contact
Advertise
Pay Online

Privacy Policy
Terms and Conditions

**FOLLOW US**

Registered in England and Wales
No. 07400916
1st Floor, Suite F,
The Maltsters, 1-2 Wetmore Road,
Burton on Trent, Staffordshire, DE14 1LS

Copyright Acquisition Intl. 2015

Copperstone Capital

