# EXHIBIT M



РОССИЙСКАЯ ФЕДЕРАЦИЯ
RUSSIAN FEDERATION

Подпись владельца
Holder's signature

RUS

РОССИЙСКАЯ ФЕДЕРАЦИЯ / RUSSIAN FEDERATION

ПАСПОРТ / PASSPORT

Тип / Type
**P**

Код государства / Code of issuing State
**RUS**

Номер паспорта / Passport No.
**71 787**

Фамилия / Surname
**МАСЛОВ /**
**MASLOV**

Имя / Given names
**АНТОН ВЛАДИМИРОВИЧ /**
**ANTON**

Гражданство / Nationality
**РОССИЙСКАЯ ФЕДЕРАЦИЯ / RUSSIAN FEDERATION**

Дата рождения / Date of birth
**17.07.**

Учетная запись

Пол / Sex    Место рождения / Place of birth
**M / M    ЛЕНИНГРАД / USSR**

Дата выдачи / Date of issue
**24.02.2012**

Дата окончания срока / Date of expiry действия
**24.02.2022**

Орган, выдавший документ / Authority
**ФМС**

Подпись владельца / Holder's signature

RUS

P<RUSMASLOV<<ANTON<<<<<<<<<<<<<<<<<<<<<<<<<<<
588RUS    171M2202244<<<<<<<<<<<<<<02

# EXHIBIT N



# REPÚBLICA DE PANAMÁ
### PROVINCIA DE PANAMÁ

## NOTARÍA DÉCIMA DEL CIRCUITO DE PANAMÁ

Teléfonos: (507) 340-3670
(507) 340-3672/73
(507) 340-3674/75
(507) 340-3676/77

Fax:        (507) 340-3671

P.O. Box 0831-02484
Paitilla - Panamá

ESCRITURA No.  14405  DE  06  DE  junio  DE  12

POR LA CUAL:    SE PROTOCOLIZA EL PACTO SOCIAL DE LA SOCIEDAD ANONIMA
DENOMINADA *TAREK INVESTORS INC.*

La Presente Escritura Pública
a sido Protocolizada en Notaria
Pública del Circuito Notarial
de Panamá e Inscrita en el
Registro Público.

SEC-Exante-E-




**REPUBLICA DE PANAMA**
PAPEL NOTARIAL

NOTARIA DECIMA DEL CIRCUITO DE PANAMA

ESCRITURA PÚBLICA NÚMERO CATORCE MIL CUATROCIENTOS CINCO ———(14405) ———
POR LA CUAL SE PROTOCOLIZA EL PACTO SOCIAL DE LA SOCIEDAD ANÓNIMA
DENOMINADA —————————— TAREK INVESTORS INC. ——————————
————————————————————————— Panamá, 06 de junio de 2012—

En la Ciudad de Panamá, Capital de la República y Cabecera del Circuito Notarial del mismo nombre, a
los seis (6) días del mes de junio de dos mil doce (2012), ante mí, RICARDO ADOLFO LANDERO,
notario Público Décimo del Circuito de Panamá, con cédula de identidad personal número cuatro-ciento
tres-dos mil trescientos treinta y siete (4-103-2337), comparecieron personalmente los señores JORGE
SALCEDO, varón, panameño, mayor de edad, casado, panameño, vecino de esta ciudad, con cédula
de identidad personal número ocho- setecientos cinco-dos mil trescientos cuarenta y nueve (8-705-
2349), y CRISTINO GUEVARA, varón, mayor de edad, panameño, casado, vecino de esta ciudad,
portador de la cédula de identidad personal número nueve-ciento treinta y siete-seiscientos noventa y
nueve (9-137-699), a quienes conozco, actuando ambos en sus propios nombres, me presentaron para
su protocolización en esta Escritura Pública y al efecto protocolizo el Pacto Social de la Sociedad
Anónima denominada— TAREK INVESTORS INC., con domicilio en la ciudad de Panamá,
República de Panamá y constituida con la Ley treinta y dos (32) de veintiséis (26) de febrero de mil
novecientos veintisiete (1927).-Queda hecha la protocolización solicitada y se expedirán las copias que
soliciten los interesados.— ADVERTÍ a los comparecientes que la copia de la Escritura debe ser inscrita
y leída como les fue la misma en presencia de los testigos instrumentales señoras ELIA MATAMOROS,
portadora de la cédula de identidad personal número ocho-setecientos-mil ochocientos noventa y ocho
(8-700-1898), y YELLY LOPEZ, portadora de la cédula de identidad personal número ocho-setecientos
veintiuno-cuatrocientos ochenta y ocho (8-721-488), ambas mujeres, panameñas, mayores de edad,
vecinas de esta ciudad, quienes conozco y son hábiles para el cargo, la encontraron conforme, le
impartieron su aprobación y la firman todos para constancia por ante mí, el Notario que doy fe.—ESTA
ESCRITURA EN EL PROTOCOLO DEL PRESENTE AÑO LLEVA EL NUMERO DE ORDEN
CATORCE MIL CUATROCIENTOS CINCO —————————(14405)—
(FDO.) JORGE SALCEDO————CRISTINO GUEVARA——— ELIA MATAMOROS ——-YELLY LOPEZ-
-Lledo. RICARDO ADOLFO LANDERO, NOTARIO PÚBLICO DECIMO DEL CIRCUITO DE PANAMA.
CERTIFICADO DE CONSTITUCION ———————————— DE ——————
————————————— TAREK INVESTORS INC. ——————————

Organizada bajo la Ley General de Sociedades Anónimas de la República de Panamá. Los suscritos,

JORGE SALCEDO, varón, panameño, mayor de edad, casado, panameño, vecino de esta ciudad, con cédula de identidad personal número ocho- setecientos cinco-dos mil trescientos cuarenta y nueve (8-705-2349), y CRISTINO GUEVARA, varón, mayor de edad, panameño, casado, vecino de esta ciudad, portador de la cédula de identidad personal número nueve-ciento treinta y siete-seiscientos noventa y nueve (9-137-699), con el fin de constituir una Sociedad Anónima de conformidad con las disposiciones de la Ley treinta y dos (32) de mil novecientos veintisiete (1927) y sus enmiendas, sobre Sociedades Anónimas de la República de Panamá, por el presente establecen, acuerdan y constituyen el siguiente PACTO SOCIAL bajo las siguientes cláusulas ——————————————

PRIMERA: La Sociedad se denomina: **TAREK INVESTORS INC.** ——————

SEGUNDA: La Sociedad se dedicará principalmente a comprar, vender, transferir, disponer, negociar, permutar, poseer, administrar, dar o tomar en comisión, hipoteca, prenda, arrendamiento, uso, usufructo, o anticresis, toda clase de bienes, sean muebles o inmuebles, acciones o derechos y celebrar y efectuar todos los actos, contratos, operaciones, negocios y transacciones de lícito comercio, establecer sucursales, agencias y oficinas de representación en cualquier país, colonia, territorio o lugar. Además la Sociedad se podrá dedicar a la administración general de barco o navíos, su compra, venta, fletamento, a la operación de líneas marítimas de navegación, de agencias marítimas y en general a cualquier actividad lícita en cualquier lugar; la Sociedad se podrá dedicar igualmente a realizar todos los actos, contratos operaciones, negocios o transacciones permitidas por la Ley a las Sociedades Anónimas. ——————

TERCERA: El capital social autorizado será la suma de DIEZ MIL DOLARES (US$10,000.00) divididos en CIEN (100) acciones comunes de un valor nominal de CIEN DOLARS (US$100.00) cada una. Las acciones podrán ser emitidas de forma nominativas o al portador, cambiables las unas por las otras a voluntad de su dueño todas las acciones tendrán los mismos derechos y privilegios y cada una tendrá derecho a un (1) voto en todas las Juntas Generales de Accionistas. Sin perjuicio de lo que al respecto determinen los Estatutos de la Sociedad, los Certificados de Acciones serán firmados por el Presidente o Vicepresidente, conjuntamente con el Tesorero o el Secretario.——————

CUARTA: En cada nueva emisión de acciones los accionistas tendrán el derecho preferente de suscribir las acciones por emitirse en proporción a la cantidad de acciones, de las que en ese momento sean propietarios.——————

QUINTA: El Registro de Acciones y demás libros exigidos por la Ley serán llevados o en cualquier lugar que señale la Junta Directiva.——————

SEXTA
Global
SEPTI
OCTA
llevará
accion
medio
NOVE
ningún
impone
DECIN
el nún
funcio
funcio
Direc
nomb
podrá
las a
direc
y de
que
ejer
Pac
neg
Jur
car
So
de
Di
su
D

SEC-Exante-E-





REPUBLICA DE PANAMA
PAPEL NOTARIAL

NOTARIA DECIMA DEL CIRCUITO DE PANAMA

**SEXTA:** Mientras la Juntas Directiva no resuelva otra cosa, el domicilio de la Sociedad estará en Torre Global Bank, Piso 18, Oficina No.1801, Calle 50, República de Panamá.

