# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | CA No. 16-cv-00845 (MCA-LDW) |
| Plaintiff, | |
| v. | |
| EVGENII ZAVODCHIKOV, et al., | |
| Defendants. | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR DEFAULT JUDGMENT


John Donnelly, Esq.

Attorneys for Plaintiff
U.S. Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA  19103
Tel:  (215) 597-3100
Fax:  (215) 597-2740
DonnellyJ@sec.gov


Dated: December 4, 2018

## TABLE OF AUTHORITIES

**CASES**                                                           **Page(s)**

*Anderson v. Found. for Advancement, Educ., and Employment of Am. Indians,*
    155 F.3d 500 (4th Cir. 1998) ...............................................................13

*Bermudez v. Reid*, 733 F.2d 18, 21 (2d Cir. 1984) ...................................................2

*Calder v. Jones*, 465 U.S. 783 (1984)......................................................................16

*Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532 (D.N.J. 2008)........................12

*Comdyne I, Inc. v. Corbin*, 908 F.2d 1142 (3d Cir. 1990)..................................2, 12

*Compudyne Corp. v. Shane*, 453 F. Supp. 2d 807 (S.D.N.Y. 2006) ......................19

*Doug Brady, Inc. v. N.J. Bldg. Laborers Statewide Funds,*
    250 F.R.D. 171 (D.N.J. 2008)........................................................................13, 22

*Ernst & Ernst v. Hochfelder,* 425 U.S. 185 (1976) .................................................20

*Fustok v. Conticommodity Servs., Inc.*, 873 F.2d 38 (2d Cir. 1989) ......................28

*Graham v. SEC*, 222 F.3d 994 (D.C. Cir. 2000)................................................19, 21

*In re Enron Corp. Secs., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549
    (S.D. Tex. 2002)..................................................................................................19

*In re Fannie Mae Sec. Lit.*, 503 F. Supp. 2d 25 (D.D.C. 2007)..............................21

*In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319 (S.D.N.Y. 2004) ......19

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945) .........................................15, 17

*Kokesh v. SEC*, 137 S. Ct. 1635 (2017) ..................................................................26

# TABLE OF AUTHORITIES (Continued)

**CASES**                                                                      **Page(s)**

*Maersk Line v. Americargo Inc.*, No. 17-cv-5742, 2018 WL 3435070
    (D.N.J. July 17, 2018) (Arleo, J.) .....................................................2, 12, 13, 22

*Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361 (3d Cir. 2002).........................*passim*

*Reves v. Ernst & Young*, 494 U.S. 56 (1990)...........................................................20

*SEC v. Abacus Int'l Holding Corp.*, No. C 99-02191,
    2001 U.S. Dist. LEXIS 12635 (N.D. Cal. Aug. 16. 2001) ................................26

*SEC v. Am. Realty Tr.*, 586 F.2d 1001 (4th Cir. 1978)...........................................20

*SEC v. Antar*, 97 F. Supp. 2d 576 (D.N.J. 2000)....................................................28

*SEC v. Bilzerian*, 29 F.3d 689 (D.C. Cir. 1994) .....................................................24

*SEC v. Bonastia*, 614 F.2d 908 (3d Cir. 1980) .................................................23, 24

*SEC v. Chester Holdings, Ltd.*, 41 F. Supp. 2d 505 (D.N.J. 1999) ..................23, 24

*SEC v. China Infrastructure Inv. Corp.*, 189 F. Supp. 3d 118
    (D.D.C. 2016) ...............................................................................................23, 29

*SEC v. Clark*, 915 F.2d 439 (9th Cir. 1990) ..........................................................26

*SEC v. Cole*, No. 12-cv-8167 (RJS), 2014 U.S. Dist. LEXIS 133739
    (S.D.N.Y. Sept. 22, 2014)....................................................................................24

*SEC v. Colonial Inv. Mgmt. L.L.C.*, 381 F. App'x 27 (2d Cir. 2010) .....................24

## TABLE OF AUTHORITIES (Continued)

**CASES**                                                                    **Page(s)**

*SEC v. Compania Internacional Financiera S.A.*, No. 11-cv-4904,
    2011 WL 3251813 (S.D.N.Y. July 29, 2011)....................................................16

*SEC v. Current Fin. Servs.*, 100 F. Supp. 2d 1, 6-7 (D.D.C. 2000).........................19

*SEC v. E-Smart Techs., Inc.*, 139 F. Supp. 3d 170, 183 (D.D.C. 2015).................26

*SEC v. Farkas*, 557 F. App'x 204 (4th Cir. Feb. 11, 2014) ....................................24

*SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215 (D.C. Cir. 1989) ................25, 26

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996)....................19, 25, 28

*SEC v. Hong*, No. 16-cv-9947 (S.D.N.Y.)..........................................................30, 31

*SEC v. W.J. Howey*, 328 U.S. 293 (1946)................................................................20

*SEC v. Hughes Capital Corp.*, 124 F.3d 449 (3d Cir. 1997).................................25

*SEC v. Maillard*, No. 13-cv-5299, 2014 WL 1660024
    (S.D.N.Y. Apr. 23, 2014)...................................................................................16

*SEC v. Management Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975) ................23, 24

*SEC v. Milan Grp., Inc.*, 962 F. Supp. 2d 182 (D.D.C. 2013)...............................20

*SEC v. Nagaicevs*, No. 12-cv-00413, 2013 WL 3730578
    (N.D. Cal. July 12, 2013).............................................................................15, 16

*SEC v. One Or More Unknown Traders in the Common Stock of Certain Issuers*,
    825 F. Supp. 2d 26 (D.D.C. 2010).....................................................................24

*EC v. Pirate Inv'r L.L.C.*, 580 F.3d 233 (4th Cir. 2009) ........................................20

# TABLE OF AUTHORITIES (Continued)

**CASES**                                                                                      **Page(s)**

*SEC v. Razmilovic*, 738 F.3d 14 (2d Cir. 2013)...................................................28

*SEC v. Robinson*, No. 00 Civ.7452 RMB AJP, 2002 U.S. Dist. LEXIS 12811
   (S.D.N.Y. July 16, 2002) .....................................................................27

*SEC v. Rosenthal*, 650 F.3d 156 (2d Cir. 2011)....................................................31

*SEC v. Sargent*, 329 F.3d 34 (1st Cir. 2003) .........................................................27

*SEC v. Savoy Indus., Inc.*, 665 F.2d 1310 (D.C. Cir. 1981) ...................................23

*SEC v. U.S. Funding Corp.*, Civ. No. 02-2089, 2006 U.S. Dist. LEXIS 24789
   (D.N.J. Apr. 11, 2006) ........................................................................28

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990)..............................................23

*SEC v. Warde*, 151 F.3d 42 (2d Cir. 1998)............................................................27

*SEC v. Whittemore*, 659 F.3d 1 (D.C. Cir. 2011) ..................................................26

*SEC v. Zandford*, 535 U.S. 813 (2002)..................................................................20

*Stevens v. InPhonic, Inc.*, 662 F. Supp. 2d 105 (D.D.C. 2009) .............................21

*United States v. Naftalin*, 441 U.S. 768 (1979) .....................................................18