**SEPTIMA:** La Sociedad será de duración perpetua, pero podrá ser disuelta de conformidad con la Ley.

**OCTAVA:** Las reuniones de la Junta General de Accionistas, ya sean ordinarias o extraordinarias, se llevarán a cabo en el lugar que dispongan los accionistas o la Junta Directiva. En todas las reuniones de accionistas, éstos podrán hacerse representar y votar por medio de sus representantes legales o por medio de apoderados nombrados por documentos públicos o privados, con o sin poder de substitución.

**NOVENA:** La Junta General de Accionistas constituyen el poder supremo de la Sociedad, pero en ningún caso podrá por voto de la mayoría privar a los accionistas de sus derechos adquiridos ni imponerles una resolución contraria al Pacto Social o a los Estatutos.

**DECIMA:** La Junta Directiva estará compuesta de tres (3) a siete (7) miembros. La Junta Directiva fijará el número y elegirá a los dignatarios de la Sociedad y cualquier persona podrá desempeñar las funciones de dignatarios en uno o varios cargos. Los Directores y los Dignatarios ejercerán sus funciones hasta que sean reemplazados en sus cargos. En caso de ocurrir vacantes en la Junta Directiva, la misma Junta Directiva podrá elegir a la persona que deba llenar la vacante y podrá también nombrar nuevos Directores hasta completar el número total permitido de los mismos. Los Directores podrán ser removidos de sus cargos, sin proceso alguno por el voto de los tenedores de la mayoría de las acciones y los dignatarios en cualquier tiempo, por acuerdo de la Junta Directiva. Para ser director o dignatario no es necesario ser accionista. La Junta Directiva podrá adoptar, alterar, reformar y derogar los Estatutos de la Sociedad, designar y sustituir a los dignatarios y adoptar todas las medidas que considere convenientes para la buena marcha o de ésta. Las Facultades de la Sociedad serán ejercidas por la Junta Directiva, salvo aquellas que están reservadas exclusivamente por la Ley y el Pacto Social a los accionistas. La Junta Directiva tendrá control absoluto y dirección completa de los negocios de la Sociedad; en consecuencia, la Sociedad será dirigida y sus derechos ejercidos por la Junta Directiva, la cual podrá con el consentimiento expreso de los accionistas, comprar, vender, ceder, cambiar, dar en fideicomiso, en prenda o en hipoteca o gravar en cualquier otra forma los bienes de la Sociedad, inclusive las naves y los bienes inmuebles. En las reuniones de la Junta Directiva, cualquiera de sus miembros podrán ser representados y votar por poder mediante apoderado que no tiene que ser Director ni accionista, nombrado por escrito en documento público o privado, con o sin poder de substitución, con o sin limitación alguna.

**DECIMA PRIMERA:** Los primeros Directores son **JORGE SALCEDO, CRISTINO GUEVARA** y

YAHAIRA DE SEDAS, todos con dirección en Torre Global Bank, Piso 18, Oficina No.1801, Calle 50,

República de Panamá. ------

DECIMA SEGUNDA: Los Dignatarios de la Sociedad serán un Presidente, un Secretario y un Tesorero, nombrados por la Junta Directiva. La Sociedad podrá también tener cualesquiera otros dignatarios, agentes o representantes que la Junta Directiva determine. Cualquier dignatario podrá desempeñar más de un cargo. El Presidente será el representante Legal de la Sociedad ------

DECIMA TERCERA: Los primeros dignatarios de la Sociedad serán las siguientes personas: ------

DIRECTOR/PRESIDENTE ---------- JORGE SALCEDO ----------

DIRECTOR/SECRETARIO ---------- CRISTINO GUEVARA ----------

DIRECTOR TESORERO ---------- YAHAIRA DE SEDAS ----------

DECIMA CUARTA: Ningún contrato y otra transacción entre esta Sociedad y cualquier otra Sociedad será afectado o invalidado por el hecho de que cualquier director o dignatario de esta Sociedad sea director o dignatario de otra Sociedad y cualquier director o dignatario de la Sociedad, individual o mancomunadamente, pueda ser parte o estar interesado en cualquier contrato o transacción de esta Sociedad. ------

DECIMA QUINTA: El Agente Residente de la Sociedad lo será la firma de abogados GERLI & CO., con oficinas en Torre Global Bank, Piso 18, Oficina No.1801, Calle 50, República de Panamá, quien acepta el cargo. *GERLI & CO. no asume o acepta responsabilidad alguna por las acciones, negocios, transacciones, que lleve a cabo la sociedad, sus apoderados, directores y dignatarios, representantes o accionistas.* ------

DECIMA SEXTA: Cada uno de los suscriptores de este Pacto Social convienen en tomar UNA (1) ACCIÓN. En fe de lo cual hemos extendido y firmado este Certificado de constitución en la Ciudad de Panamá, a los seis (6) día de junio de dos mil doce (2012). ------

-- A CONTINUACIÓN SE TRANSCRIBE EL PACTO SOCIAL DE LA SOCIEDAD EN IDIOMA INGLÉS --

---------- ARTICLES OF INCORPORATION OF ----------

---------- TAREK INVESTORS INC. ----------

Organized under the General Corporation Laws of the Republic of Panama. The undersigned, JORGE SALCEDO, male, of lawful age, Panamanian, resident of this city, holder of personal identify card number 8-705-2349, and CRISTINO GUEVARA, male, of lawful age, Panamanian citizen, resident of this city, holder of personal identity card number 9-137-699, with the purpose of organizing a corporation pursuant to Law thirty two (32) of nineteen twenty seven (1927) respect to corporations of the Republic




**REPUBLICA DE PANAMA**
PAPEL NOTARIAL

REPUBLICA DE PANAMA

B/. 800

NOTARIA DECIMA DEL CIRCUITO DE PANAMA

No 1801 Calle 50,

ario y un Tesorero,

otros dignatarios,

desempeñar más

sonas.

er otra Sociedad

a Sociedad sea

ad, individual o

sacción de esta

RLI & CO.: con

, quien acepta

es, negocios

represententes o

nar UNA (1)

la Ciudad de

A INGLES-

JORGE

ntity card

esident of

rporation

Republic

of Panama, do hereby establish, agree and organize the following articles of incorporation under the following clauses.

**FIRST**: The name of the corporation is **TAREK INVESTORS INC.**

**SECOND**: The corporation shall mainly to purchase, sale, transfer, dispose of, negotiate, exchange, own, manage, give or take in commission, mortgage, pledge, lease, use, usufruct or anthichresis all kinds of properties, whether real or personal, shares or rights, and enter into and carry out all acts, contracts, operations, businesses and transactions of legal commerce, establish branches, agencies and representation offices in any country, colony, territory or place.

Further, the corporation shall engage in the general administration of vessels or ships, its purchase, sale, charter, operation of maritime navigation lines, maritime agencies and in general any legal activity in any place.

The Corporation shall likewise perform all acts, contracts, operations, businesses or transactions permitted by the Law on Corporations.

**THIRD**: The authorized capital of the corporation shall consist of TEN THOUSAND DOLLARS (US$10,000.00) divided into HUNDRED (100) common shares, with a nominal value of ONE HUNDRED (US$100.00) each. Shares may be issued to bearer or in nominative form, and the same may be exchanged one for the other at the option of its owner. All shares shall have the same rights and privileges, and each shall be entitled to one (1) vote at all General Stockholders' Meeting. Without prejudice to the provisions of the By-laws of the corporation, the Share Certificates shall be signed by the President or Vice-President, jointly with the Secretary or Treasurer.

**FOURTH**: In each new issuance of shares, shareholders shall have preferential right to subscribe shares to be issued in proportion to the shares they own.

**FIFTH**: The Stock Registry and other books required by the Law shall be kept in the place indicated by the Board of Directors.

**SIXTH**: Unless otherwise provided by the Board of Directors, the domicile of the corporation shall be at Global Bank Tower, 18th Floor, Suite No. 1801, 50th Street, Republic of Panama.

**SEVENTH**: The duration of the corporation shall be perpetual, but it may be dissolved pursuant to the Law. **EIGHTH**: General Stockholders' Meeting, whether ordinary or special, shall be held in the place provided by the shareholders or the Board of Directors. At all Stockholders' Meetings, they shall be represented and vote by their legal representatives or by proxies appointed by public or private documents, with or without power of substitution.