*Valicenti Advisory Servs. v. SEC*, 198 F.3d 62 (2d Cir. 1999) ..............................20

*Weiss v. SEC*, 468 F.3d 849 (D.C. Cir. 2006).........................................................20

## TABLE OF AUTHORITIES (Continued)

**STATUTES, RULES AND OTHER AUTHORITIES**      **Page(s)**

15 U.S.C. § 77e .................................................................................2

15 U.S.C. § 77q(a) ..................................................................... *passim*

15 U.S.C. §§ 77t(b) ...........................................................................14

15 U.S.C. §§ 77v(a) ....................................................................14, 15

15 U.S.C. § 78aa ..........................................................................14, 15

15 U.S.C. § 78j(b) ..................................................................... *passim*

15 U.S.C. § 78t(b) ..................................................................... *passim*

15 U.S.C. § 78t(e) ...................................................................2, 18, 21

15 U.S.C. § 78u ................................................................................14

15 U.S.C. § 78u-1 ..................................................................... *passim*

26 U.S.C. § 6621(a)(2) .....................................................................28

17 C.F.R. § 240.10b-5 ............................................................... *passim*

Fed. R. Civ. Proc. 4(f) .................................................................1, 11

Fed. R. Civ. Proc. 4(h) .....................................................................11

Fed. R. Civ. Proc. 55(a) ..............................................................2, 10

Fed. R. Civ. Proc. 55(b) ..............................................................1, 12

10 Wright, Miller & Kane,
<u>Federal Practice & Procedure</u> § 2685 (3d ed. 1998)................................1

# TABLE OF CONTENTS

**Page**

FACTUAL BACKGROUND ...................................................................3

I.     THE FRAUDULENT SCHEME .................................................5

II.    THE DEFAULTING DEFENDANTS' INVOLVEMENT IN THE
       SCHEME ...................................................................................8

       A. The Defaulting Defendants' Trading Coincides With the Hackers'
          Access to Hacked Newswire Services.......................................8

       B. The Defaulting Defendants Reaped Huge Profits From Their Illegal
          Trading....................................................................................9

III.   PROCEDURAL STATUS ..........................................................9

LEGAL STANDARD ..........................................................................12

ARGUMENT .......................................................................................13

I.     THE COURT HAS JURISDICTION AND THE DEFAULTING
       DEFENDANTS HAVE BEEN PROPERLY SERVED ..............14

       A. The Court has Subject Matter Jurisdiction ..............................14

       B. The Court has Specific Personal Jurisdiction Over The Defaulting
          Defendants .............................................................................14

       C. The Commission has Properly Served the Defaulting Defendants..........17

II.    THE COMPLAINT ESTABLISHES THE DEFAULTING
       DEFENDANTS' LIABILITY ...................................................18

III.   THE DEFAULTING DEFENDANTS ARE CULPABLE, HAVE NO
       DEFENSE, AND, ABSENT A DEFAULT JUDGMENT, THE
       COMMISSION WOULD BE PREJUDICED .............................21

**TABLE OF CONTENTS (Continued)**

**Page**

IV.   THE COURT SHOULD GRANT THE RELIEF SOUGHT ........................22

    A. The Defaulting Defendants Should Be Permanently Enjoined From
       Future Violations of the Securities Laws ..................................................23

    B. The Defaulting Defendants Should be Ordered to pay Disgorgement
       and Prejudgment Interest .........................................................................25

    C. The Court Should Order the Defaulting Defendants to pay a Civil
       Penalty of Three Times Their Ill-gotten Gains .......................................29

CONCLUSION ........................................................................................................31

Pursuant to Federal Rule of Civil Procedure 55(b)(2), Plaintiff Securities and Exchange Commission ("Commission") respectfully submits this memorandum of law in support of its motion for default judgment as to the following eight defendants in this case:  Evgenii Zavodchikov, Extra Trading Company, Andrey Bokarev, Radion Panko, Green Road Corp., Natalia Andreevna Alepko, Solar Line, Inc., and Anton Maslov (collectively the "Defaulting Defendants").[1]  The entry of a default judgment under Rule 55(b) of the Federal Rules of Civil Procedure is left to the "sound judicial discretion" of the court.  *See* 10 Wright, Miller & Kane, Federal Practice & Procedure § 2685 (3d ed. 1998).  Where "a

---

[1]    In the Commission's complaint, the nine defendants named in this case are collectively referred to as the "Trader Defendants."  Because this motion concerns the eight defendants who are in default, this memorandum refers to them as the "Defaulting Defendants."  Tarek Investors Inc., the lone defendant that has not yet defaulted, is organized in the Republic of Panama, a signatory to the Inter-American Convention on Letters Rogatory (the "Inter-American Convention"). Service pursuant to the Inter-American Convention requires Plaintiff to submit a service package via the United States Central Authority to the Panama Central Authority for service on the Panamanian entity.  On January 24, 2018, Plaintiff submitted its service package to the United States Central Authority.  On January 25, 2018, the United States Central Authority submitted Plaintiff's service package to the Panama Central Authority.  As of the date of this submission, the Panamanian Central Authority has not served process on Tarek, and it has not responded to requests for an update regarding the status or anticipated timing or service.  Today, Plaintiff has submitted a request to the Clerk's Office to serve Tarek via Federal Rule of Civil Procedure 4(f)(2)(C)(ii).  In a separate submission filed today, Plaintiff respectfully requests that the case against Tarek Investors be placed in administrative suspense pending service of that Defendant.

party fails to respond . . . the court is ordinarily justified in entering a judgment against the defaulting party." *Bermudez v. Reid*, 733 F.2d 18, 21 (2d Cir. 1984).

Here, the Defaulting Defendants have been served with process, but have failed to answer or otherwise respond to the Complaint. The Clerk of Court has entered their defaults pursuant to Federal Rule of Civil Procedure 55(a). (*See* Docket entries on Feb. 28, 2018 and Apr. 26, 2018). The Defaulting Defendants should not be permitted to avoid the consequences of their fraudulent conduct by simply ignoring this lawsuit. Accordingly, judgment by default is appropriate.

Upon a defendant's default, the Court should accept as true all of the factual allegations of the complaint. *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990); *Maersk Line v. Americargo Inc*., No. 17-cv-5742, 2018 WL 3435070 (D.N.J. July 17, 2018) (Arleo, J.) The well-pled allegations in the Commission's Complaint establish that the Defaulting Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C.§ 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by perpetrating a fraudulent scheme, and Sections 20(b) and 20(e) of the Exchange Act. [15 U.S.C. §§ 78t(b) and (e)].

The Commission respectfully requests that the Court grant its motion for entry of a default judgment, enjoin the Defaulting Defendants from future

violations of the federal securities laws set forth above, order that each of the Defaulting Defendants is liable for disgorgement of their ill-gotten gains as a result of the conduct alleged in the Complaint and prejudgment interest thereon, order a civil monetary penalty of three times their ill-gotten gains, lift the previously ordered asset freeze for the limited purpose of transferring assets up-to the amount of the judgment to the Commission, and grant any other relief that the Court deems just and proper.