**NINTH**: The General Stockholders' Meeting constitutes the supreme power of the corporation, but in any case by majority vote it shall prohibit the shareholders from their rights acquired nor impose any resolution contrary to the Articles of Incorporation or the By-laws. ---------------------------------

**TENTH**: The Board of Directors shall be composed of three (3) to seven (7) members. The Board of Directors shall fix the number and elect the officers of the corporation, and any person may hold the position of officer in one or more positions. ---------------------------------

The Directors and Officers shall exercise their duties until replaced in their offices. In case of vacancies in the Board of Directors, said Board of Directors shall elect the person to fill the vacancy and shall also appoint new Directors until completing the total number permitted. Directors may be removed from their offices, without any procedure by the vote of the majority of the shareholder, and the officers at any time, by agreement of the Board of Directors. In order to be director or officer, it is not necessary to be shareholder. ---------------------------------

The Board of Directors shall adopt, alter, amend and annul the By-laws of the corporation, appoint and substitute the officers and adopt all measures deemed convenient for the good operation thereof. The powers of the corporation shall be exercised by the Board of Directors, except those exclusively reserved by the Law and the Articles of Incorporation to shareholders. ---------------------------------

The Board of Directors shall have absolute control and complete management of the businesses of the corporation; therefore, the corporation shall be managed and its rights exercised by the Board of Directors, being empowered with the express consent of the shareholders, to purchase, sell, assign, exchange, give in trust, pledge or mortgage or encumber in any other manner the goods of the corporation, including the vessels and real properties. At the meetings of the Board of Directors, any of its members may be represented and vote by proxy, who need not be Director nor shareholder, appointed by public or private written document, with or without power of substitution, with or without any limitation. ---------------------------------

**ELEVENTH**: The first Officers shall be:---------------------------------

JORGE SALCEDO, CRISTINO GUEVARA and YAHAIRA DE SEDAS, all with domicile at Global Bank Tower, 18th Floor, Suite No. 1801, 50th Street, Republic of Panama. ---------------------------------

**TWELFTH**: The Officers of the corporation shall be a President, a Secretary and a Treasurer, appointed by the Board of Directors. The Corporation shall also have other officers, agents or representatives as determined by the Board of Directors. Any Officer may hold more than one office. The President shall be the Legal Representative of the corporation. ---------------------------------

**THIRTEENTH**: The first Officers of the corporation shall be the following persons: ---------------------------------



## REPUBLICA DE PANAMA
### PAPEL NOTARIAL

### NOTARIA DECIMA DEL CIRCUITO DE PANAMA

——JORGE SALCEDO ———DIRECTOR/PRESIDENT ——

——CRISTINO GUEVARA ——DIRECTOR/SECRETARY ——

——YAHAIRA DE SEDAS ——DIRECTOR/TREASURER——

**FOURTEENTH:** No contract or other transaction between this corporation and any other corporation shall be affected or invalidated by the fact that any director or officer of this corporation be a Director or officer of any other corporation, and any officer of the corporation, individually or jointly, may be a part or be interested in any contract or transaction of this corporation. ——

**FIFTEENTH:** The Resident Agent of the corporation in the Republic of Panama shall be law firm GERLI & CO., with offices located at Global Bank Tower, 18th Floor, Suite No. 1801, 50th Street, Republic of Panama, Telephone (507) 340-3670, Fax (507)340-3671, P.O. Box 0831-2482, Panamá, Republic of Panamá. *GERLI & CO. does note assume nor accepts any responsibility whatsoever for the actions, businesses, transactions performed by the corporation, its proxies, directors and officers, representatives or shareholders.* ——

**SIXTEENTH:** Each one of the subscribers of these Articles of Incorporation agrees to subscribe ONE (1) SHARE ——

In witness whereof, we have issued and signed these Articles of Incorporation in the City of Panama, on June sixth (6th) day two thousand twelfth (2012). ——

(FDOS.) JORGE SALCEDO ———CRISTINO GUEVARA ——

ESTE PACTO SOCIAL HA SIDO DEBIDAMENTE REFRENDADO POR EL LICENCIADO ISMAEL GERLI, Abogado en ejercicio, actuando en nombre y representación de Gerli & Co., con oficinas en Torre Global Bank, Piso 18, Oficina No.1801, Calle 50, República de Panamá, teléfono (507) 340-3670, fax (507) 340-3671, P.O. Box 0831-2484, Panamá, República de Panamá, quien acepta el cargo ——

(FDO.) LICDO. ISMAEL GERLI ——

Concuerda con su original esta copia que expido, sello y firma a los seis (6) días del mes de junio de dos mil doce (2012). ——

Ricardo A. Landero M.
Notario Público Décimo

The Director and President of

## TAREK INVESTORS INC.

### I, JORGE SALCEDO

*hereby submit my resignation as Director and President of this Company.*

## TAREK INVESTORS INC.

*This resignation is to be effective as on the date hereof and I hereby confirm that I have no past or present claim against company of whatever nature.*

*WITNESS my hand,*

**JORGE SALCEDO**



SEC-Exante-E-

The Director and Secretary of

## TAREK INVESTORS INC.

### I, CRISTINO GUEVARA

hereby submit my resignation as Director and Secretary of this Company.

## TAREK INVESTORS INC.

This resignation is to be effective as on the date hereof and I hereby
confirm that I have no past or present claim against the company of
whatever nature.

WITNESS my hand,

**CRISTINO GUEVARA**



## TRANSFER OF SUBSCRIPTION

FOR VALUE RECEIVED, I, **JORGE SALCEDO** have sold, assigned and transferred, and by these presents do sell, assign and transfer unto the bearer all my rights, title and interest in and to one (1) share of the capital stock **TAREK INVESTORS INC.,** corporation organized under the Laws of the REPUBLIC OF PANAMA, do hereby authorize and empower the Treasurer and Secretary of said Corporation to Register this transfer on the Books of the Company.

WITNESS my hand, this June 8th, 2012

**JORGE SALCEDO**



SEC-Exante-E-

## TRANSFER OF SUBSCRIPTION

FOR VALUE RECEIVED, I, **CRISTINO GUEVARA**, have sold, assigned and transferred, and by these presents do sell, assign and transfer unto the bearer all my rights, title and interest in and to one (1) share of the capital stock **TAREK INVESTORS INC.**, corporation organized under the Laws of the REPUBLIC OF PANAMA, do hereby authorize and empower the Treasurer and Secretary of said Corporation to Register this transfer on the Books of the Company.

WITNESS my hand, this June 8th, 2012

**CRISTINO GUEVARA**



SEC-Exante-E-

The Director and Treasurer of

## TAREK INVESTORS INC.

### I, YAHAIRA DE SEDAS

hereby submit my resignation as Director and Treasurer of this Company.

## TAREK INVESTORS INC.

This resignation is to be effective as on the date hereof and I hereby
confirm that I have no past or present claim against the company of
whatever nature.

WITNESS my hand,

**YAHAIRA DE SEDAS**



SEC-Exante-E-

## Declaration of Trust

We, BUSINESS RESOURCES LTD. hereby acknowledge and declare that we hold 1 share of no par value in the Company

### *TAREK INVESTORS INC.*

as per copy of the share certificate № 1 for 1 share attached herewith (hereinafter called "the Shares") as nominee of and Trustee for

**ANTON MASLOV,**
**HOLDER OF RUSSIAN FEDERATION PASSPORT 71 78███████,**
**D.O.B 17.07.████**

(hereinafter called "the Owner") and **WE UNDERTAKE AND AGREE** not to transfer, deal with or dispose of the Shares save as the Owner may from time to time direct and further to give full effect to the trust hereby declared, we irrevocably assign to the Owner the right to receive any dividends which may be declared on the Shares together with all profits and other monies which may be paid or payable to us from time to time upon the Shares or in respect thereof, **ANDWE FURTHER AGREE AND UNDERTAKE** to exercise our voting power as holder of the Shares in such manner and for such purposes as the Owner may from time to time direct or determine.

DATED this 7th day of June 2012.

....................................................
Ms. Joahna Linzi Rita Alcindor
On behalf of
BUSINESS RESOURCES LTD.