## FACTUAL BACKGROUND

Along with the Defendants in the related case, *SEC v. Dubovoy, et al.*, 15-cv-06076 (DNJ) (MCA), the Defaulting Defendants participated in a massive fraud on the U.S. markets, in which the participating traders collectively reaped over $100 million in illicit profits, with the Defaulting Defendants realizing nearly $19.5 million in ill-gotten gains. (Compl. ¶¶ 1-9). The fraudulent scheme involved two computer hackers, who were named as defendants in *SEC v. Dubovoy* (the "Hackers"), stealing unpublished press releases, frequently involving upcoming earnings announcements, from certain newswire services. (*Id.*) The Hackers then transmitted (directly or indirectly) the stolen press releases to a network of traders, including the Defaulting Defendants, who traded on that material, nonpublic information and realized substantial ill-gotten gains. (*Id.*)

3

The individual Defaulting Defendants each traded through accounts held in the name of the defendant entity they owned.  (Compl. ¶¶ 14-22, 60.)  While all the individual Defaulting Defendants are Russian citizens, they formed entities in various off-shore locales, including Seychelles, Belize, Commonwealth of Dominica, and Panama.  (*Id*. ¶¶ 14-22.)  Zavodchikov owned Extra Trading, which owned sub-account ending *1217 at Exante Ltd. ("Exante"), which purports to be a Malta-based broker-dealer.  (*Id*. ¶¶ 14-15, 60.)  Bokarev and Panko were the co-owners of Green Road, which owned sub-account ending *1213 at Exante.  (*Id*. ¶¶ 16-18.)  Alepko owned Solar Line, which owned sub-account ending *1228 at Exante.  (*Id*. ¶¶ 19-20.)  And, Maslov owned Tarek Investors, which owned sub-account ending *1228 at Exante.  (*Id*. ¶¶ 21-22.)  All of the Defendants used Exante as their broker.  (*Id*. ¶¶ 14-22.)  Exante held trading accounts at two U.S. brokers.  (*Id*. ¶ 60.)  In connection with the fraudulent scheme, the Defaulting Defendants placed the illegal trades through Exante's U.S. accounts, resulting in nearly $19.5 million in ill-gotten gains.  (*Id*.)[2]

_____

[2]    Exante had been named as a defendant in *SEC v. Dubovoy*.  *See SEC v. Dubovoy*, No. 15-cv-06076 (DNJ) (MCA), Docket No. 1.  Exante produced evidence that the illegal trades done through Exante's omnibus accounts were done by certain of its clients, including the Defaulting Defendants.  Subsequently, the Commission dismissed Exante from that action without prejudice.  *Id*., Docket Nos. 256 and 258.

## I.     THE FRAUDULENT SCHEME

The Defendants' fraudulent scheme worked as follows.  The Hackers hacked into the computer systems of the newswire services, through deceptive means, and illegally accessed press releases that had been uploaded to the newswire service by companies whose stock was traded on U.S. securities exchanges before those press releases were publicly disseminated by the newswire service.  (Compl. ¶¶ 1-10, 61-63, 77-81.)  Marketwired and PR Newswire Association LLC (each the "Newswire Service") provide end-to-end content, news production, and distribution to their clients, including many publicly traded companies (also known as "issuers") in the United States.  (Compl. ¶¶ 61-62.)  Part of their distribution services entail editing and releasing issuers' press releases, which contained quarterly earnings data and other important financial information.  (Compl. ¶¶ 73-76.)  After an issuer submits a draft press release to the Newswire Service, but before it is disseminated to the public, the Newswire Service electronically stores the release on its servers.  (*Id.* ¶ 74.)  For each press release, there is a window of time between the submission and public dissemination of the release (the "window").  (*Id.* ¶ 76.)  That window varied between a number of minutes and a number of days.  (*Id.*)

The Defendants exploited this window to profit from the fraudulent scheme. From 2010 to 2015, the Hackers hacked into the Newswire Services' computer systems and stole thousands of press releases prior to their public dissemination.

5

(Compl. ¶¶ 1-2, 77-82.)  The Hackers used deceptive means to gain unauthorized access to the Newswire Services' computer systems, using tactics such as: (1) employing stolen username/password information of authorized users to pose as authorized users; (2) deploying malicious computer code designed to delete evidence of the computer attacks; (3) concealing the identity and location of the computers used to access the Newswire Services' computers; and (4) using back-door access modules.  (*Id*. ¶ 79.)

The Hackers transmitted (directly or indirectly) the stolen information to a network of traders, including the Defaulting Defendants and many other traders named as defendants in *SEC v. Dubovoy*, who traded on the information before the press releases were publicly issued.  (Compl. ¶¶ 5, 77, 102.)  When the Defaulting Defendants placed these in-window trades, they often did so within minutes of other traders involved in the scheme.  (*Id*. ¶¶ 108-150.)  After the press releases were issued, the Defaulting Defendants and other traders would close their trading positions.  (*Id*. ¶ 77.)

The Hackers were not always able to access each Newswire Service's network.  (Compl. ¶¶ 4, 61-63, 77-81.)  Depending on their access, the Hackers' theft of unpublished press releases oscillated between the Newswire Services.  (*Id*.)  The Defaulting Defendants' trading activity largely mirrored this access, meaning when the Hackers only had access to press releases from a certain Newswire

Service, the Defaulting Defendants traded in the securities of issuers whose press releases were stolen from that Newswire Service. (Compl. ¶ 81.)

Armed with the unfair advantage that the inside information gave them over an unsuspecting market, the Defaulting Defendants bought or sold (depending on whether they concluded that, when the information was publicly announced, the price of the company's stock would increase or decrease) securities in those companies whose press releases had been stolen. (*Id*. ¶¶ 5-6.) The Defaulting Defendants made their initial trades in the window of time between when the press releases were uploaded to the Newswire Services' computer systems and when they were publicly disseminated—which, often, was only a few hours later. (Compl. ¶¶ 101-112.) Similarly, as part of the scheme, the traders, including the Defaulting Defendants, used deceptive means to conceal their access to the stolen releases and make payments to the Hackers. (*Id*. ¶ 7.) The Defaulting Defendants concealed their trading activities through the use of undisclosed sub-accounts trading under the name of Exante at two U.S. brokers and through the creation and use of off-shore entities. (*Id*.) After the market reacted to the news, resulting in an increase or decrease in the price of the company's stock, the Defaulting Defendants closed their positions and reaped enormous profits. (*Id*. ¶ 8.) The traders involved in the scheme collectively realized over $100 million in ill-gotten gains from this

fraud, with the Defaulting Defendants collectively realizing nearly $19.5 million. (*Id*. ¶¶ 9, 33.)

The Hackers' theft of the unpublished press releases oscillated between Newswire Services. (*Id*. ¶ 74). From October 2012 – February 2014, the Hackers had access to the systems of Marketwired. (*Id*.) The Hackers had access to PR Newswire during at least the period January 2013 – March 2014. (*Id*.)