SEC-Exante-E-0002397

# CERTIFICATE OF INCUMBENCY

We, the Registered Agent of **TAREK INVESTORS INC.**, validly existing under the provisions of Law 32 of 1927 of the City of Panama, Republic of Panama, do hereby certify that:

1. This Corporation was legitimately formatted and registered on the:

   **8th day of June of 2012**.

   Microjacket N°. 771371 Document N°. 2187762

2. The present Director (s) of this Corporation were elected on **June 8th, 2012**, in accordance with Public Deed **14405** dated June 6th, 2012 of the Tenth Notary Public of the Circuit of Panama:

   | | |
   |---|---|
   | **JORGE SALCEDO** | Director/President |
   | **CRISTINO GUEVARA** | Director/Secretary |
   | **YAHAIRA DE SEDAS** | Director/Treasurer |

3. That its Subscribers are:

   **JORGE SALCEDO**
   **CRISTINO GUEVARA**

4. The authorized capital of the corporation is **TEN THOUSAND DOLLARS (US$10,000.00)** divided into **ONE HUNDRED (100)** common shares of a nominal value of **ONE HUNDRED DOLLARS (US$100.00)** each one.

5. That the Registered Office of this Corporation is at **Global Bank Tower, 18th Floor, Office 1801, 50th Avenue, Panama Republic of Panama**.

Any amendments to the herein mentioned will be certified with a new Incumbency Certificate.

Dated: June 8th, 2012

**GERLI & CO.**
Register Agent



# EXHIBIT O

**FILED UNDER SEAL**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **[UNDER SEAL],** | | No. 15 Civ. _____ |
| | **PLAINTIFF,** | |
| | | **FILED UNDER SEAL** |
| **v.** | | |
| **[UNDER SEAL],** | | |
| | **DEFENDANTS** | |

## DECLARATION OF KENNETH ZAVOW

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

SECURITIES AND EXCHANGE
COMMISSION,

      Case No.

      Plaintiff,

  v.

ARKADIY DUBOVOY, et al.,

      Defendants.

## Declaration of Kenneth Zavos

I, Kenneth Zavos, hereby declare as follows:

1.      I am employed as an IT Forensics Analyst at the U.S. Securities and Exchange Commission's Division of Enforcement in Washington, D.C. As part of my duties I was asked to analyze and review the following:

      a.      forensic images taken of servers used by Newswire Service 1

      b.      documents and communications produced by the Federal Bureau of Investigation

      c.      forensic images taken of servers used by Newswire Service 2

      d.      reports of forensic exams conducted by Cybersecurity Company 1

      e.      information provided by Newswire Service 1 and Newswire Service 2

## The Hacker Defendants Accessed Unpublished News Releases at Newswire Service 1

2.      I reviewed reports of forensic exams conducted by Cybersecurity Company 1 regarding unauthorized computer intrusions at Newswire Service 1 that occurred from at least March 2010 until July 2014.

3.      Those reports show that unauthorized individuals ("hackers") used Structured Query Language ("SQL") injections to gain access to Newswire Service 1's computer servers.

4.      SQL is a computer programming language designed for managing data in a database system.  Using SQL queries users can retrieve specifically-requested data from a given database.  SQL injection is a technique computer hackers use to steal content from a computer network.

5.      Cybersecurity Company 1 specifically determined:

a.      The hackers used SQL injection to insert code into Newswire Service 1's network which gave the hackers access to Newswire Service 1's servers.

b.      From March 2010 through July 2010, the hackers issued more than 2,300 discovery SQL queries and 23,000 SQL content requests to Newswire Service 1 servers, through which they extracted the content of not-yet-public press releases.

c.      From August 2010 until November 2010, the hackers issued approximately 360 discovery SQL queries and 4,700 SQL content requests to Newswire Service 1 servers, through which they extracted the content of not-yet-public press releases.

d.      From January 2011 until July 2011, the hackers issued approximately 4,200 discovery SQL requests and 34,300 SQL content requests to Newswire Service 1 servers, through which they extracted the content of not-yet-public press releases.

e.      From July 2011 until March 2012, the hackers issued approximately 48 discovery SQL requests and 2,300 SQL content requests to Newswire Service 1 servers, through which they extracted the content of not-yet-public press releases.

11.     In addition to providing the hackers' access, the malware installed by the hackers was designed to delete and conceal evidence of their activities. Despite the hackers' efforts to hide their activities, Newswire Service 2's logs recorded more than 55,000 instances of unauthorized press release extractions.

12.     On January 12, 2011, Newswire Service 2's IT staff switched servers which had the unintentional effect of terminating the hackers' access to Newswire Service 2's server.

13.     In March 2012, Newswire Service 2 hired Cybersecurity Company 2 to analyze and help protect Newswire Service 2's network from intrusions. In March 2012, Cybersecurity Company 2 determined that hackers were accessing Newswire Service 2's servers without authorization. In the course of that investigation, Cybersecurity Company 2 found, among other things, that malware installed on one of the servers was collecting and transmitting passwords from the organization to the hackers every five minutes. Additionally, Cybersecurity Company 2 also determined the hackers had installed malware on Newswire Service 2's servers that was intended to be used to conceal their hacking activity.

14.     In January 2013, the hackers accessed Newswire Service 2's computer systems through compromised Virtual Private Network ("VPN") credentials. The use of an authorized user's VPN credentials allowed the hackers to conceal their intrusions. Newswire Service 2 discovered the use of compromised VPN credentials, and took steps to end the intrusions in March 2013.

### Identification of the Hackers

15.     The hackers used multiple IP addresses to attack Newswire Service 1 and/or Newswire Service 2' servers, including but not limited to IP addresses ending: *18.42; *9.101; *136.6, and *26.98.

4

16.     I analyzed emails from a Google email account, which the FBI identified as belonging to defendant Ivan Turchynov. The meta-data for Turchynov's email account shows he used a computer with the IP address ending *18.42 to access webpages in December 2011.

17.     The IP address ending *18.42, originating in Ukraine, was used multiple times to hack both Newswire Service 1 and Newswire Service 2.

18.     A video named "readme.avi" was sent as an attachment to an email from Turchnyov's account on October 25, 2010. This video depicts the unauthorized collection of information from Newswire Service 2's servers. This video shows:

    a.    A Windows' computer screen with a custom administrator panel.

    b.    The administrator panel is split into two parts - the "documents" section on the left and the "archives" section on the right.

    c.    The "documents" section contains a list of more than 300 file names with id numbers, and the "archives" section contains the names of zip archives. Many of the file names include the term "release" in the file name. The file id numbers match those used internally by Newswire Service 2 to identify press releases for publicly-traded companies.

    d.    The hacker uses Cyrillic to provide on-screen narration and to conduct the unauthorized intrusion depicted.

    e.    Ten files are selected in the administrator panel and downloaded into a zip archive, automatically named "24 Oct 1440.zip" after the Day, Month, and Time in 24-hour clock format.

    f.    The downloaded files are opened on screen, showing that they are press releases for publicly-traded companies.

        g.     The IP address of the system being used in the operation is also clearly visible in the status bar of one window and the URL field of two other windows.

19.    Newswire Service 2's server logs show they were accessed by hackers on October 24, 2010 by the same IP address depicted as downloading files to the "24 Oct 1440.zip" file referenced above. All of the files within the zip archives in the "24 Oct 1440.zip" file referenced above matched the entries in the Newswire Service 2 server log with respect to date, approximate time, file size, and IP address to which they were extracted.

I, Kenneth Zavos, do hereby declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge. Executed on this 10th day of August, 2015.

Kenneth Zavos

# EXHIBIT P

Assets Currently Held by Exante for Eleven Customers that Directed Allegedly Illicit Trades Identified by Securities and Exchange Commission

| Customer Account No. | Currency Balance | Currency Value (in USD) | Positions | Position Value (in USD) | NAV (in USD) |
|---|---|---|---|---|---|
| TII1228 | 441,370.33 EUR | $481,871.09 | | | |
| (Tarek Investors Inc.) | (84.04) CHF | -$84.87 | | | |
| | (110,992.64) USD | -$110,992.64 | | | |
| | | | 310 million rubles Promissory Notes from Moscow Business Development Bank (банк развития бизнеса) - maturity date September 17, 2018 (BDB.U2018) | $4,953,006.87 | |
| Total | | | | | $5,323,800.46 |
| GRC1213 | 1,754,228.99 USD | $1,754,228.99 | | | |
| (Green Road Corp.) | 99,150.30 EUR | $108,220.95 | | | |
| | 122,090.84 JPY | $1,006.67 | | | |
| | (20,528.19) CHF | -$20,731.78 | | | |
| | | | 88,000 shares RenFin II Ltd. (Fund - RenAsset Management) | $1,175,680.00 | |
| Total | | | | | $3,018,404.84 |
| ETC1217 | 186,884.30 EUR | $203,965.53 | | | |
| (Extra Trading Co.) | (7,884.06) USD | -$7,084.06 | | | |
| Total | | | None | N/A | $196,881.44 |
| MEI1204 | ██ | ██ | | | |
| (Memelland | ██ | ██ | | | |
| Investments Ltd.) | | | | | |
| | | | ████████████ | ██ | |
| | ██ | | | | ██ |
| | ███ | ██ | ██ | ██ | |
| | ██ | ██ | ██ | ██ | |
| | ██ | ██ | ██ | | ██ |
| | ███ | ██ | ██ | | |
| | | | ██ | ██ | ██ |
| SLI1228 | 2.27 USD | $2.27 | | | |
| (Alepko Solar Line Inc.) | 0.62 EUR | $0.68 | | | |
| Total | | | None | N/A | $2.96 |
| | ███ | ██ | ██ | ██ | |
| | ███ | ██ | | | ██ |
| | ███ | ██ | | | |
| | ██ | | ██ | ██ | ██ |

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY EXANTE LTD.