Many of the stolen press releases contained information about quarterly and annual earnings data for companies whose stock was traded on U.S. stock exchanges. (Compl. ¶¶ 67, 69, 76.) It is common for financial analysis firms to estimate or predict a given issuer's quarterly or annual earnings. (*Id*. ¶ 77.) The "market" reaches a consensus expectation based on these different predictions. (*Id*.) When an issuer releases its earnings, the share price for that issuer generally increases if its earnings exceed the market consensus and generally decreases if its earnings fall short of the consensus prediction. (*Id*.) Accordingly, the Defaulting Defendants gained an unfair advantage over other traders from the illegal conduct.

## II.   THE DEFAULTING DEFENDANTS' INVOLVEMENT IN THE SCHEME

### A. The Defaulting Defendants' Trading Coincides With the Hackers' Access to Hacked Newswire Services

The Defaulting Defendants' trading tracks the Hackers' access to stolen press releases. (Compl. ¶¶ 1-10, 63, 77-81, 103, 115-150) When the Hackers stole

press releases from Marketwired, the Defaulting Defendants traded in the securities

of the issuers whose press releases were stolen from Marketwired.  (*Id*.)  When the

Hackers had access to PR Newswire, the Defaulting Defendants traded in

securities of issuers who issued their press releases through PR Newswire.  (*Id*.)

## B. The Defaulting Defendants Reaped Huge Profits From Their Illegal Trading

The illegal trading was hugely profitable.  The participants in the scheme

reaped over $100 million in ill-gotten gains.  (*E.g.*, Compl. ¶ 9.)  The Defaulting

Defendants realized nearly $19.36 million in illicit gains from their trading.  (*E.g.*,

Compl. ¶¶ 9; Canjels Decl. ¶¶ 10-13 and Tables 1 and 2A-2D)

## III.    PROCEDURAL STATUS

On February 17, 2016, the Commission filed the Complaint in this matter.

(Docket No. 1).  That same day, the Court granted the Commission's motion for a

temporary restraining order against the Defendants, freezing assets, and granting

other relief.  (Docket No. 6.)  On February 29, 2018, the Court granted the

Commission's motion for a preliminary injunction against the Defendants, freezing

assets, and granting other relief.  (Docket No. 10.)

On June 15, 2017, the Commission filed a motion for leave to serve the

Individual Defendants, all of whom reside in the Russian Federation, via

alternative means.  (Docket No. 17).  Subsequently, on August 30, 2017, the Court

granted the Commission's motion (the "Order"), ordering that the Commission

serve all the Individual Defendants by publication, and send the Complaint and summons to certain of the Individual Defendants via email.  (Docket No. 18).  The Commission served the Individual Defendants in accordance with the Order.  On September 8, 2017, the Commission filed the Declaration of John Donnelly Regarding Service, which detailed the Commission's emailing the Complaint and amended summons to certain of the Individual Defendants as directed in the Order. (Docket No. 20).  Subsequently, the Commission filed the Declaration of John Donnelly Regarding Service by Publication on October 30, 2017 (Docket No. 21). As detailed in that Declaration, pursuant to the Order, the Commission published notice of this action in the New York Times International Edition on September 20, 2017; September 27, 2017; October 4, 2017; and October 11, 2017.  As a result, the Individual Defendants were required to respond to the Complaint by November 1, 2017, at the latest—21 days after the final publication of the notice. To date, none of the Individual Defendants has responded to the Complaint, appeared in this action, or contacted counsel for the Commission.  (Declaration of John Donnelly, Dec. 4, 2018, at ¶ 8).  None of the Individual Defendants is an infant.  (*Id*. at ¶ 9).  On information and belief, none of the Individual Defendants is incompetent or in military service of the United States.  (*Id*.)  Pursuant to Federal Rule of Civil Procedure 55(a), the Clerk of Court entered the default of the

Individual Defendants on February 26, 2018. (*Id*. at ¶10; Docket entry Feb. 26,

2018, no document number.) )

Likewise, the Commission has served Defendants Extra Trading, Green

Road, and Solar Line with process, and the Clerk has entered their default. (*Id*. at

¶¶ 11-15). Extra Trading is a Seychelles corporation. (Compl. ¶ 15). On January

3, 2018, Plaintiff provided a copy of the summons and Complaint to the Clerk's

Office for service by mail on Extra Trading, via its registered agent in Seychelles,

pursuant to Federal Rules of Civil Procedure 4(h) and 4(f)(2)(C)(ii). (Docket No.

27). On January 9, 2018, the Clerk's Office mailed the service package to Extra

Trading by registered mail requiring a receipt with a signature from the recipient.

(Docket Nos. 27-1, 27-2). The Clerk's Office received a signed return receipt for

the service package, which it entered on March 2, 2018. (Docket No. 33). That

same day, Plaintiff filed a Declaration of Proof of Service outside the United

States. (Docket No. 34). Green Road is a Belizean corporation. On February 13,

2018, the summons and Complaint were severed on Green Road through service

by hand delivery on its registered agent, Titoff Realty Ltd. in Belize. (Docket No.

29 (Affidavit of Proof of Service Outside the United States)). Solar Line is a

corporation formed in the Commonwealth of Dominica. On March 8, 2018, the

summons and Complaint were served on Solar Line via hand delivery on its

11

registered agent in the Commonwealth of Dominica.  (Docket No. 36 (Affidavit of Proof of Service Outside the United States)).

Extra Trading, Green Road, and Solar Line have never answered, moved, or otherwise responded to the Complaint.  (Donnelly Decl. at ¶¶ 11, 15).  On April 26, 2018, Plaintiff filed a request for the Clerk of Court to enter the Default of Extra Trading, Green Road, and Solar Line.  (Docket No. 37).  That same day, the Clerk of Court entered the Default of those Defendants.  (Donnelly Decl. at ¶ 15; Docket entry Apr. 26, 2018, no document number).

## LEGAL STANDARD

Before granting a motion for default judgment, a court must:  (1) determine it has jurisdiction both over the subject matter and parties; (2) determine whether defendants have been properly served; (3) determine whether the Complaint pleads a cause of action; and (4) determine whether plaintiff has established damages. *Maersk*, 2018 WL 3435070, at *1 (citing *Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 535-36 (D.N.J. 2008)).  While the court accepts the facts alleged in the Complaint as true for purposes of determining liability, courts make an independent determination of the amount of disgorgement and penalty to be ordered.  *See id*. (citing *Comdyne*, 908 F.2d at 1149).  While the Court may conduct a hearing, it is not required to do so as long as there is a basis for the amount in the default judgment.  *See* Rule 55(b)(2).  The Court may rely on the

12

pleadings, affidavits, or documentary evidence to determine the appropriate sum for the default judgment. *See Anderson v. Found. for Advancement, Educ., and Employment of Am. Indians,* 155 F.3d 500, 507 (4th Cir. 1998).

In addition, the Court must make factual findings regarding: (1) whether the party subject to the default has a meritorious defense; (2) the prejudice suffered by the party seeking a default judgment; and (3) the culpability of the party subject to default. *Maersk*, 2018 WL 3435070, at *1 (citing *Doug Brady, Inc. v. N.J. Bldg. Laborers Statewide Funds*, 250 F.R.D. 171, 177 (D.N.J. 2008)).