# EXHIBIT Q

**FILED UNDER SEAL**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

[UNDER SEAL],

              **PLAINTIFF,**

    v.

[UNDER SEAL],

              **DEFENDANTS**

No. 15 Civ. _____

**FILED UNDER SEAL**

## DECLARATION OF DANIEL KOSTER

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | |
| v. | |
| ARKADIY DUBOVOY, et al., | |
| Defendants. | |

## Declaration of Daniel L. Koster

I, Daniel L. Koster, hereby declare as follows:

1.      I am employed as a Data Analytics Specialist for the Complex Financial Instruments Unit in the Division of Enforcement of the United States Securities and Exchange Commission (the "Commission"), the Plaintiff in this matter, located at 1617 JFK Boulevard, Suite 520, Philadelphia, Pennsylvania 19103.  I have been employed by the Commission since July 2000.  My official duties include participating in fact-finding inquiries and investigations to determine whether federal securities laws have been, are presently being, or are about to be violated, and assisting in the Commission's litigation of enforcement actions.

2.      I received a Bachelor of Science degree in Business Administration with a concentration in Finance from the University of Central Florida in 2000 and a Master of Accountancy degree from The George Washington University in 2006.  I passed all sections of the Certified Public Accountant exam in 2007.

3.      In connection with my work, I have, among other things, reviewed records of brokerage accounts held or controlled by Jaspen Capital Partners Limited ("Jaspen") and Bering Explorer Fund Ltd. ("Bering"), including records and information the Commission received from foreign financial firms that allow customers to trade derivatives known as Contracts for

Differences ("CFD").  In addition, I have reviewed documents produced by the domestic

broker-dealers and stock exchanges related to CFD trades executed by the foreign financial

firms.

4.      I make this declaration based on my personal knowledge, information and/or

belief, and my review and analysis of the records referenced above, in support of the

Commission's Motion for a Temporary Restraining Order Freezing Assets and Granting Other

Relief.

## Background

5.      Jaspen is an entity established in Bermuda with its principal place of business in

Kiev, Ukraine. **Exhibit 21** is a true and correct copy of Jaspen's incorporation documents.

Jaspen also purports to be a full service investment bank that provides advisory services

including asset management and sales and trading.  **Exhibit 22** is a true and correct excerpt of

Jaspen's website.  Its principals include defendant Andriy Supranonok, who resides in Kiev,

Ukraine.  He is a dual citizen of Ukraine and the United Kingdom.  **Exhibits 34 and 35** are true

and correct redacted copies of Supranonok's passports.  Jaspen's website lists Supranonok as

the Chief Executive Officer of Jaspen.  **Exhibit 36** is a true and correct excerpt of Jaspen's

website listing Jaspen's officers.  Previously, Supranonok was employed as head of sales and

trading at Kiev-based Phoenix Capital.  **Exhibit 39** is a true and correct excerpt of

Supranonok's LinkedIn profile that lists his previous employers.  Defendant Oleksandr

Makarov was also employed by Phoenix Capital.  **Exhibit 40** is a true and correct excerpt of

offering documents that list his previous employers.

6.      Bering is an entity established in the Bahamas with its principal place of business

in Moscow, Russia Federation.  One of its directors is defendant Maxim Zakharchenko, who

resides in Moscow, Russian Federation.  He is one of two Bering directors and had trading authority in Bering's brokerage accounts at Cantor Fitzgerald Europe ("Cantor"). Zakharchenko appears to have directed Bering's illicit trades.  **Exhibit 42** is a true and correct redacted copy of Zakharchenko's passport.

7.      During the relevant period, Jaspen had accounts at Cantor Fitzgerald Europe, GFT Global Markets U.K. Limited ("GFT"), ADM Investor Services International ("ADM"), and Saxo Bank A/S ("Saxo"), and used these accounts to trade in the securities of companies whose stock was traded on U.S. exchanges and whose confidential press releases had been stolen. **Exhibits 29 and 30** are true and correct copies of excerpts of Jaspen's account records with ADM for account numbers ending in *CMO7, *CMO8, and *CM21.  **Exhibit 31** is a true and correct copy of Jaspen's account opening form with Cantor for account numbers ending in *0011 and *0994.  **Exhibits 32 and 33** are true and correct excerpts of Jaspen's trading with Saxo for account numbers ending in *INET1 and *INET2.  Suprananok also had an account at GFT, which was used to trade securities of companies whose press releases had been stolen (GFT account ending *1765).  That account is included in the discussion of Jaspen's conduct in this Declaration.  **Exhibit 37** is a true and correct copy of an excerpt of Supranonok's account records with GFT for account number ending in *1765.  **Exhibit 38** is a true and correct excerpt of Jaspen's account opening form with Cantor that lists Supranonok as an authorized trader.

8.      Bering had accounts at Cantor that it used to trade in the securities of companies whose stock was traded on U.S. exchanges and whose confidential press releases had been stolen.  **Exhibit 41** is a true and correct copy of Bering's account opening form with Cantor for account numbers ending in *0966 and *0969.

9.      Cantor is a CFD firm located in London.  Cantor Fitzgerald L.P., a limited partnership organized under the laws of Delaware, is the parent company of Cantor.  In 2014, Solo Capital, another CFD firm located in London, United Kingdom purchased Cantor's CFD business.  Jaspen and Bering's accounts transferred to Solo Capital following the sale.

10.     GFT is a CFD firm located in London, United Kingdom.  In mid-2014, GAIN Capital Forex.com Limited, a CFD firm located in London, United Kingdom acquired GFT's parent company.  For ease of reference, "GFT" refers collectively to GFT Global Markets U.K. Limited and GAIN Capital Forex.com Limited.  GAIN Capital Forex.com Limited is a subsidiary of GAIN Capital Holdings Inc., a company organized under the laws of Delaware and whose stock is listed on the New York Stock Exchange.  GAIN Capital Holdings Inc. is headquartered in Bedminster, New Jersey.

11.     ADM is a CFD firm located in London, United Kingdom.  ADM is a subsidiary of Archer-Daniels-Midland (UK) Limited which is a subsidiary of Archer-Daniels-Midland Co., a company organized under the laws of Delaware and whose stock is listed on the New York Stock Exchange.

12.     Saxo is a Danish company headquartered in Copenhagen.

13.     Newswire Service 1 is a newswire service based in Toronto, Canada.  It provides end-to-end content, news production, and distribution services to its clients, including many issuers in the United States.

14.     Newswire Service 2 is a newswire service with headquarters in New York, New York.  It provides end-to-end content, news production, and distribution services to its clients, including many issuers in the United States.

15.     Newswire Service 3 is a newswire service with its headquarters in New York and California.

## How CFD Work

16.     CFD are securities traded overseas that derive their value from stocks. The stocks at issue in this case are all listed on stock exchanges in the United States.  When a trader executes a trade in a CFD, they either buy to go long (betting the price of the underlying stock will go up) or sell to go short (betting the price of the underlying stock will go down).  When the traders close their position by selling or buying the contracts, they receive the difference between the price of the underlying stock at the time they opened the position and the time they closed the position (minus a fee paid to the CFD firm).

17.     "Leverage" refers to the difference between the amount of money a trader has on deposit at a CFD firm and the notional value of the underlying securities traded.

18.     "Notional value" refers to the cash value of the positions in the underlying stocks. In this case, the total notional value of the positions Bering took while in possession of the illegally obtained press releases is approximately $176 million and Jaspen is approximately $1 billion.

19.     "Direct Market Access" refers to an arrangement whereby a broker-dealer permits customers to enter orders into a trading center but such orders flow through the broker-dealer's trading systems prior to reaching the trading center.   In the context of this case, certain CFD firms placed trades in the U.S. markets using Direct Market Access provided by U.S. broker-dealers.  These trades included trades in stocks underlying the CFD bets, thereby hedging their exposure on the CFD contracts through trades on U.S. stock exchanges.