## <u>ARGUMENT</u>

The Court should enter the default judgment against the Defaulting Defendants. They have been properly served with the summons and Complaint, but have failed to answer, plead, or otherwise defend this case, and the Clerk of Court has entered their default. The Defaulting Defendants failure to appear and participate in this case should not prevent the Commission form obtaining relief against them.

## I.   THE COURT HAS JURISDICTION AND THE DEFAULTING DEFENDANTS HAVE BEEN PROPERLY SERVED

### A. The Court has Subject Matter Jurisdiction

Before granting a motion for default judgment, the Court must find that it has both subject matter jurisdiction over the action and personal jurisdiction over the Defaulting Defendants.  This  case involves questions of federal law as the Commission brought this action to enjoin violations of the federal securities laws, and to obtain disgorgement, prejudgment interest, civil monetary penalties, and such other  further relief as the Court may grant.  The Court has jurisdiction over the action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].  (Compl. ¶¶ 11-12.)

### B.  The Court has Specific Personal Jurisdiction Over the Defaulting Defendants

Likewise, the Court has personal jurisdiction over the Defaulting Defendants.   In finding personal jurisdiction as to a foreign company that sold securities to U.S. investors through American Depository Receipts, the Third Circuit stated:  "A foreign corporation that purposefully avails itself of the American securities market has adequate notice that it may be haled into an American court for fraudulently manipulating that market." *Pinker v. Roche*

14

*Holdings, Ltd*., 292 F.3d 361, 371-72 (3d Cir. 2002). For the same reason, the Court has personal jurisdiction over the Defaulting Defendants.[3]

The federal securities laws authorize nationwide service of process. *See* 15 U.S.C. §§ 77v(a), 78aa. Where Congress has authorized nationwide service of process, courts look to a defendant's contacts with the United States, and not only the state in which the federal court sits. *See Pinker*, 292 F.3d at 369; *SEC v. Nagaicevs*, No. 12-cv-00413, 2013 WL 3730578, at *2-3 (N.D. Cal. July 12, 2013) (granting SEC's motion for default judgment against Latvian defendant). As a result, jurisdiction is proper if the defendant has sufficient minimum contacts with the United States such that exercising jurisdiction is consistent with the Due Process Clause of the Fifth Amendment, and where exercising jurisdiction "comports with 'traditional notions of fair play and substantial justice.'" *Pinker*, 292 F.3d at 368-69 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Here, the Defaulting Defendants had the necessary contacts with the United States for the Court to exercise specific personal jurisdiction over them in this case. Like the defendant in *Pinker*, the Defaulting Defendants purposefully availed themselves "of the American securities market" and had "adequate notice that

---

[3]     Venue is also proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. (Compl. ¶ 13).

[they] may be haled into an American court for" defrauding that market. *Pinker*, 292 F.3d at 370. The Defaulting Defendants engaged in a massive scheme over a period of years to defraud the U.S. securities markets and other, innocent market participants. By trading in securities of publicly traded companies on U.S. stock exchanges through Exante's omnibus accounts at two U.S. brokers, the Defaulting Defendants purposefully availed themselves of the privilege of doing business in the United States, and the laws and protections of this country—including the protections afforded by the same federal securities laws and rules that they violated. Because the claims at issue arise out of these contacts with the United States, specific personal jurisdiction exists. *See, e.g., Pinker,* 292 F.3d at 369-373; *SEC v. Maillard*, No. 13-cv-5299, 2014 WL 1660024, at *2 (S.D.N.Y. Apr. 23, 2014); *Nagaicevs*, 2013 WL 3730578, at *2-3; *SEC v. Compania Internacional Financiera S.A.*, No. 11-cv-4904, 2011 WL 3251813, at *5 (S.D.N.Y. July 29, 2011).[4]

Furthermore, exercising jurisdiction over the Defaulting Defendants is fair and reasonable is consistent with "traditional notions of fair play and substantial

---

4    The personal jurisdiction requirement is also satisfied where a defendant has acted outside the country and caused sufficiently foreseeable consequences in this country. *See*, *e.g.*, *Calder v. Jones*, 465 U.S. 783 (1984); *Nagaicevs*, 2013 WL 3730578, at * 2-3. Defaulting Defendants' knew and intended to defraud and injure innocent market participants on the U.S. exchanges and within the country, for their own profit, and they did so. Accordingly, this provides another, independent basis for personal jurisdiction.

justice." *Int'l Shoe*, 326 U.S. at 316. When evaluating whether this jurisdictional element is satisfied in the federal court context, courts evaluate the burden on the defendant, the forum's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the judicial system's interest in obtaining the most effective resolution of controversies, and "the national interest in furthering the policies of the law(s) under which the plaintiff is suing." *Pinker*, 292 F.3d at 370-71. These factors favor the exercise of jurisdiction here. The Commission is the federal agency tasked with insuring the fair and orderly operation of the U.S. securities markets and is authorized to bring actions and obtain relief against those individuals and entities who violate the federal securities laws. As such, the national interest in vindicating the federal securities laws and safeguarding U.S. markets, the judicial system's interest in the convenient and effective resolution of this matter, the forum's interest in adjudicating this dispute and Plaintiff's interest in obtaining convenient and effective relief all favor the exercise of jurisdiction.[5]

### C. The Commission has Properly Served the Defaulting Defendants

As discussed in detail above in Fact Section, Subpart III, "Procedural Status," the Commission served the five Individual Defendants, all of whom are Russian citizens residing in Russia, through alternative means approved by the

---

[5]     Any burden on the Defaulting Defendants to litigating the matter in the United States is far outweighed by the other factors.

Court.  (Docket Nos. 17-18, 20-21.)  The Commission has also served the three

entity defendants, all of which are foreign entities, formed in various overseas

jurisdictions, in accordance with Rule 4, either through service by mailing sent by

the Clerk's Office or through hand delivery on the defendant's registered agent.

(Docket Nos. 27, 29, 33-34, 36, and 37).  The Clerk of Court has entered the

Defaults of the Defaulting Defendants.  (Docket entries dated Feb. 26, 2018 and

Apr. 26, 2018).

## II.    THE COMPLAINT ESTABLISHES THE DEFAULTING
##        DEFENDANTS' LIABILITY

The well-pled allegations of the Complaint establish that the Defaulting

Defendants violated Section 17(a) of the Securities Act; and Section 10(b) of the

Exchange Act, and Rule 10b-5 thereunder.  In addition, the Defaulting Defendants

are also liable pursuant to Section 20(b) of the Exchange Act for violating Section

10(b) of the Exchange Act and Rule 10b-5 thereunder through or by means of the

Hackers and, pursuant to Section 20(e) of the Exchange Act for aiding and abetting

the Hackers' violations of the securities laws.

Section 17(a) of the Securities Act prohibits fraudulent conduct by any

person in the offer or sale of securities, and Section 10(b) of the Exchange Act and

Rule 10b-5 thereunder prohibit fraudulent conduct in connection with the purchase

or sale of a security.  *See United States v. Naftalin*, 441 U.S. 768, 772-73 (1979).