20.     The CFDs at issue in this case were equity CFDs, which are agreements between two parties to exchange the difference in value of an underlying stock between the time the contract is opened and the time it is closed.  If the share price increases, the seller pays the difference to the buyer.  If the share price declines, the buyer must pay the seller.

21.     Because equity CFDs mirror the movement and pricing of the underlying stock on a dollar-for-dollar basis, any fluctuation in the public market price of the underlying security is reflected in the unrealized gain or loss of the CFD position.  The purchase and sale prices of equity CFDs are identical to the prices quoted for the shares on the public exchange on which the underlying stock is listed.

22.     Generally, a CFD investor benefits by acquiring the future price movement of the underlying stock without having to pay for or take formal ownership of the underlying stock.

23.     Usually, purchasers of long CFDs also receive other benefits commonly associated with stock ownership, such as the right to receive dividend payments and participate in stock splits.  CFDs normally do not have an expiration date or delivery date, and there is no restriction on the entry or exit price of a CFD.

24.     An equity CFD investor typically initiates a long position in the same manner in which he or she would purchase common stock, by submitting an order with a CFD provider to buy a certain number of CFDs in a particular stock. The provider ordinarily purchases the corresponding number of the underlying shares to hedge its position and writes the CFDs to the investor at the same price.  As with stock transactions, the buyer is able to enter market, limit, or stop loss orders when initiating CFD positions.

25.     When initiating an equity CFD position, the investor normally is not required to pay for the related shares or pay any premium.  So the main costs associated with CFDs are

transaction fees charged by CFD providers when a customer opens and closes a position, plus a potential payout based on any decline in the value of the underlying asset.  However, CFD providers typically require the investor to post margin on the underlying equity value.

26.     During the relevant time period discussed in the complaint in this case, Jaspen and Bering traded equity CFD through Cantor, GFT, ADM, and Saxo.

27.     Firms such as Cantor, GFT, ADM, and Saxo that provide equity CFD trading, hedge client positions by buying or selling the stocks underlying the CFD.  The CFD trades by Jaspen and Bering that I tracked each resulted in a corresponding hedge trade in the U.S. markets.

28.     All NASDAQ trades are processed through NASDAQ's computer servers in Carteret, New Jersey.

### Jaspen and Bering's CFD Trades were Hedged in the United States

29.     As part of this investigation, I interviewed personnel from Cantor, GFT, ADM, and Saxo about the process those firms use to hedge their risk on CFD trades.

30.     Each of the firms Jaspen and Bering used to trade CFDs hedged their exposure created by Jaspen and Bering's trading.   As a result, each firm, either directly or indirectly, caused stocks to be traded in the United States.  Thus, Jaspen and Bering's CFD trades were the proximate cause of trades in the United States equity markets.

31.     Cantor hedged Jaspen and Bering's trades by trading stocks in the United States, primarily in an account labeled Cantor Fitzgerald EU at Credit Agricole Securities.

32.     GFT hedged Jaspen's trades by indirectly causing stocks to be traded in the United States by using Direct Market Access platforms provided by Commerzbank AG and ING UK.  Commerzbank AG executed its hedging trades in stocks listed in the United States through

UBS, Citadel, and RBC. ING UK executed its hedging trades in stocks listed in the United States primarily through Credit Suisse Europe Limited.

33.     ADM hedged Jaspen's trades by indirectly causing stocks to be traded in the United States by ING UK or Cheuvreux International Limited, an affiliate of Credit Agricole. ING UK executed its hedging trades in stocks listed in the United States primarily through Credit Suisse Europe Limited.

34.     Saxo hedged Jaspen's trades by trading stocks in the United States, primarily by executing trades in an account labeled Saxo Clrg at Nomura Securities.

## Jaspen and Bering Were Experienced CFD Traders

35.     When Jaspen opened its CFD account with Saxo, it received account opening documents explaining that the price and liquidity of CFD mirror the activity of the stocks they reference that are traded on the New York Stock Exchange or NASDAQ. **Exhibit 1** is a true and correct copy of Jaspen's account opening documents with Saxo.

36.     When Jaspen opened its CFD account with ADM, it represented that it had experience trading CFD and it intended to trade "CFDs on US MKTS." **Exhibit 2** is a true and correct copy of Jaspen's account opening form with ADM.

37.     Cantor told Bering on at least two occasions that it needed to confirm a hedge trade in the U.S. before it could process Bering's CFD trade. First, on July 26, 2012, Bering placed an order with Cantor to sell CFD referencing 100,000 shares of ACME Packet, Inc. Prior to confirming that CFD trade Cantor told Bering it needed to "check[ ] the borrow first," meaning it had to confirm that it could sell short 100,000 shares of ACME Packet, Inc. in the U.S. **Exhibit 3** is a true and correct record of the instant message conversation between Bering and Cantor related to this trade.

8

38.     Then, on August 9, 2012, Bering asked Cantor to confirm it could sell CFD referencing 100,000 shares of Digital Generation, Inc.  Cantor informed Bering that its ability to process this trade was contingent on Cantor's ability to sell short 100,000 shares in the U.S. **Exhibit 4** is a true and correct record of the instant message conversation between Bering and Cantor related to this trade.

## Examples Demonstrating How Jaspen and Bering's CFD Trades Impacted U.S. Markets

### Trading in Edwards Life Sciences

39.     On April 23, 2013 at 4:01 p.m., Edwards Life Sciences ("Edwards"), a stock listed on the New York Stock Exchange, announced first quarter earnings results by issuing a press release through Newswire Service 1.  **Exhibit 5** is a true and correct copy of Edwards's press release.

40.     The press release was submitted to Newswire Service 1 on April 23, 2013 at 11:39 a.m.  The press release stated that the company's earnings per share (a key performance metric) was four cents lower than what the market was expecting.

41.     Newswire Service 1 confirmed that the release was accessed by unauthorized persons.

42.     Shortly thereafter, at approximately 1:13 p.m. Jaspen began selling CFD relating to Edwards in its GFT account.  That day, prior to dissemination of Edwards's press release, Jaspen sold CFD referencing a total of 23,500 Edwards Life Sciences shares.  **Exhibit 6** is a true and correct redacted copy of the GFT record of the trades.  GFT hedged these trades in the U.S. markets by causing Citadel Derivatives Group, LLC to sell short 23,500 Edwards shares. **Exhibit 7** is a true and correct redacted Citadel record of the trades.

43.     During that same time, Jaspen also sold CFD referencing a total of 15,196 Edwards's shares in two Cantor accounts. **Exhibit 8** is a true and correct redacted Cantor record of the trades. Cantor hedged these trades in the U.S. markets by causing Commerzbank AG to sell short 15,196 Edwards shares in the U.S. using a UBS Securities (a broker-dealer registered in the U.S.) account for $1,263,367. **Exhibit 9** is a true and correct redacted record of those hedge trades.

44.     Bering also sold CFD relating to Edwards stock during the window between the upload of the press release and its public dissemination. Bering sold CFD referencing a total of 15,000 Edwards shares in its Cantor account. **Exhibit 10** is a true and correct redacted Cantor record of the trades. Cantor hedged Bering's CFD trades in the U.S. markets by causing Commerzbank AG to sell short 15,000 Edwards shares in the U.S. using a UBS Securities account for $1,243,200. See **Exhibit 9.**

45.     When the press release was publicly disseminated after the U.S. markets closed on April 23, 2013, the price per share of Edwards's stock dropped from a closing price of $82.81 on April 23, 2013 to a closing price of $64.60 on April 24, 2013.

46.     On April 24, 2013, Jaspen closed its CFD positions relating to shares of Edwards, realizing a total profit of over $670,000. **Exhibit 6** is a true and correct redacted GFT record of the trades reflecting a profit of $430,675; **Exhibit 8** is a true and correct redacted Cantor record of the trades reflecting a profit of $171,378 in Cantor account *0994 and a profit of $68,520 in Cantor account *0011.

47.     On April 24, 2013, Bering closed its CFD positions relating to shares of Edwards, realizing a total profit of over $280,000. **Exhibit 10** is a true and correct redacted Cantor record of the trades.

48.     Jaspen and Bering's combined profits trading Edwards Life Sciences CFDs on April 23-24, 2015 was approximately $950,000.

**Trading in Walter Energy Inc.**

49.     On August 1, 2012 at 4:00 p.m., Walter Energy Inc. ("Walter"), a stock listed on the New York Stock Exchange, announced quarterly earnings results by issuing a press release through Newswire Service 1.  **Exhibit 11** is a true and correct copy of Walter Energy Inc.'s press release.