To establish a *prima facie* case under Section 17(a) of the Securities Act, Section

10(b) of the Exchange Act or Rule 10b-5 thereunder, the Commission must establish that the Defaulting Defendants, in the offer, purchase or sale of securities: (i) employed any device, scheme, or artifice to defraud; (ii) made any untrue statement of material fact or omitted to state material facts necessary to make the misstatements not misleading; or (iii) engaged in any transaction, practice, or course of business that operated as a fraud or deceit. *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996); *Graham v. SEC*, 222 F.3d 994, 1000, 1002-03 (D.C. Cir. 2000); *SEC v. Current Fin. Servs.*, 100 F. Supp. 2d 1, 6-7 (D.D.C. 2000). A claim under both of these statutes does not require "'the making of an untrue statement of material fact or omission to state a material fact,'" but may rely on proof of fraudulent conduct or a fraudulent scheme. *Compudyne Corp. v. Shane*, 453 F. Supp. 2d 807, 821 (S.D.N.Y. 2006) (quoting *In re Enron Corp. Secs., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 577 (S.D. Tex. 2002)); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 335 (S.D.N.Y. 2004) ("It is apparent from Rule 10b-5's language and the caselaw interpreting it that a cause of action exists under subsections (a) and (c) for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant."). As described above, the Defaulting Defendants participated in a fraudulent scheme by trading on stolen information. (Compl. ¶¶ 1-10, 73-154.)

The defendant must also act with the requisite intent. To establish a

violation of Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5, the Commission must prove that the defendant acted with *scienter*. *Aaron*, 446 U.S. at 695. *Scienter* has been defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder, 425* U.S. 185, 193 (1976). *Scienter* may be established by showing that the defendant "acted intentionally or recklessly . . . ." *SEC v. Pirate Inv'r L.L.C.*, 580 F.3d 233, 241 (4th Cir. 2009). Sections 17(a)(2) and (3), however, do not require *scienter*; negligent conduct is sufficient for liability. *SEC v. Am. Realty Tr.*, 586 F.2d 1001, 1006 (4th Cir. 1978) (holding that negligence is sufficient for liability under Section 17(a)(2)); *Weiss v. SEC*, 468 F.3d 849, 855 (D.C. Cir. 2006); *SEC v. Milan Grp., Inc.*, 962 F. Supp. 2d 182, 191 (D.D.C. 2013).

The Defaulting Defendants' *scienter* in carrying out their misconduct can be inferred from the factual allegations in the Complaint. (Compl. ¶¶ 1-10, 14-60, 73-154.) *See Valicenti Advisory Servs. v. SEC*, 198 F.3d 62, 65 (2d Cir. 1999) (scienter may be inferred from circumstantial evidence). The Defaulting Defendants perpetrated their fraudulent scheme in connection with the purchase and/or sale or offer for sale of securities. *See SEC v. Zandford*, 535 U.S. 813, 822-23 (2002) (the "in connection with" requirement of Section 10(b) and Rule 10b-5 is satisfied when the fraud and the securities transactions coincide); *Reves v. Ernst & Young*, 494 U.S. 56, 67-68 (1990); *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-

99 (1946).

Therefore, the well-pled allegations in the Complaint independently

establish the Defaulting Defendants' liability under Section 17(a) of the Securities

Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.[6]

## III.   THE DEFAULTING DEFENDANTS ARE CULPABLE, HAVE NO DEFENSE, AND, ABSENT A DEFAULT JUDGMENT, THE COMMISSION WOULD BE PREJUDICED

In evaluating a motion for a default judgment, the Court must also make

---

[6]      The allegations in the complaint establish that the Defaulting Defendants are also liable pursuant to Section 20(b) of the Exchange Act, which makes it "unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person." Here, in addition to their own violations Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, the Defaulting Defendants also violated the Exchange Act "through or by means" of the Hackers. Establishing liability under Section 20(b) of the Exchange Act requires (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation. *Stevens v. InPhonic, Inc.*, 662 F. Supp. 2d 105, 129 (D.D.C. 2009); *In re Fannie Mae Sec. Lit.*, 503 F. Supp. 2d 25, 45 (D.D.C. 2007). Liability under Section 20(b) requires at least reckless conduct and more than "mere negligence." *In re Fannie Mae Sec. Lit.*, 503 F. Supp. 2d at 45. Likewise, the Defaulting Defendants are also liable for aiding and abetting the Hacker's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. A defendant is liable for aiding and abetting a securities law violation under Section 20(e) of the Exchange Act, where: "(1) that a principal committed a primary violation; (2) the aider and abettor provided substantial assistance to the primary violator; and (3) that the aider and abettor had the necessary scienter-*i.e.*, that she rendered such assistance knowingly or recklessly." *Graham*, 222 F.3d at 1000. Accordingly, the Defaulting Defendants are also liable for aiding and abetting. While the Defaulting Defendants are liable for these violations, the remedy for control person liability and aiding and abetting is the same as the remedies available for the Defaulting Defendants' primary violations.

factual findings regarding:  (1) whether the party subject to the default has a

meritorious defense; (2) the prejudice suffered by the party seeking a default

judgment; and (3) the culpability of the party subject to default.  *Maersk*, 2018 WL

3435070, at *1 (citing *Doug Brady, Inc. v. N.J. Bldg. Laborers Statewide Funds*,

250 F.R.D. 171, 177 (D.N.J. 2008)).  Here, all of these considerations favor

granting the motion for default judgment.  The Defaulting Defendants are culpable

and have no defense.  The underlying fraudulent scheme has resulted in two

criminal cases and two civil enforcement actions, naming over 40 defendants.

Four individuals have pled guilty to their involvement in the scheme, and two

others were convicted by a jury of various crimes, including securities fraud.  *See*

*United States v. Dubovoy*, 15-cr-390 (D.N.J.) (MCA); *United States v. Korchevsky*,

15-cr-381 (E.D.N.Y.) (RJD).  Thirteen Defendants have settled the Commission's

civil claims, agreeing to injunctions and to collectively paying over $50 million.

The evidence is ample and, as the Defaulting Defendants have failed to appear,

undisputed.  In addition, this action is the means through which the Commission,

on behalf of the public, can hold the Defaulting Defendants accountable for their

misconduct and obtain relief against them.  Accordingly, absent a default

judgment, the Commission would be unfairly prejudiced.


## IV.   THE COURT SHOULD GRANT THE RELIEF SOUGHT

The Court should issue a final judgment against each of the Defaulting

22

Defendants:  (1) permanently enjoining them from future securities laws

violations; (2) ordering them to pay disgorgement of their ill-gotten gains and

prejudgment interest thereon; and (3) ordering them to pay a civil monetary

penalty of three times their ill-gotten gains.