50.     The press release was submitted to Newswire Service 1 at 1:48 p.m. on August 1, 2012.  It revealed that the Walter's earnings for the prior quarter exceeded market expectations.

51.     At 2:14 p.m., Jaspen starting buying Walter CFD in its GFT account ultimately referencing 36,000 Walter shares.  **Exhibit 12** is a true and correct redacted GFT record of the trades.  GFT hedged these trades in the U.S. markets by causing Citadel Derivatives Group, LLC to buy 36,000 Walter shares for $1,236,535.  **Exhibit 13** is a true and correct redacted record of the trades.

52.     During this period, Jaspen also bought CFDs referencing 41,123 Walter shares in its Cantor account.  **Exhibit 14** is a true and correct redacted Cantor record of the trades.  Cantor hedged these trades in the U.S. markets by buying 41,123 Walter shares using a Credit Agricole Securities (a broker-dealer registered in the U.S.) account for $1,413,332.  **Exhibit 15** is a true and correct redacted record of the trades.

53.     During the window of time between upload and public dissemination, Bering bought CFD referencing 45,000 Walter shares in its Cantor account.  **See Exhibit 13.**  Cantor hedged these trades in the U.S. markets by buying 45,000 Walter shares using Credit Agricole Securities for $1,552,050.  **See Exhibit 15.**

54.     The press release regarding Walter's earnings caused Walter's stock to increase from a closing price of $34.50 on August 1, 2012 to $35.39 on August 2, 2012.

55.     The next day, Jaspen closed its Walter CFD position, realizing a profit of nearly $90,000.  **See Exhibit 12** for the redacted GFT record of the trades reflecting a profit of $41,965 in GFT account *1765; **Exhibit 14** for the redacted Cantor record of the trades reflecting a profit of $47,965 in Cantor account *0011.

56.     That same day, Bering closed its Walter CFD position, realizing a profit of $36,944 in Cantor account *0966.  **See Exhibit 14.**

### Trading in RadioShack Corp.

57.     On January 30, 2012 at 4:17 p.m., RadioShack Corp. ("RadioShack"), a stock listed (at the time) on the New York Stock Exchange, announced quarterly earnings results by issuing a press release through Newswire Service 2.  **Exhibit 16** is a true and correct copy of RadioShack Corp.'s press release.

58.     RadioShack submitted the press release to Newswire Service 2 at 2:26 p.m. on January 30, 2012, disclosing that RadioShack had realized lower earnings than expected.

59.     At 2:51 p.m. Jaspen started selling RadioShack CFD in its Saxo account ultimately referencing a total of 226,200 RadioShack shares.  **Exhibit 17** is a true and correct redacted record of the trades.  Saxo hedged Jaspen's RadioShack CFD trades in the U.S. markets by selling 226,200 RadioShack shares.  **Exhibit 18** is a true and correct redacted record reflecting these trades.

60.     After the press release was publicly disseminated, the price of RadioShack stock dropped nearly 30%.

61.     Jaspen closed its position in RadioShack CFDs at Saxo the next day, realizing profits of $668,696.  **See Exhibit 17.**

### The Extent of Jaspen and Bering's Trading

62.     From at least September 2011 to February 2014, more than 200 times, Jaspen traded before dissemination of a press release where that press release had been stolen from a Newswire Service.  Jaspen realized ill-gotten gains of approximately $25 million on these trades.

63.     From at least July 2012 to February 2014, more than 50 times, Bering traded before dissemination of a press release where that press release had been stolen from a Newswire Service.  Bering realized ill-gotten gains of approximately $7 million on these trades.

64.     It appears that Jaspen is continuing to trade based on information from stolen press releases.  From December 2014 to at least May 2015, Jaspen made more than 75 CFD trades during the window between when a press release was uploaded to Newswire Service 3 and when it was disseminated.  Jaspen realized over $15 million in profits on these trades.

### Jaspen and Bering Transferred Money to Other International Financial Institutions

65.     Jaspen sent and received funds in its CFD trading accounts to and from the following financial institutions:

    a.   ING Bank Slaski SA in Poland;

    b.   Lloyds TSB Bank PLC in London, U.K.;

    c.   Societe Generale Cyprus Limited in Cyprus; and

    d.   Raiffeisen Bank International AG in Vienna, Austria.

**Exhibit 19** is a true and correct redacted record of these transfers.

66.     Jaspen also owned brokerage accounts held by three broker-dealers located in the United States.  Jaspen used brokerage accounts located in Norway that were held with Apex, a U.S. broker-dealer, to trade equities before releases that had been stolen (account numbers

ending in *0397, *5787, *5796 and *0765). **Exhibits 26, 27, and 28** are true and correct copies of excerpts of Jaspen's account records with Apex. Jaspen had brokerage accounts with the U.S. broker-dealer, InterActive Brokers (account numbers ending in *2712 and *6768). **Exhibit 20** is a true and correct redacted summary record of wire transfers relating to Jaspen's InterActive Broker's account. **Exhibits 23 and 24** are true and correct copies of excerpts of Jaspen's account records with InterActive Brokers. Additionally, Jaspen had an account with the U.S. broker-dealer, R.J. O'Brien located in Chicago, IL (account number ending in *0006). **Exhibit 25** is a true and correct copy of an excerpt of Jaspen's account records with R.J. O'Brien.

I, Daniel L. Koster, do hereby declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.  Executed on this _5_ th day of August, 2015.

Daniel L. Koster

# EXHIBIT R

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

--------------------------------------------------------------x

SECURITIES AND EXCHANGE )
COMMISSION, )    Civil Action No.: 15-cv-06076 (MCA-MAH)
)
        Plaintiff, )    (Document Filed Electronically)
)
       -against- )
)
ARKADIY DUBOVOY, et al. )
)
        Defendants. )
)

--------------------------------------------------------------x

### DECLARATION OF GATIS EGLITIS IN SUPPORT OF DEFENDANT EXANTE LTD.'S OPPOSITION TO A PRELIMINARY INJUNCTION

I, Gatis Eglitis, of full age, hereby certify as follows:

1.      I am an Executive Director and co-founder of Exante Ltd. ("Exante"), a defendant in the above-captioned action (the "Action"). I principally am responsible for managing Exante's front office operations, including serving as the director of sales, director of the help desk, and director of the execution desk.

2.      I respectfully submit this declaration based upon my own personal knowledge in opposition to the motion of the Securities and Exchange Commission ("SEC") seeking a preliminary injunction extending the Court's Amended Temporary Restraining Order Freezing Assets, Granting Other Relief, and Order to Show Cause (the "Order"), ECF No. 13.

3.      The purpose of this declaration is to explain (i) the nature of Exante's business, (ii) the fact that the assets frozen by the Order belong to Exante's customers, and that all of Exante's trading – including that identified in the SEC's Complaint (the "Complaint") – was performed on behalf of Exante's customers, (iii) the lack of connection between the frozen assets and the allegations in the Complaint, and (iv) the irreparable injuries that Exante's customers and Exante itself will suffer if the SEC's motion is granted.

DOC ID - 23387433.8

## The Nature of Exante's Business

4.      Exante is a private limited liability company based in the Republic of Malta, with its registered office at Portomaso Tower Annex Level 7, Vjal Portomaso, St. Julians STJ 4011, Malta.

5.      Exante is an executing broker, not a hedge fund.  As explained on Exante's website, Exante "is a next generation brokerage company that aims to give its clients access to a broad range of financial instruments and markets."  Attached hereto as Exhibit A is a true and correct printout of Exante's website, to which page numbers have been added for the convenience of the Court and counsel.  (The language quoted above appears on page 130.)

6.      Exante provides its customers with direct access to a broad range of financial instruments and global markets through its electronic trading platform.  Currently, Exante has approximately 400 to 500 customers.

7.      Exante places trades exclusively for the accounts of its customers, and does not engage in any proprietary trading.  Indeed, as explained on Exante's website, Exante "does not have a dealing desk. The absence of a dealing desk eliminates the possibility of the broker having a market position opposed to that of any of its customers at any time." (*See* Exhibit A at 15.)

8.      Exante holds its customers' assets and executes its customers' trades through accounts that it introduces to "clearing" firms on an omnibus basis, whereby all customers' assets are held and all customers' trades are conducted through accounts in the name of Exante.  Thus, the description of Exante in Exhibit 95 of the Declaration of Lynn O'Connor (ECF No. 7-34) as an "Omnibus Introducing Broker" is correct.  Attached hereto as Exhibit B is a true and correct copy of the Omnibus Account Addendum Exante executed and submitted to one of its U.S. clearing firms -- R.J. O'Brien & Associates, LLC ("RJO") -- which operated

Exante's account in accordance with that agreement, in which Exante accurately represented and warranted at section 4 that its omnibus accounts at RJO would "be used to carry only property for the account of [Exante's] clients whose names and addresses are unknown to RJO."