### A. The Defaulting Defendants Should Be Permanently Enjoined From Future Violations of the Securities Laws.

"The Court is authorized to grant injunctions 'commanding compliance with

the [federal securities] laws and regulations promulgated thereunder.'" *SEC v.*

*China Infrastructure Inv. Corp.*, 189 F. Supp. 3d 118, 132 (D.D.C. 2016) (quoting

*SEC v. Savoy Indus., Inc.*, 665 F.2d 1310, 1217 n.54 (D.C. Cir. 1981)).  *See also*

*SEC v. Bonastia*, 614 F.2d 908, 912 (3d Cir. 1980).  An injunction is appropriate if

the court determines there is a reasonable likelihood that the defendant will violate

the laws again in the future.  *Bonastia*, 614 F.2d at 912; *SEC v. Chester Holdings,*

*Ltd.*, 41 F. Supp. 2d 505, 527 (D.N.J. 1999).[7]  Considerations to this end are: (1)

the degree of the defendant's scienter; (2) whether the infraction was of an isolated

or recurrent nature; (3) defendant's recognition of his or her wrongful conduct; (4)

the sincerity of assurances against future violations; and (5) the likelihood, due to

---

[7]     Unlike private litigants, the Commission need not show risk of irreparable injury, or the unavailability of remedies at law in a request for injunctive relief. *SEC v. Unifund SAL*, 910 F.2d 1028, 1036 (2d Cir. 1990); *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808-09 (2d Cir. 1975) (stating that standards of public interest, not requirements of private litigation, govern Commission requests for injunctive relief).

defendant's professional occupation, that future violations may occur. *See Bonastia*, 614 F.2d at 912; *Chester*, 41 F. Supp. 2d at 527. Permanent injunctions against future violations of the securities laws may be ordered as part of a judgment by default, if a factual basis for that relief exists to meet the above standard. *See Bonastia*, 614 F.2d at 912; *SEC v. Farkas*, 557 F. App'x 204, 207 (4th Cir. Feb. 11, 2014) (*per curiam*) (citing *SEC v. Bonastia*, 614 F.2d at 912); *SEC v. Bilzerian*, 29 F.3d 689, 695 (D.C. Cir. 1994); *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 814 (2d Cir. 1975); *SEC v. Cole*, 2014 U.S. Dist. LEXIS 133739, at *17-21 (S.D.N.Y. Sept. 22, 2014); *SEC v. One Or More Unknown Traders in the Common Stock of Certain Issuers*, 825 F. Supp. 2d 26, 34-35 (D.D.C. 2010) (granting injunction and other relief in context of a default judgment).

All of these factors weigh in favor of imposing an injunction against the Defaulting Defendants. As set forth in the Complaint, they are liable for illegal conduct and acted with a high degree of scienter. *See, e.g., SEC v. Colonial Inv. Mgmt. L.L.C.*, 381 F. App'x 27, 31-32 (2d Cir. 2010) (issuing injunction where defendants acted with a high degree of *scienter* and attempted to mask their violation of the federal securities laws). Their fraud was neither an accident, nor an isolated occurrence. They engaged in a massive fraudulent scheme over a period of years. The collectively made over 275 illegal trades, and collectively

24

realized gross profits of approximately $19.36 million.  (*See* Canjels Decl. at

¶¶ 10-13.)  They showed no respect for the law or the integrity of the U.S.

securities markets.  Moreover, the Defaulting Defendants have not appeared in this

case and have not taken responsibility for their violations of the federal securities

laws.  And, while the Defaulting Defendants' occupations are unknown, their

involvement in this massive scheme makes it likely that future violations may

occur.

Accordingly, the Commission respectfully requests that the Court enjoin the

Defaulting Defendants from future violations of Section 17(a) of the Securities Act

and Section 10(b) of the Exchange Act.

## B. The Defaulting Defendants Should be Ordered to pay Disgorgement and Prejudgment Interest

The Commission requests that the Court also hold the Defaulting Defendants

liable for disgorgement of their ill-gotten gains.  "'Disgorgement is an equitable

remedy designed to deprive a wrongdoer of his unjust enrichment and to deter

others from violation of the securities laws.'"  *SEC v. Hughes Capital Corp*., 124

F.3d 449, 455 (3d Cir. 1997) (quoting *SEC v. First City Fin. Corp., Ltd*., 890 F.2d

1215, 1230 (D.C. Cir. 1989)).  It has long been recognized that "[t]he deterrent

effect of an SEC enforcement action would be greatly undermined if securities law

violators were not required to disgorge illicit profits."  *SEC v. First Jersey Sec.,

Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996) (citations omitted).  Courts have

recognized that it is a proper exercise of a court's equitable powers to order disgorgement and prejudgment interest as remedies "[t]o prevent unjust enrichment and to deter others from violating the securities laws." *SEC v. Abacus Int'l Holding Corp.*, No. C 99-02191, 2001 U.S. Dist. Lexis 12635, at *12 (N.D. Cal. Aug. 16. 2001) (citing *SEC v. Clark*, 915 F.2d 439, 453 (9th Cir. 1990)). All of the conduct at issue and on which the requested disgorgement is based occurred within the five years preceding filing of the Complaint. *Kokesh v. SEC*, 137 S. Ct. 1635, 1644 (2017).

The Commission is not required to establish the disgorgement amount with certainty; rather the Commission need only show a "'reasonable approximation of profits causally related to the violation.'" *SEC v. Whittemore*, 659 F.3d 1, 7 (D.C. Cir. 2011) (quoting *First City*, 890 F.2d at 1230-31). The burden then shifts to the defendant, who must show why the SEC's calculation "was not a reasonable approximation." *Whittemore*, 659 F.3d at 7. "Any risk of uncertainty as to the amount of ill-gotten gains appropriately 'fall[s] on the wrongdoer whose illegal conduct created that uncertainty.'" *SEC v. E-Smart Techs., Inc.*, 139 F. Supp. 3d 170, 183 (D.D.C. 2015) (quoting *First City*, 890 F.2d at 1232)).

Here, the requested disgorgement consists of the gross profits made by the Defaulting Defendants on their illicit trades. As set forth in the Canjels Declaration, ¶¶ 10-13 and Tables 1 and 2A-2D, the Defaulting Defendants ill-

26

gotten gains are:

1.  Zavodchikov and Extra Trading:  $2,120,618;

2.  Bokarev, Panko, and Green Road:  $3,161,160;

3.  Alepko and Solar Line:  $4,426,507; and

4.  Maslov:  $9,653,814.

The Commission submits that the Individual Defendants should be held jointly and severally liable with the entities that they controlled.  As a result, Maslov should be liable for the ill-gotten gains realized by his entity, Tarek Investors.

In addition, the Defaulting Defendants should be required to pay prejudgment interest on the disgorgement amount.  "Awarding prejudgment interest deprives defendant of the time value of his ill-gotten gains and is a proper exercise of judicial discretion in Commission cases."  *See SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998); *SEC v. Sargent*, 329 F.3d 34, 40 (1st Cir. 2003) (award of pre-judgment interest prevents defendant from profiting from illegal conduct). Requiring one who violates the federal securities laws to pay prejudgment interest "prevents a defendant from obtaining the benefit of 'what amounts to an interest free loan procured as a result of illegal activity.'"  *SEC v. Robinson*, No. 00 Civ.7452 RMB AJP, 2002 U.S. Dist. Lexis 12811, at *9 (S.D.N.Y. July 16, 2002). To the extent the Defaulting Defendants' assets were frozen, the value of those

assets were excluded from the prejudgment interest calculation from the date they were frozen.  *See SEC v. Razmilovic*, 738 F.3d 14, 36-38 (2d Cir. 2013).