9.      Exante has also held accounts with United States clearing firms Lek Securities Corporation ("Lek") and Interactive Brokers.  Exante's customers enter orders for their accounts at Exante by entering those orders into Exante's electronic trading platform, which then routes those orders to the appropriate market to be executed.  In the case of orders for securities or futures products that trade in United States markets, Exante's systems automatically and instantaneously route the orders to one of Exante's United States clearing firms, which, in turn, automatically and instantaneously route the orders to the applicable exchange or other marketplace to be executed in the name of such clearing firm.  Once the orders are executed, the clearing firm allocates the trades to Exante's account at the clearing firm, and Exante then allocates the trades to the accounts at Exante of the customers who had placed the orders for the respective trades.

10.     Exante has been licensed by the Malta Financial Services Authority ("MFSA") pursuant to article 6 of the Malta Investment Services Act, 1994, since June 13, 2011. A true and correct copy of Exante's current license from the MFSA, dated July 22, 2014, is attached hereto as Exhibit C.  True and correct copies of its past licenses from the MFSA, dated August 16, 2011 and June 13, 2011, are attached hereto as Exhibit D and Exhibit E, respectively.

11.     Exante has always held a "Category 2" license, which authorizes it to provide investment services including asset management, nominee services, reception and transmission of orders, and execution of orders on behalf of other persons.  (Exhibits C-E.)  As stated on the license holder information page for Exante on the MFSA's website, a true and

correct printout of which is attached hereto as Exhibit F, Category 2 license holders are "authorised to provide any Investment Service, and to hold or control Clients' Money or Customers' Assets, but not to deal for their own account or underwrite."

12.     Attached hereto as Exhibit G is a true and correct copy of the Terms of Business agreement that Exante enters into with its customers.  As explained in Section 4.1 of that agreement, Exante "offers brokerage services through an Online Facility, which allows [its customers] to place Orders, enter into Contracts and conduct Transactions in Instruments with various Counterparties, and provides related services, including the maintenance of the Client's Account, subject to the terms and conditions set out in th[e] Agreement (the "Services").  As part of the Services, EXANTE will execute, transmit and receive orders on [its customers'] behalf. EXANTE will not make personal recommendations or advice on the merits of purchasing, selling or otherwise dealing in particular Instruments, placing of Orders, entering into Contracts or particular Transactions, their taxation consequences or the composition of any account or any other rights or obligations attaching to such Investments, Orders, Contracts or Transactions."

### The Frozen Assets Belong Entirely to Exante's Customers, and
### All of Exante's Trading Identified in the Complaint Was on Behalf of Its Customers

13.     As a result of this Action, Exante's accounts at the clearing firms Lek and RJO have been frozen.  (The Order provides that Exante accounts at Interactive Brokers should be frozen as well, but such accounts do not contain any assets.)

14.     All of the frozen accounts contain only the assets of Exante's customers, and were used solely to execute trades directed by Exante's customers.  They are not, and have never been, used for any proprietary trading by Exante.

15.     A true and correct copy of Exante's Account Statement with Lek as of July 31, 2015 is attached hereto as Exhibit H.  The net equity in Exante's accounts with Lek as of

July 31, 2015 was $10,191,678.19.  (Exhibit H at 1.)  Exante's accounts with Lek collectively

held assets for 89 of Exante's customers as of July 31, 2015.  Neither the net equity nor the

number of Exante's customers with assets in Exante's Lek accounts has substantially changed

since July 31, 2015.

16. A true and correct redacted copy of Exante's Account Statement with RJO

as of July 31, 2015 is attached hereto as Exhibit I.  The net equity in Exante's accounts with RJO

as of July 31, 2015 was $2,049,064.23.  (Exhibit I at 15.)  Exante's accounts with RJO

collectively held assets for 22 of Exante's customers as of July 31, 2015.  Neither the net equity

nor the number of Exante customers with assets in Exante's RJO accounts has substantially

changed since July 31, 2015.

### Almost All of the Frozen Assets in Exante's Accounts Have No Connection to This Action

17. After I received a copy of the Court's Order, I carefully reviewed the

assets in Exante's frozen accounts and the holdings of Exante's customers.

18. All of the trades Exante executed were entered at the direction of and on

behalf of Exante's customers, including the trades identified in the Complaint.

19. None of the frozen assets in Exante's accounts belong to customers who

are defendants in this Action, except for a total of approximately $8,000 of assets belonging to

two customers.

20. Two customers with frozen assets in Exante's Lek account are defendants

in this action:  Memelland Investments Ltd. ("Memelland") and Global Hedge Capital Fund Ltd.

("Global Hedge").  Combined, those two customers' assets account for a tiny fraction –

approximately 0.06% – of the total assets that are frozen.

21. Memelland holds 50,000 shares of Marfin Capital Bank, symbol

CY0000200119, in Exante's Lek account.  Those shares were valued at €0.063 each as of

July 31, 2015, for a total position value of $3,460.07. (Exhibit H at 1.) Memelland also held a cash position of 21 cents in Exante's Lek account. Memelland does not hold any assets in Exante's RJO account. A true and correct redacted copy of the August 7, 2015 account statement for Memelland's account with Exante is attached hereto as Exhibit J. As of August 7, 2015, the net asset value of Memelland's account with Exante was €2,073.22, or approximately $2,268.10 in U.S. dollars. (*See* Exhibit J.)

22. Global Hedge holds three positions in the Exante's Lek account: it owns 10 shares of Amazon (AMZN) and 80 shares of Alibaba (BABA), and is short 60 shares of Powershares QQQ Trust Series 1 (QQQ). The net value of those positions as of July 31, 2015 was $4,911.70. (Exhibit H at 2, 9.) Global Hedge does not hold any assets in Exante's RJO account. A true and correct redacted copy of the August 7, 2015 account statement for Global Hedge's account with Exante is attached hereto as Exhibit K. As of August 7, 2015, the net asset value of Global Hedge's account with Exante was €791.27, or approximately $865.65 in U.S. dollars. (*See* Exhibit K.)

23. Collectively, those two defendants – Memelland and Global Hedge – are the owners of assets worth approximately $8,371.98 in the frozen Exante accounts. The other assets in Exante's frozen accounts – valued at $12,240,742.42 as of July 31, 2015 – belong to 100 other Exante customers, who are not alleged to have engaged in any wrongdoing.

24. When Exante received a copy of the Complaint in this Action, it immediately froze Memelland's and Global Hedge's accounts with Exante to prevent those customers from withdrawing their assets. Exante is willing to freeze the account of any other individual or entity that the SEC specifies based on a good faith determination by the SEC that such individuals or entities placed illicit trades through their accounts at Exante.

25.     None of the trades specified in the Complaint as allegedly having been made by Exante (*see* Complaint ¶¶ 167, 174, 181, 187, 219) were made on behalf of Global Hedge.

26.     Other than Memelland and Global Hedge, none of the other defendants in this Action – including the Dubovoy Group Defendants and the Hacker Defendants, as those terms are defined in the Complaint – are known to Exante or have ever been customers of Exante.

27.     Following receipt of the Complaint, Exante analyzed its computer and networking systems to determine if the IP address ending in "5.166," discussed in paragraphs 106-109 of the Complaint, was assigned to Exante's systems, and determined that none of Exante's computer or networking systems have used an IP address ending in "5.166."

### Continuation of the Freeze Will Harm
### Exante's Customers and Exante Itself

28.     Exante and its customers would be harmed if the freeze order is not lifted for the assets that have nothing to do with any wrongdoing alleged in this Action.

29.     A continuation of the freeze would prevent Exante's customers from accessing their capital held in the frozen accounts.

30.     A continuation of the freeze would irreparably harm Exante, as it likely would put Exante out of business.

31.     Being named as a defendant in this action has already caused Exante to suffer severe reputational harm and loss of goodwill among its customers and others.  Exante acts exclusively as an executing broker for its customers.  If Exante's customers cannot access their assets, Exante would be unable fulfill one of its basic responsibilities to them.  If the freeze is not lifted, that reputational harm would deepen and likely result in Exante's remaining

customers attempting to end their relationships with Exante. Once Exante loses those customers they would be unlikely to return, even if Exante is later dismissed from this Action.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 19th day of August, 2015 in London, England.

_____
Gatis Eglitis