The Commission's standard practice—which courts routinely adopt—is to seek prejudgment interest on defendant's disgorgement obligation calculated in the same manner that the Internal Revenue Service uses to calculate tax underpayments under 26 U.S.C. § 6621(a)(2).  *See SEC v. U.S. Funding Corp.*, Civ. No. 02-2089, 2006 U.S. Dist. LEXIS 24789, at *22 (D.N.J. Apr. 11, 2006); *First Jersey Sec., Inc.*, 101 F.3d at 1476; *SEC v. Antar*, 97 F. Supp. 2d 576, 588 (D.N.J. 2000) (citing cases).  Using this methodology, as set forth in the Donnelly Declaration, ¶¶ 16-23 and Exhibits 1-4 thereto, the Commission requests that the Court Order the Defaulting Defendants to pay prejudgment interest as follows:

1.  Zavodchikov and Extra Trading:  $69,889.75;

2.  Bokarev, Panko, and Green Road:  $145,369.75;

3.  Alepko and Solar Line:  $344,030.60; and

4.  Maslov:  $571,246.31.

The Commission respectfully submits that this calculation, the Canjels Declaration and attachments thereto, the Donnelly Declaration and the attachments thereto, and the court record are sufficient factual bases for the Court to determine the disgorgement amount without the need for an inquest or evidentiary hearing. *See Fustok v. Conticommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989) (finding

a hearing to determine damages specified in default judgment unnecessary when district court relied upon documentary evidence and personal knowledge of the record); *China Infrastructure*, 189 F. Supp. 3d at 132 (concluding that the complaint, declaration and exhibits were sufficient to determine relief without a hearing).

### C. The Court Should Order the Defaulting Defendants to pay a Civil Penalty of Three Times Their Ill-gotten Gains

The Court should impose treble penalties on the Defaulting Defendants pursuant to Section 21A of the Exchange Act.  Section 21A applies "[w]hever it shall appear to the Commission that any person has violated any provision of this title or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information in . . . a transaction on or through the facilities of a national securities exchange . . . ."  15 U.S.C. § 78u-1(a)(1). Under such circumstances, the Commission "may bring an action in United States district court to seek, and the court shall have jurisdiction to impose, a civil penalty to be paid by the person who committed such violation[.]"  *Id*. § 78u-1(a)(1)(A). The amount of penalty to be imposed on the violator "shall be determined by the court in light of the facts and circumstances, but shall not exceed three times the profit gained or loss avoided as a result of such unlawful purchase, sale, or communication."  *Id*. § 78u-1(a)(2).

Under Section 21A, a civil monetary penalty of three times the Defaulting

Defendants' ill-gotten gains would result in the following penalties:

a. Defendants Zavodchikov and Extra Trading Company are jointly and
   severally liable for a monetary penalty of $6,361,854

b. Defendants Bokarev, Panko, and Green Road Corp. are jointly and
   severally liable for a monetary penalty of $9,483480;

c. Defendants Alepko and Solar Line Inc. are jointly and severally liable for
   a monetary penalty of $13,279,521; and

d. Defendant Maslov is liable for a monetary penalty of $28,961,442.

While this case is not a typical case involving trading on material nonpublic

information, on its face, Section 21A applies to the claims here because the

Defaulting Defendants violated the Exchange Act and bought and sold securities

while in possession of material nonpublic information. *See SEC v. Hong*, No. 16-

cv-9947 (S.D.N.Y.), Docket No. 33, at ¶¶ 10-11 (granting the Commission's

motion for a default judgment and ordered the defendants to pay a civil penalty of

three times their ill-gotten gains where defendants hacked into the computer

networks of two law firms and stole, through deception, confidential information

concerning several public traded companies that were engaged in merger and

acquisition discussions; and successfully traded on that information); Donnelly

Decl. at ¶ 24 and Exhibit 5 (attaching a true and correct copy of the Order granting

the SEC's motion for default judgment in *Hong*).[8]

## CONCLUSION

For the reasons stated above, the Commission respectfully requests that this

Court grant the Commission's motion and issue an order in the form filed

herewith:

(1) permanently restraining and enjoining the Defaulting Defendants and

their agents, servants, employees, attorneys, and all persons in active concert or

---

[8]     If the Court concludes that Section 21A does not apply to the conduct at issue here, then the Court should order the Defaulting Defendants to pay a civil penalty pursuant to Section 20(d) of the Exchange Act. *See SEC v. Rosenthal*, 650 F.3d 156 (2d Cir. 2011) (explaining that Section 20(d) applies to violations of the Exchange Act "other than by committing a violation subject to a penalty pursuant to [Section 21A]"). Under the three-tier rubric of Section 20(d), the Defaulting Defendants would be subject to a third-tier penalty. The Court has the discretion to order a monetary penalty up to the greater of defendants' gross ill-gotten gains or the maximum penalty amount per violation. The maximum third-tier penalty for individuals during the period March 4, 2009 to March 5, 2013 was $150,000 per violation. That amount increased to $160,000 per violation during the period March 6, 2013 to November 2, 2015. The maximum third-tier penalty for an entity defendant during the period March 4, 2009 to March 5, 2013 was $725,000 per violation. That amount increased to $775,000 for the period March 6, 2013 to November 2, 2015. Each illegal trade constitutes a violation of the Exchange Act. As set forth in the Canjels' Declaration, each of the Defaulting Defendants placed tens of illegal trades. (*See* Canjels' Dec. ¶¶ 10-13 and Table 1). The maximum third-tier penalties for the Defaulting Defendants under Section 20(d) would be: (1) Zavodchikov: $8,210,000; (2) Extra Trading Company: $39,700,000; (3) Bokarev: $11,830,000;(4) Panko: $11,830,000; (5) Green Road: $57,200,000; (6) Alepko: $9,180,000; (7) Solar Line: $44,400,000; and (8) Maslov: $13,050,000. For many of the Defaulting Defendants the maximum third-tier penalty under 20(d) exceeds the requested penalty under 21A.

participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder;

(2) ordering the Defaulting Defendants to disgorge their ill-gotten gains, together with prejudgment interest, derived from the activities set forth in this Complaint; and

(3) ordering the Defaulting Defendants to each pay a civil penalty of three times their ill-gotten gains pursuant to Section 21A of the Exchange Act.  [15 U.S.C. § 78u-1]; and

(4) that the asset freeze shall previously ordered by this Court in the Temporary Restraining Order issued on February 17, 2016 (Docket No. 5) and in the Preliminary Injunction issued on February 29, 2016 (Docket No. 10) shall be lifted for the limited purpose of the assets, up to the amount owed under this Order, being transferred to an account, or through other means, designated by the Commission.

Respectfully submitted,

By:   <u>/s John Donnelly</u>
       John Donnelly, Esq.


       Attorneys for Plaintiff
       U.S. Securities and Exchange Commission
       Philadelphia Regional Office
       1617 JFK Boulevard, Suite 520
       Philadelphia, PA  19103
       Tel:  (215) 597-3100
       Fax:  (215) 597-2740
       DonnellyJ@sec.gov

Dated: December 4, 2018